**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

_____

DANIEL LUKE SCHWARTZ,

                       Petitioner,                           Case No. 20-CV-1028

        -vs-

SHARON ROSE HINNENDAEL,

                       Respondent.

_____

**RESPONDENT'S TRIAL BRIEF AND MOTION TO DISMISS
PURSUANT TO THE HAGUE CONVENTION**

_____

## I.      INTRODUCTION

This matter is before the Court for the Eastern District of Wisconsin, Green Bay Division,

on the Petitioner's, Daniel Luke Schwartz ("Danny") Petition for Issuance of a Show Cause

Order and For Return of Children to the United States of Mexico ("Petition") filed with the Court

on July 8, 2020. (ECF No. 1). The Petition is brought pursuant to the Hague Convention on the

Civil Aspects of International Child Abduction ("Hague Convention" or "Convention") as

implemented by the International Child Abduction Remedies Act ("ICARA" or "Act"), 22

U.S.C. §§ 9001 et seq.

## II.      PROCEDURAL HISTORY

In the Petition, Danny seeks the return of two children, Henry Herman Schwartz

("Henry"), d.o.b. June 19, 2018, and Alice Judith Schwartz[sic] ("Alice"), d.o.b. March 10,

2020, from the United States to Mexico pursuant to the Hague Convention. *(ECF No. 1, ¶¶1 &*

*7).* The Respondent, Sharon Rose Hinnendael ("Sharon") filed an Answer and Affirmative

Defenses on July 31, 2020, denying having taken any wrongful action. *(ECF No. 22)*. Sharon alleged that the minor children were not habitual residents of Mexico and that Danny consented and acquiesced to Henry and Alice coming to the United States. *(ECF No. 22)*. Sharon further alleged that to return Henry and Alice to Mexico would create a grave risk that they would suffer some physical or psychological harm or otherwise place the children in an intolerable situation. *(ECF No. 22)*. The Court conducted evidentiary hearings on September 10, 2020 and September 15, 2020 and ordered briefing by both parties related to the evidence entered into the record, thus far. On September 15, 2020 the parties stipulated, on the record to the admissibility of all exhibits marked by both parties, and the Court admitted the same into evidence at the conclusion of testimony on that date. On September 16, 2020, the Court issued an order denying Danny's Motion to Exclude Sharon's expert witness, Dr. Alan Jaffe, from testifying and scheduled Dr. Jaffe's testimony to be heard subsequent to briefing, on October 9, 2020. *(ECF No. 60)*.

III. **FACTS**

Both Danny and Sharon are United States Citizens. *(ECF No. 1, ¶¶5 & 6)*. Danny was born on October 6, 1987 *(ECF No. 1 ¶5)* in Pasadena, California. *(Resp. Tr. Ex. 1010, See Privacy Act Waiver signed by Danny confirming the same)*. Sharon was born on May 22, 1986 *(ECF No. 1, ¶6)* in Appleton, Wisconsin. *(Resp. Tr. Ex. 1010, Sharon's birth certificate as part of Henry's passport application)*. Danny grew up in Pasadena, California and attended and graduated from Denison University in Ohio. *(Sept. 10, 2020 Tr. Trans., p. 105:11 & 17)*. Sharon grew up in Green Bay, Wisconsin and attended and graduated from Notre Dame Academy High School in Green Bay, Wisconsin. *(Sept. 10, 2020 Tr. Trans., p. 215:22-25)*. Danny's parents and family currently reside in Pasadena, California. *(ECF No. 23, ¶6; Sept. 10,*

2

*2020 Tr. Trans. p. 238:9-11; p. 76:19-24; p. 105:2-3).* Sharon's parents currently reside in Sister Bay, Wisconsin. *(Sept. 10, 2020 Tr. Trans., p. 216:3-5).*

The parties were married in Glendale, California on April 19, 2014. *(ECF No. 1, ¶8; Resp. Tr. Ex. 1001).* Sharon filed for divorce from Danny in Los Angeles County, California on November 25, 2014, only eight (8) months after their wedding date. *(Resp. Tr. Ex. 1002).* Sharon's correspondence with her California divorce attorney in 2014 showed proof that in 2014 Sharon considered filing a restraining order against Danny due to harassing behaviors and from fear of his substance abuse. *(Resp. Tr. Ex. 1003; Sept. 10, 2020 Tr. Trans., p. 216:19-25; p. 217:1-8).* Shortly after filing for divorce in 2014, Sharon moved back to Wisconsin and consulted with an OB-GYN in Green Bay who Sharon confided in that Danny had sexually and verbally abused her. *(Resp. Tr. Ex. 1004; Sept. 10, 2020 Tr. Trans., p. 218:7-25).*

On June 26, 2015, Sharon moved to Puerto Penasco, Mexico for personal safety reasons due to Danny's continued harassment and substance abuse, as well as, to begin employment at Vida Vacations. *(ECF No. 23, ¶21; Resp. Tr. Ex's. 1005 & 1006).* Danny followed Sharon to Mexico and promised to refrain from domestic harassment and substance abuse if she agreed to reconcile. *(ECF No. 23, ¶22; Resp. Tr. Ex 1007).* The parties reconciled and had a non-legal wedding celebration in Puerto Penasco, Mexico inviting their families from the United States to attend. *(Sept. 10, 2020 Tr. Trans. p. 89:4-12).* Shortly after the Mexican wedding celebration, the Los Angeles County divorce action was dismissed on September 4, 2018 due to inactivity. *(Resp. Tr. Ex.1002).*

On June 19, 2018, the parties' son Henry was born in Mexico. *(Resp. Tr. Ex. 1009).* The hospital issued a birth certificate for Henry which contained Henry's footprint and which only listed Sharon as Henry's parent. *(Resp. Tr. Ex. 1009).* On August 15, 2018 the parties moved to

3

a rental property located at 100 Lomas Del Sol Bahia De Banderas, Nayarit Mexico. *(September 15, 2020 Tr. Trans. p. 275:12-22).* On August 27, 2018 a Consular Report of Birth Abroad of a Citizen of the United States of America was issued for Henry listing both Danny and Sharon as his parents. *(Resp. Tr. Ex. 1009).* Together, the parties submitted an application for Henry's United States Passport on or about June 8, 2018. *(Sept. 10, 2020 Tr. Trans. p. 106:16-25; p. 108:1-3; Resp. Tr. Ex. 1010).* On August 24, 2018, a United States Passport was issued to Henry Herman Schwartz confirming Henry as a citizen of the United States of America. *(Resp. Tr. Ex. 1011).* Shortly after the issuance of Henry's United States Passport, Henry began traveling to the United States a total of nine (9) times, from September 6, 2018 through January 3, 2020, to visit the parties' families, all of whom resided in the United States, and to celebrate family weddings, birthdays, etc. *(Resp. Tr. Ex.'s 1012-1020).*

On March 10, 2020 Alice was born in Mexico. *(Resp. Tr. Ex. 1083).* The hospital issued a birth certificate for Alice which contained Alice's footprint and which only listed Sharon as Alice's parent. *(Resp. Tr. Ex. 1083).* On June 11, 2020, Sharon was issued a Mexican Restraining Order against Danny. *(Resp. Tr. Ex. 1083).* On June 12, 2020 Alice was issued a Mexican birth certificate in the name of "Alice Judith Hinnendael" based upon the information provided to the Mexican authorities by Sharon, including Alice's hospital birth certificate and the parties' California Marriage License. *(Resp. Tr. Ex. 1078).* On June 16, 2020 a United States Passport was issued to "Alice Judith Hinnendael" confirming Alice as a citizen of the United States of America. *(Resp. Tr. Ex. 1082).* It was Sharon's understanding that Alice's United States passport was issued under exigent circumstances pursuant to 22 C.F.R. Section 51.28(5)(i)(iii) and 22 C.F.R. Section 213 (b). *(September 10, 2020 Tr. Trans. p. 37:24-25; p.*

4

*38:1-25; p. 39:1-5; and, Resp. Tr. Ex.'s 1080 & 1081).* Sharon, Henry and Alice flew to the

United States on June 17, 2020 and reside in Sister Bay, Wisconsin. *(ECF No. 23 ¶45).*

## IV.    DANNY HAS FAILED TO SHOW BY A PREPONDERANCE OF EVIDENCE THAT MEXICO WAS THE CHILDRENS' HABITUAL RESIDENCE IMMEDIATELY PRIOR TO LEAVING FOR THE UNITED STATES

The Convention, as implemented by ICARA, establishes legal rights and procedures for

the return of children from one signatory country to the other. Abbot v. Abbott, 560 U.S. 1, 130

S. Ct. 1983 (2010). When Convention issues arise United States district courts have concurrent

original jurisdiction over such actions. 22 U.S.C.A. § 9003(a). Moreover, venue is proper under

28 U.S.C.A § 1391(b) in the federal district where a substantial part of the events giving rise to

an ICARA claim occurred. 28 U.S.C.A § 1391(b). If jurisdiction and venue are established,

courts are vested with the authority to decide choice of forum for resolving the underlying child

custody dispute. 22 U.S.C.A. § 9001(b)(4); 22 U.S.C.A. § 9003. ICARA prohibits courts from

making a final determination as to the child's custody. 22 U.S.C.A. § 9001(b)(4).

For an ICARA claim, a petitioner bears the burden of establishing a child was wrongfully

removed or retained within the meaning of Article 3 of the Convention. 22 U.S.C.A. § 9003(e).

Pursuant to Foster v. Foster, petitioner must establish by a preponderance of the evidence that:

1)      the child was habitually residing in the other State;

2)      the removal or retention of the child constituted a breach of custody rights

attributed by the law of that State; and

3)      the applicant was exercising those rights at the time of wrongful removal.

*See* Foster v. Foster, 429 F.Supp.3d 589,604 (W.D. Wis. 2019). To establish a prima facie case,

Danny must demonstrate that the minor children, Henry and Alice, were habitual residents of

Mexico. *See* Norinder v. Fuentes, 657 F.3d 526, 533 (7th Cir. 2011). Norinder directs us that,

5

"the first step for a court considering a [Hague] petition is to determine the child's habitual residence." Id. Habitual residence is determined at the point in time "immediately before the removal or retention." Hague Convention, supra note 2, art. 3(a).

Monasky holds that locating a child's home is a fact-driven inquiry and as result, directs courts to be "sensitive to the unique circumstances of the case and informed by common sense." Monasky v. Talieri, ___ U.S. ___, 140 S.Ct. 719, 206 L.Ed.2d 9 (S.Ct. 2020). The Monasky court also directs that, "the inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case." Monasky, 140 S.Ct. at 727. In a footnote the Monasky court lists factors the courts should consider in determining habitual residency:

> Facts courts have considered include: "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings." Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015).

Id. at 727.

### A.    Intent of the Parents

The Convention does not define the term "habitual residence." See Norinder, 657 F.3d at 533-34. For young children, the Seventh Circuit instructs that the proper focus is on the intent of the parents, rather than on the children's acclimatization. See Koch v. Koch, 450 F.3d 703, 713 (2006). "Parental intent acts as a surrogate for that of children who have not yet reached a stage in their development where they are deemed capable of making autonomous decision as to their residence." Mozes v. Mozes, 239 F.3d 1067, 1076 (9th Cir. 2001). The petitioner carries the burden to prove this shared intent by a preponderance of the evidence. Foster, 429 F. Supp.

at 606; see also 22 U.S.C. Section 9003(e)(1)(A).  Koch instructs us that when parents no longer

agree on where children's habitual residence has been fixed, the court should examine "all

available evidence" and that the court "should look at actions as well as declarations".  Koch,

450 F.3d at 713, 715 (quoting Gitter v. Gitter, 396 F.3d 124, 134 (2d Cir. 2005).

In this case, substantial evidence shows that Danny and Sharon did not agree on Mexico

as their settled home for the children.  Danny, by his own admission on direct examination,

stated, "The first couple of years of our marriage I begged to move back to the States for our

families, and Sharon said there's no way she'd ever live in the United States again."  *(September

10, 2020 Tr. Trans. p. 84:22-24).*  On cross examination Danny further elaborated:

> Q:     Mr. Schwartz, it's your testimony that you begged Sharon to move back to the
>        United States.  True"
>
> A:     False.  Oh, sorry, yes.  True.  True.
>
> Q:     Because you wanted to go back to the United States, right?
>
> A:     I wanted to be around my family.  And in the first few years of our being in
>        Mexico it wasn't as lucrative as it has been in the most previous few.
>
> Q:     And you wanted to be near your family in Pasadena, correct?
>
> A:     Yes, sir.
>
> Q:     And your family is in New York?  That's also correct, isn't it Mr. Schwartz?
>
> A.     Yes, sir.
>
> Q:     And you wanted to see your friends and your family.  True?
>
> A:     More so I wanted to raise our children around our family.
>
> Q:     And that would be the United States.  True?
>
> A:     At the time, yes.

*(See September 10, 2020 Tr. Trans. p. 104:20-25; p. 105:1-10).*

7

Sharon testified, when called adversely, that on multiple occasions throughout the parties' marriage that she and Danny discussed living places other than Mexico with the children. *(September 10, 2020 Tr. Trans. p. 25:6)*. Mr. Cade specifically asked Sharon, "Let's turn for a moment to leaving Mexico. Did you and Mr. Schwartz have discussion about leaving Mexico?" (September 10, 2020 Tr. Trans. p. 25). Sharon testified that:

A:    There were always conversations about moving back to either Los Angeles or Wisconsin or [Indiscernible] – with the children.

Q:    I asked what was discussed. What was in those conversations? Can you be specific? You're giving me a generality, there was always discussions. What was specifically discussed?

A:    Well, we discussed what Danny would do for work, because he had a job offer in Los Angeles at one point and had an interview with a guy who was some guy that he had interviewed with years ago. And then we discussed me modeling and acting again which I could do in the States and couldn't do in Mexico. And we discussed New York where I had an agency there for modeling and acting; or Chicago to be close to family so that they could help with the children and they would grow up knowing their cousins.

Q:    I'm sorry, I thought you were done.

A:    No. We discussed school systems – and [Indiscernible]. Yeah, sorry, I'm done.

*(September 10, 2020 Tr. Trans. p. 25:6-25; p. 26:1-4).*

Danny testified that he and Sharon separated on May 6, 2020, and that he moved out of the rented marital home located in Nayarit, Mexico, to an apartment on the beach. *(September 10, 2020 Tr. Trans. p. 99:16-25)*. In fact, after Danny moved out of the family home, he agreed that he and Sharon had conversations where Danny specifically told Sharon to move back to Wisconsin with the children. *(September 10, 2020 Tr. Trans. p. 101:7-11)*. Additionally, Sharon's Trial Exhibit 1071 is an audio recording of a conversation between Danny and Sharon where they discuss Sharon and the children going to Wisconsin and Danny specifically tells her, "I think you should go back, because you're really freaking out. So I don't want to watch that,

that's for sure. Yeah. Have your parents book the flight. So I'll pay for the passport, or I'll pay for the flights." *(Resp. Tr. Ex. 1071).* In the same discussion, Sharon told Danny that Wisconsin was the safest place for the children in every possible way and during the same conversation, Danny did not dispute that fact. *(Resp. Tr. Ex. 1071).*

Sharon testified that Danny's abuse and drug use grew worse after the children were born, but "especially after the birth of Alice." *(September 10, 2020 Tr. Trans. p. 219:18-25).* Sharon testified to a series of cumulative events immediately before and shortly after Alice's birth that confirmed to Sharon that Danny's wish to move back to the United States was the correct decision for the children. The cumulative events included an April 8, 2020 video of Danny dancing around the parties' kitchen high saying he's going to kill someone *(Res. Tr. Ex. 1041)*; Danny's drug dealer friends coming to the marital home in Mexico after Danny moved out looking for money from Danny *(September 10, 2020 Tr. Trans. p. 219:24-25; p. 220:1-2)*; a car accident caused by Danny where Danny told Sharon that he paid off the police *(Resp. Tr. Ex.'s 1067 & 1068; September 10, 2020 Tr. Trans. p. 220:3-21, p. 222:10-18)*; a voicemail message from the parties' marriage counselor, Dr. Alexa Thurman, to Sharon warning her that Danny was "completely raged" and "unstable" *(September 10, 2020 Tr. Trans. p. 2-25; Resp. Tr. Ex. 1028)*; a video recording of Danny stating he knew where a gun was *(Resp. Tr. Ex. 1040)*; and a voice mail message from Danny's own mother, Mary Beth Evans, in May of 2020, after Danny had moved out of the marital home, telling Sharon that she wished Danny was "just a normal guy and enjoyed his family and loved those beautiful kids and you, but I can't control it" *(Resp. Tr. Ex. 1066; September 10, 2020 Tr. Trans. p. 237 & 238:2-10).* Sharon testified that as a result of the cumulative series of events she wanted Henry and Alice to be safe and living in Wisconsin. *(September 10, 2020 Tr. Trans. p. 13:13-19).* Coupled with the verbal abuse by

9

Danny in front of the children, similar to the verbal abuse this court heard when FaceTime recordings were played during trial *(Resp. Tr. Ex. 1036 & 1039)*, Sharon lived in a state of fear. To protect herself and the children she obtained a Mexican Restraining Order on June 11, 2020. *(Resp. Tr. Ex. 1077; September 10, 2020 Tr. Trans. p. 240:2-13).*

During Danny's case in chief, he presented no evidence to support Mexico as the habitual residence of Henry and Alice immediately prior to them leaving for the United States. *(September 10, 2020 Tr. Trans. pp. 81-104).* What Danny did testify to, however, was the fact that when they first moved to Mexico, Sharon thought she was fulfilling a lifelong dream. *(September 10, 2020 Tr. Trans. p. 90:12-13).* Whether or not Sharon loved Mexico pre-children and wrote about it in a silly marketing promotion in 2015 is a non-issue with respect to Danny's burden of proof immediately prior to the children leaving Mexico. When asked by Mr. Podell on direct examination whether Sharon ever told him, "I'm moving to Wisconsin or California, New York or anywhere else" Danny answered, "no". *(September 10, 2020 Tr. Trans. p. 100:15-17).* However, just earlier in his direct testimony Danny specifically told Mr. Podell that Sharon reiterated to him over and over during the Covid-19 pandemic that she was adamant about getting out of Mexico with the children, and it would be safer . . . to go to the States. *(September 10, 2020 Tr. Trans. p. 84:9-15).* Sharon presented an audio recording of Danny, in his own words, telling Sharon to move to Wisconsin with the children and that he will put their things in storage and maybe move to L.A. himself. *(Resp. Tr. Ex. 1071).* Danny's own testimony contradicts itself, where in one instance he claims that he and Sharon never had discussions of where the children should live, but then in another he testifies that they did.

The parties had no "settled intention" or "shared intent" to make Mexico the habitual residence of the children. The evidence presented by Danny in this regard falls short of proving

10

by a preponderance of the evidence that both he and Sharon agreed upon raising their children in Mexico. If anything, the evidence shows that Danny wanted to move the children back to the States to be with family, and Sharon agreed.

**B.     Acclimatization**

Absent proof of a shared intent to make Mexico Henry and Alice's settled home, the court can consider whether the children had been acclimatized to life in Mexico. <u>Holder v. Holder</u>, 392 F.3d 1009, 1019 (9th Cir. 2011). <u>Holder</u> tells us that acclimatization is not necessarily whether the children "can count to ten in German but more generally whether the children's lives have become firmly rooted in their new surroundings." <u>Id</u>. The courts have made it clear that the place of birth is not automatically the child's habitual residence. <u>Delvoye v. Lee</u>, 329 F.3d 330, 334 (3rd Cir.) cert. denied 540 U.S. 967, 124 S.Ct. 436, 157 L.Ed.2d 312 (2003). <u>Holder</u> specifically declined to delineate whether there are circumstances under which an infant can acquire a new habitual residence in the absence of shared parental intent. <u>Holder</u> at 1021. As such, both <u>Mozes</u> and <u>Monasky</u> require that the court looks beyond the representations of the parties and consider "all available evidence." See <u>Mozes</u>, 239 F.3d at 1076 and <u>Monasky</u> 140 S.Ct. at 727.

Evidence in this case supports a finding that neither Sharon nor Danny intended to abandon the United States as their habitual residence and that due to the children's ages, among other facts, Henry and Alice did not acclimatize to Mexico. The evidence is undisputed that neither Sharon nor Danny took steps to obtain Mexican passports for either themselves or the children, who by default of being born in Mexico clearly were eligible for Mexican passports. *(September 10, 2020 Tr. Trans. p. 64:4-25; p. 65:4-11).* Danny admitted during direct testimony that he does not have a Mexican passport, "I am a permanent resident . . . I have a permanent

resident card. I am a permanent resident." *(September 10, 2020 Tr. Trans. p. 105:24-25; p. 108:3-4).* In fact, Danny, Sharon and the children all have passports issued by the United States of America. *(September 15, 2020 Tr. Trans. p. 279:2-12).*

Sharon testified that she had a work visa when she was employed, but when she was no longer working in Mexico that her employer immediately took back her work visa. *(September 10, 2020 Tr. Trans. p. 62:17-25, p. 63:1-16).* Danny confirmed this fact in his direct testimony when answering Mr. Podell he stated, "Okay. So in Mexico in order to have a bank account with your name on it you either have to have a work visa or a permanent residence card . . .Sharon did not do that. And when her temporary resident card expired, she was not eligible." *(September 15, 2020 Tr. Trans. p. 355:11-17).* Prior to the removal of the children Sharon was living in Mexico only on a tourist visa, which based upon her understanding, required that she return to the United States every six (6) months. *(September 10, 2020 Tr. Trans. p. 63:9-16; see also Resp. Tr. Ex. 1113 Sharon's Mexican Official Entry Tourist Card).* As such, even if Sharon intended to stay in Mexico indefinitely, she would not have been able to legally do so.

Upon information and belief and based upon Danny's own Petition he was furloughed by his employer during the Covid-19 pandemic. *(ECF No. 1, ¶14).* Additionally, during a taped conversation with Sharon in March, regarding his job, Danny said that "my mother took a look at it and it sounds like a resignation letter with no income whatsoever with no return date." *(Resp. Tr. Ex. 1071).* Also, Danny's May 7, 2000 messaging with the parties' friend Haroon, supports the proposition that Danny is no longer working: "but not working and being a full time stay at home dad has fucked me up." *(Resp. Tr. Ex. 1091).* While Danny's Petition indicated he was furloughed he gave differing testimony at trial by stating, "first of all, I didn't get laid off," "I

never got laid off.*" (September 10, 2020 Tr. Trans. p. 144:24-25; p. 145:1).* Danny's testimony as to his current employment in Mexico is simply not credible. If Danny no longer has a job, this fact alone casts doubt on whether he would be allowed to remain in Mexico indefinitely, even if he wished to. See Koch, 450 F.3d at 534 (noting that the father "obtained a three-year renewable work permit, the longest permit available" in Germany; also noting that there was no evidence that the parties sought legal status for the mother, a German citizen, in the United States).

The evidence also strongly cuts against finding that Danny and Sharon ever shared an intent to abandon their residency in the United States. Specifically, Sharon testified that Danny has a valid California driver's license *(Resp. Tr. Ex. 1110)* and that she did as well until recently when she obtained a Wisconsin Driver's license. *(Resp. Tr. Ex. 1111; September 15, 2020 Tr. Trans. p. 270:2-25).* There was no evidence produced to show that either party ever obtained a Mexican driver's license. The parties never owned real estate in Mexico. *(September 10, 2020 Tr. Trans. p. 249:15-23).* Based upon Sharon's un-contradicted testimony the lease to the property they were renting together as a family in Nayarit, Mexico ended on August 15, 2020. *(September 15, 2020 Tr. Trans. p. 276:1-10).* Danny's own Mexican divorce petition which he filed with this court alleges that the parties own no assets or property in Mexico. *(ECF No. 18).* Danny did not challenge Sharon's testimony that she had no reason to disagree with Danny's allegation as to lack of assets and property in Mexico. *(September 15, 2020 Tr. Trans. p. 274:6-25; p. 275 :1-7).* Danny did not contradict Sharon's testimony that throughout the time the parties lived in Mexico that they maintained a joint bank account through Bank of America in the United States. *(September 15, 2020 Tr. Trans. p. 276:11-24).* Danny did not contradict Sharon's testimony that she continued to file United States Federal and State tax returns for tax years 2015 through 2018 while living in Mexico and the only reason she did not file in 2019 was that she did

not earn enough income to do so. *(September 15 2020 Tr. Trans. p. 278:3-19).* Sharon testified that she was not fluent in Spanish and, due to their young ages, neither were Henry and Alice. *(September 10, 2020 Tr. Trans. p. 80:1-25; September Tr. Trans. p. 269:3-20; p. 268:12-25).* Sharon's un-contradicted testimony was that while Danny had American work friends he socialized with, she was mainly focused on staying at home and taking care of the children without a similar social outlet. *(September 15, 2020 Tr. Trans. p. 281:1-10).* Sharon's un-contradicted testimony was that Henry traveled extensively with both she and Danny in the first 18 months of his life away from Mexico and to the United States to visit family. *(Resp. Trl Ex's 12-21; September 10, 2020 Tr. Trans. p. 68:23-25).* In fact, Henry's passport, at not even two years of age, had more stamps on it to and from the United States than the average adult does in a lifetime. *(Resp. Tr. Ex. 1011).* Sharon's allegations in her Declaration as to Danny's extensive travel away from Mexico to the United States and other countries without her and the children went unchallenged by Danny. *(ECF 23 ¶37).* Danny did not challenge Sharon's testimony that their families live in the United States. *(September 10, 2020 Tr. Trans. p. 69:1-8).* In fact, Danny offered no testimony during the two-day trial as to acclimation that would cause Sharon's credibility to be questioned.

In light of Danny and Sharon's failure to share a settled intention to abandon the United States, and due to the children's young age, this court should find that Henry and Alice were not acclimated to Mexico based upon the simple fact that both of their parents kept strong ties to the United States. This is supported by <u>Foster</u> which found that "in light of the children's extremely limited knowledge of both the dominant language of the Guatemalan people and Spanish, almost no involvement in schooling or other meaningful social activities, and frequent return trips back to Wisconsin, the objective evidence does not support a finding that their habitual residency

transferred to Guatemala, particularly in the absence of a shared intent on the part of their parents to abandon the United States for Guatemala." <u>Foster</u> at 612.

The common sense approach, as suggested in <u>Monasky,</u> does not support a finding that Henry and Alice's habitual residency transferred to Mexico, especially in the absence of a shared intent of Danny and Sharon to abandon the United States for Mexico. Danny has failed to meet his burden of demonstrating by a preponderance of the evidence that the children's lives were firmly rooted in Mexico at the time Sharon took them to the United States. Rather, the overwhelming amount of the objective evidence shows that the children's lives were firmly rooted in the United States along with Danny and Sharon. The objective evidence shows that, if anything, due to the worldwide Covid-19 pandemic, the parties had discussions and agreements about moving back to the United States with the children, permanently. As such, this court should dismiss Danny's Petition and find that Sharon's retention of Henry and Alice in Wisconsin was not wrongful under the Convention.

## V.    DANNY IMPROPERLY ASSERTS CUSTODY RIGHTS TO THE CHILDREN

The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever 'a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.' <u>Walker v. Walker,</u> 701 F.3d 1110, 1121 (7th Cir. 2012) (quoting <u>Bader v. Kramer,</u> 484 F.3d 666, 671 (4th Cir. 2007). A person cannot fail to exercise his custody rights under The Hague short of acts that constitute clear and unequivocal abandonment of the child. <u>Id.</u>

Danny has no custody rights to Alice in Mexico as Danny appears nowhere on Alice's Mexican birth certificate. (Resp. Tr. Ex. 1083). As such, Danny cannot even assert *de jure* custody rights to Alice and the Petition as to Alice must be dismissed. Moreover, Danny left

15

Sharon, Henry and Alice by his own admission on May 6, 2020. *(September 10, 2020 Tr. Trans. p. 99:16-25)*. Sharon testified that Danny's employer did not offer health or dental insurance and Danny showed no proof of insurance coverage at any time during the parties' marriage while residing in Mexico. *(September 15, 2020 Tr. Trans. p. 261:19-23)*. After moving on May 6, 2020 Danny, in essence, financially cut off Sharon and the children giving Sharon no options other than to leave to go to the United States. *(September 15, 2020 p. 284:16-25)*. Danny offered no rebuttal evidence to prove that he was financially supporting Sharon, Henry and Alice after May 6, 2020 other than his own self-serving testimony. Danny had abandoned Sharon, Henry and Alice for a lifestyle of constantly abusing drugs with friends. Danny's positive drug test for marijuana and cocaine as late as May 19, 2020 along with the hundreds of videos of Danny snorting cocaine in the family home is proof of his lifestyle and total abdication of his role of a parent and husband. *(Resp. Tr. Ex.'s 1073 & 1107)*.

## VI. DANNY CONSENTED TO SHARON TAKING HENRY AND ALICE TO THE UNITED STATES AND ACQUIESCED TO HER RETAINING THEM THERE

The consent exception to The Hague applies when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention before it takes place. Walker v. Walker 701 F.3d 1110, 1122 (7th Cir. 2012). The court found in Foster that "while James disputed at trial that he consented to his children's removal, the text messages between Ericka and James reflects that he was fully aware that Ericka was taking the children with her in February . . , and not only did nothing to protest or otherwise impede their removal, but contrary to his testimony at trial, he repeatedly acquiesced in her doing so, including telling her in texts to just get on with it, as well as suggesting that she use their account to buy the plane tickets. Accordingly, although the court agrees with James that he never gave his express consent for the children to

leave with Ericka, he appears to have given tacit consent and certainly acquiesced in her decision to do so." <u>Foster</u> at 613.

As in <u>Foster</u> Danny repeatedly consented to Sharon taking Henry and Alice to Wisconsin both verbally and in messaging. As early as March of 2020 Danny verbally told Sharon, "Ferraris and 16 acres in Wisconsin, that you want to bring your kids to, you know? Yeah. Good for you. That's amazing. But really. That's totally, totally fine. That's totally fine." I will store all of our stuff like I did my car and I'll go back to L.A. if I feel in danger, or stay here and kind of do business at the weekend. You know?" *(Resp. Tr. Ex. 1071).* Danny went on to say in the same audio consent, "It's up to you. You know? I think you should go back, because you're really freaking out. So I don't want to watch that, that's for sure. Yeah. Have your parents book the flight. So I'll pay for the passport, or I'll pay for the flights, but I'd rather not because they are going to be a lot of money right now." *(Resp. Tr. Ex. 1071).* Danny went on to explain to Sharon that, "I think it's dangerous to take a newborn child with no shots on legs to Chicago or where else. But may not, because they are empty. But I'd rather that than you stay here and make me miserable and yourself on the verge of total abyss. You know?" *(Resp. Tr. Ex. 1071).*

On May 7, 2020 Danny messaged Sharon and told her, "You are free of me. You can have the house everything in it. The kids. Whatever you want. Take it. With my blessing. I'm staying here for more than one month. You deserve happiness: and I am so sick of trying so hard for nothing. Seriously sell that ring and fix your mouth sounds like each diamond will pay for each tooth." *(Resp. Tr. Ex. 1069).* On May 11, 2020 Danny messaged Sharon and told her that, "I am moving back to the States I will run out of money and if you don't want to give us a shot after this then it's obviously over and we split and sell everything." *(Resp. Tr. Ex. 1070).*

17

Later, on the same day Danny again messaged Sharon and said that his "Plan B" was to sell everything and move back to the States." *(Resp. Tr. Ex. 1070).*

On June 22, 2020 when Sharon, Henry and Alice were in Wisconsin Danny sent a message to Sharon that said, "Can we talk? I'm so sorry for everything and I am happy you and the kids are safe and calm in Wisconsin. Can we talk you and me please? I'll always love you and am the father of your children. Love, Danny." (Resp. Trl Ex. 1085). On Henry's birthday, while in Wisconsin, Sharon posted a WhatsApp birthday post and Danny happily commented, "Happy Birthday Henry! Xoxxo." *(Resp. Tr. Ex. 1086).*

In fact, although Danny's messaging becomes more abusive toward Sharon after she is in Wisconsin for a few days, not once did Danny demand that Sharon bring the children to Mexico. In fact, as late as August 3, 2020 Danny messages Sharon indicating his acquiescence that she is now in Wisconsin long term with the children by telling her, "You're going to be 40 raising our children in your parents (sic) house…winning." *(Resp. Tr. Ex. 1086).* Danny presented no evidence at trial that he attempted to prevent Sharon from taking Henry and Alice to Wisconsin nor did he offer proof that he demanded that she return them to Mexico prior to filing the Hague action. Even more telling of Danny's true intent is the fact that Sharon filed for Legal Separation in Door County, Wisconsin on July 15, 2020. Danny's Hague attorneys were notified of the Legal Separation filing via email dated July 21, 2020 from Sharon's counsel. Despite those facts, Danny at no time requested that this court stay the Legal Separation proceeding, thus in effect, giving his tacit consent to the matter continuing and Wisconsin retaining jurisdiction over Henry and Alice.

## VII. GRAVE RISK

Per this court's order, all argument related to "grave risk" shall be held open pending Dr. Jaffe's testimony on October 9, 2020 and Sharon reserves the right to future argument and briefing regarding the same.

## VIII. CONCLUSION

Henry lived in Mexico for less than two years and Alice for less than three months at the time of Danny's Petition. During Henry's short life he flew to and from the United States a total of nine (9) times, more than most adults do in a lifetime. Both parties' families reside in the United States. Danny by his own admission, "begged" Sharon to move back to the United States with the children. Sharon and the children are not fluent in Spanish. Danny offered no testimony whether or not he is fluent in Spanish, however, in the court ordered FaceTime calls Danny only speaks to Henry and Alice in English. Danny socialized mainly with his co-workers, who were citizens of the United States. None of the witnesses testified that Danny spoke to Sharon or the children in anything other than English. Neither parent took any affirmative steps to obtain Mexican passports for themselves or the children. When choosing between a Mexican passport and a United States passport for Henry, the parties chose the United States. Neither parent renounced their U.S. Citizenship. Both parents maintain active driver's licenses from the United States and never bothered to obtain Mexican driver's licenses. Sharon has remained in Mexico, since sometime in 2015, on a tourist visa. Danny, as referenced in his own Petition, alleged that he was furloughed from his employment in Mexico.

Danny moved out of the parties' rented marital residence in Nayarit, Mexico on May 6, 2020 and the lease for the residence ended on August 15, 2020. There has been no evidence proffered by Danny as to where he is currently living or whether he currently even has a valid lease in Mexico. Danny's own Mexican divorce petition, that he filed with this court, alleges

19

that neither he nor Sharon have any assets or property in Mexico. If the children are ordered returned to Mexico there is nowhere for the children to reside, as both parents have abandoned the marital residence and no other assets or property of the parties remain in Mexico. Common sense and the cumulative facts of this case show that Mexico is not the habitual residence of Henry and Alice. Common sense and the cumulative facts of this case show that Danny and Sharon did not have a shared intent that Mexico was their habitual residence. Common sense and the cumulative facts of this case show that neither Danny nor Sharon intended for their children's lives to be firmly rooted in Mexico, whatsoever.

Common sense tells us that Danny's Petition is not about the return of Henry and Alice to Mexico, but rather that it is simply another vehicle to continue his ongoing harassment and control of Sharon. Danny's harassment of Sharon dates back to 2014. (Resp. Tr. Ex.'s 1003 & 1004). To this day and hundreds of miles away, Danny still continues to harass Sharon as documented in recorded FaceTime calls played for the court. *(Resp. Tr. Ex.'s 1036 1037, 1038 & 1039).* On August 11, 2020, in front of Henry and Alice, Danny disparaged and threatened Sharon and her father:

> Oh, my God, Terry, I read Sharon's Restraining Order. You and your family are going to look so stupid when you lose this case. I love you Alice. Henry, I love you with all my heart. Do you know that? I love you with all my heart, Henry. Seriously, you're like a psycho, crazy, evil family. It's so retarded. None of your stories make sense or line up. I love you so much, Henry. I really do. I love you more than anything, Alice. Your affidavit looks like a 12-year old wrote it with no evidence, nothing anywhere. It's just the craziest psychobabble I've ever seen, backed by you, the world's second biggest idiot. Hi Alice. But it's okay. Because this is going to cost you several hundred thousand dollars. I've got multiple lawsuits coming your way. Henry, show me your cars buddy. Show me your cars. Alice, I love you with all my heart. Do you know that? I love you with all my heart baby. You're the most beautiful girl in the whole world. Alice, you're so beautiful. Henry, show me your cars. Show me your cars . . . Terry, after you pay for my legal fees, I'm going to sue you for another several thousand dollars. I'm really excited. It's going to be good. . . I love you Henry. This is a Federal Court-sanctioned time every day. . . Henry, do you know how much I love you? We've got the sticks, the weeds and the fucking trees lost in oblivion. . . Henry, do you know how

much I love you?  I hope.  But, you're going to see how crazy your mother is by your own accord when you're able to have wherewithal.  That's how it's going to be, because you're half me."

(Resp. Tr. Ex. 1038).    Pure harassment.  If Danny's Petition was about something other than harassment and control, certainly he would have taken the opportunity to bond with Henry and Alice during FaceTime calls.  Instead, Danny repeatedly threatened and disparaged Sharon and her family, up to and including the present day.  Lending to the questionable motives behind Danny's Petition is the utter lack of evidence presented by Danny at trial that he also filed an application for Henry and Alice's return with either the U.S. Department of State or its Mexican counter-part.  Sharon believes that Danny presented no evidence of such applications, due to the fact, that no such applications exist.

Danny's Petition should be dismissed for failure to show by a preponderance of the evidence that he and Sharon had a shared intent that Mexico would be the children's habitual residence.  Additionally, Danny's Petition should be dismissed as a "Monasky common sense review" of "all other evidence" overwhelmingly shows that Henry's and Alice's lives are firmly rooted in the United States and not Mexico and that the Petition itself is a tool for Danny to continue his harassment and control of Sharon.  Despite the fact that Sharon believes that Danny has not met his burden for a Hague Petition, she also argues alternatively that a preponderance of the evidence shows that Danny does not even have de jure custody rights to Alice in Mexico as he is not on her birth certificate.  As to custody of both children, Danny did not offer proof to overcome Sharon's testimony that Danny abandoned the family financially and otherwise when he left the rented marital home on May 6, 2020 and chose a life of drugs with friends in Mexico over his own family.

Finally, pursuant to Article 13(a), this court should not return Henry and Alice to Mexico due to the fact that a preponderance of the evidence shows that Danny consented and acquiesced to the children leaving Mexico and staying in the United States as evidenced by his own testimony where he "begged" Sharon to return to the United States of America.

Sharon respectfully requests, for the reasons stated above, that Danny's Petition be dismissed and Henry's and Alice's passports be returned to her.

**CONWAY, OLEJNICZAK & JERRY, S.C.**
Attorneys for Respondent, Sharon R. Hinnendael

By: *Electronically signed by Laura J. Beck*
      Laura J. Beck
      WI State Bar. No. 1031572

**MASTERS LAW GROUP, LLC**
Attorneys for Respondent, Sharon R. Hinnendael

By: *Electronically signed by Anthony G. Joseph*
      Anthony G. Joseph
      IL State Bar No. 6303632

**MASTERS LAW GROUP, LLC**
Attorneys for Respondent, Sharon R. Hinnendael

By: *Electronically signed by Erin E. Masters*
      Erin E. Masters
      IL State Bar No. 6283476