**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

DANIEL LUKE SCHWARTZ,

      Petitioner,

    v.

SHARON ROSE HINNENDAEL,

      Respondent

Case No.: 20-CV-01028

---

**PETITIONER'S POST-HEARING MEMORANDUM ON THE ISSUES OF HABITUAL RESIDENCE AND WRONGFUL REMOVAL OR RETENTION**

---

Petitioner, Daniel L. Schwartz, by his attorneys and at the direction of the Court on September 15, 2020, submits this Post-Hearing Memorandum on the Issues of Habitual Residence and Wrongful Removal or Retention, in light of the evidence entered at trial September 10 and 15, 2020.

## I.    LEGAL STANDARD

The International Child Abduction Child Remedies Act, 42 U.S.C. § 11601 et seq. (ICARA), which implements the Hague Convention on Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), entitles a person whose child has been removed from his custody in another country and taken to the United States to secure the prompt return of the child to the child's country of habitual residence, unless the respondent can establish that an affirmative defense applies. 42 U.S.C. § 116039(a), (b).

ICARA establishes a burden shifting framework for Hague cases; the petitioner must establish the children were wrongfully removed from their habitual residence by a

preponderance of the evidence. Then, the burden shifts to the respondent to establish a defense by either clear and convincing evidence or a preponderance of the evidence depending on the defense. *See* 22 U.S.C. § 9003(e)(1)(A). "To establish a prima facie case for return of the child under the Convention, the petitioner must show, by a preponderance of the evidence, that: (1) immediately prior to removal or retention, the child habitually resided in another Contracting State; (2) the removal or retention was in breach of the petitioner's custody rights under that State's law; and (3) the petitioner was exercising those custody rights at the time of the removal or wrongful retention." *Custodio v. Samillan*, 842 F.3d 1084, 1088 (8th Cir. 2016) (*citing* Art. 3). If a petitioner establishes a prima facie case, the child must be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

Petitioner asserts Mexico was the children's habitual residence. Respondent raised the defense that Petitioner consented to the move. This Court must now determine if Petitioner has established a *prima facie* case of wrongful removal, and if Respondent has proven such consent by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

## II. PETITIONER HAS DEMONSTRATED BY A PREPONDERANCE OF THE EVIDENCE THAT MEXICO WAS THE CHILDREN'S HABITUAL RESIDENCE AT THE TIME OF THE REMOVAL.

At trial, the Petitioner demonstrated that: 1) the children were born in and have resided in Mexico for their entire lives until their wrongful removal on June 17, 2020,[1] 2) Alice had never left Mexico prior to her wrongful removal, and Henry had left only for

---

[1] Q. You've been in Mexico since you left with the children recently, correct? On a tourist visa.
A. Yes.   (Testimony of Respondent, Hr'g Tr. 64, September 10, 2020.)

one- or two-week trips to visit family and friends,[2] 3) that Petitioner is a permanent legal resident of Mexico and Respondent qualifies to be one if she applied, 4) the parties' marital home was in Mexico for the past five years and they had no residence elsewhere, 5) Petitioner's job of five years is based in Mexico and allows him a substantial income to support his family, 6) the children's pediatrician, the Respondent's doctor and therapist, and the nanny is in Mexico, and 7) there was no other habitual residence for the children.

In all of her testimony and filings, Respondent points to no other potential location which could be considered the habitual residence of the children because no other location could be considered as such. Respondent argues she and Petitioner intended to return to the United States, frequently traveled away from Mexico, had no family in Mexico, and the children had not acclimatized to Mexico. She ignores the most critical fact in the analysis—no location, other than Mexico, could be considered the children's habitual residence.

**A.** ***MONASKY V. TALGIERI*** **REQUIRES CONSIDERATION OF THE TOTALITY OF THE CIRCUMSTANCES, INFORMED BY COMMON SENSE, IN DETERMINING A CHILD'S HABITUAL RESIDENCE.**

The U.S. Supreme Court recently clarified the standard to apply in determining a child's habitual residence. "A child's habitual residence depends on the totality of the circumstances specific to the case, not on categorical requirements such as an actual agreement between the parents." *Monasky v. Taglieri*, 140 S. Ct. 719, 728 (2020). The

---

[2]     Q. Okay. Let me ask you, with regards to your various trips to the United States, that was to visit family and friends, right?
A. Yes.
Q. And after you did your visit -- usually those visits were, what, about a week, eight, nine days?
A. Yes, sometimes two weeks.
Q. Sometimes two weeks, fair. -- you always returned back to Mexico, correct?
A. Yes.    (Testimony of Respondent, Hr'g Tr. 74:25-75:8, September 10, 2020.)

factual analysis must be "informed by common sense." *Monasky*, 140 S. Ct. at 727. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* at 726.

The Supreme Court's review of the case was prompted by a circuit split in the analysis of habitual residence. *Id*. at 725. The majority of Circuits adopted the framework established by the Ninth Circuit in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), which focuses on the intent of the parents in establishing their residence. *See also Redmond v. Redmond*, 724 F.3d 729, 743-45 (7th Cir. 2013) (Analyzing the Circuit split in detail.). In contrast, the Third, Sixth, and Eighth Circuits focus on the child's perspective, examining a child's acclimatization to a country. *Id.* at 745 (noting, however, that parental intent and shared parental intentions were still used in the analysis in these Circuits).

The Supreme Court summarized the facts as follows:

In 2011, Monasky and Taglieri were married in the United States. Two years later, they relocated to Italy, where they both found work. Neither then had definite plans to return to the United States. During their first year in Italy, Monasky and Taglieri lived together in Milan. But the marriage soon deteriorated. Taglieri became physically abusive, Monasky asserts, and "forced himself upon [her] multiple times." 907 F.3d 404, 406 (CA6 2018) (en banc).

About a year after their move to Italy, in May 2014, Monasky became pregnant. Taglieri thereafter took up new employment in the town of Lugo, while Monasky, who did not speak Italian, remained about three hours away in Milan. The long-distance separation and a difficult pregnancy further strained their marriage. Monasky looked into returning to the United States. She applied for jobs there, asked about U.S. divorce lawyers, and obtained cost information from moving companies. At the same time, though, she and Taglieri made preparations to care for their expected child in Italy. They inquired about childcare options there, made purchases needed for their baby to live in Italy, and found a larger apartment in a Milan suburb.

Their daughter, A.M.T., was born in February 2015. Shortly thereafter, Monasky told Taglieri that she wanted to divorce him, a matter they had previously broached, and that she anticipated returning to the United States.

Later, however, she agreed to join Taglieri, together with A.M.T., in Lugo. The parties dispute whether they reconciled while together in that town. On March 31, 2015, after yet another heated argument, Monasky fled with her daughter to the Italian police and sought shelter in a safe house. In a written statement to the police, Monasky alleged that Taglieri had abused her and that she feared for her life. Two weeks later, in April 2015, Monasky and two-month-old A.M.T. left Italy for Ohio, where they moved in with Monasky's parents.

*Monasky*, 140 S. Ct. at 724. In the appeal to the Sixth Circuit, it was also noted that Monasky lacked an Italian driver's license, and that the parties jointly applied for a United States passport for the child. *Taglieri v. Monasky*, 907 F.3d 404, 406 (6th Cir. 2018), cert. granted, 139 S. Ct. 2691, 204 L. Ed. 2d 1089 (2019), and aff'd, 140 S. Ct. 719 (2020).

The Sixth Circuit affirmed the district court's determination using the two-part test established in *Ahmed v. Ahmed*. 867 F.3d 682 (6th Cir. 2017) (holding that a Court should first consider whether a child was acclimatized, and then examine shared parental intent in cases where acclimatization does not offer a clear answer, particularly with young children). On appeal to the Supreme Court, Monasky argued that because she and Taglieri did not agree to raise the child in Italy, the country was not the child's habitual residence. The Supreme Court rejected Monasky's proposed actual agreement standard, while also rejecting the two-part test used by the Sixth Circuit in *Ahmed* as determinative. *Monasky*, 140 S. Ct. at 728 ("A child's habitual residence depends on the totality of the circumstances specific to the case, not on categorical requirements such as an actual agreement between the parents.")

The Supreme Court determined the analysis must be "sensitive to the unique circumstances of the case and informed by common sense" "[b]ecause locating a child's home is a fact-driven inquiry." *Id.* at 727. While evidence of acclimatization may be the determinative factor in cases with "older children capable of acclimating to their

surroundings," parental intent may also be determinative, "especially [for children] too young or otherwise unable to acclimate." *Monasky*, 140 S. Ct. at 727.

Finally, the Supreme Court identified a third category of cases, "[w]here a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id*. at 727. Such "straightforward" cases are able to be resolved with a "[c]ommon sense" analysis, in which neither shared parental intent or acclimatization are determinative. *Id*. at 727. Under such an analysis, the country from which the child was removed is likely the child's habitual residence when a child lives in a marital home until the child's removal. *Id*. at 727. The Supreme Court concluded that the facts established by the petitioner were clear enough for the Court to take the unusual step of ordering the child's return to Italy from the United States rather than remand the case in light of the newly established standard.

Applying *Monasky* to this case allows a straightforward and common sense analysis. According to Respondent's declaration, she and the Petitioner have shared an address in Mexico for five years, ECF #23 ¶28, only leaving Mexico with an intent not to return on June 17,2020. ECF #23 ¶ 45. Both Henry and Alice were "born into a marital home" in Mexico, "one that [their] parents established 'with no definitive plan to return to the United States.'" *See Monasky*, 140 S. Ct. at 731. Prior to leaving Mexico on June 17, 2020, Henry had only left Mexico for brief vacations to visit family and friends. Testimony of Respondent, Hr'g Tr. 74:25-75:8, September 10, 2020. The children had a nanny in Mexico, not in the United States. Testimony of Respondent, Hr'g Tr. 107, September 15, 2020. Henry's pediatrician was in Mexico, and the children did not have a doctor in the United States. Testimony of Respondent, Hr'g Tr. 25, September 10, 2020. Only two

years ago, Respondent wrote marketing materials encouraging others to move to Mexico, stating "[t]his is the best lifestyle for me in all the past lives I've tried". Ex. 9.

Respondent acknowledged she was a resident of Mexico before June 17, 2020.[3] At present, she retains a separate apartment, furniture, clothes, a car, and two dogs, in Mexico. Testimony of Petitioner, Hr'g Tr. 90-91, September 10, 2020. She is currently living with the children and her parents at her parents' home in Wisconsin. Testimony of Respondent, Hr'g Tr. 216, September 10, 2020. Neither party owns nor rents any property anywhere in the world, other than in Mexico where both parties maintain residences. Testimony of Petitioner, Hr'g Tr. 302, September 15, 2020. Both children were "born into a marital home" in Mexico, one in which the parties lived for over four years. *See Monasky*, 140 S. Ct. at 731. As of June 17, 2020, there was no place other than Mexico which could reasonably be considered the children's habitual residence. Applying the reasoning of the Supreme Court in *Monasky*, common sense requires the conclusion that the parties and the children were habitual residents of Mexico as of June 17, 2020.

**B.     LIKE THE COURT IN *MONASKY*, FEDERAL COURTS HAVE FOUND HABITUAL RESIDENCE BASED ON THE MARITAL HOME WHERE THEY LIVED AT THE TIME OF REMOVAL.**

A determination of habitual residency must always start "immediately before the removal or retention," in this case, June 17, 2020. Art. 3. In cases with similar facts, Courts have described the "common sense" habitual residence determination as "simple." "Common sense suggests that some cases will be straightforward: Where a child has

---

[3]     Q. At the time you left Mexico you were residing in Mexico. Fair?
A. No. I'm sorry.
Q. Where were you residing, ma'am?
A. Okay. I had a short -- yeah. I was residing in Mexico, yeah. Sorry.
(Hr'g Tr. 44-45, September 10, 2020.)

lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Monasky*, 140 S. Ct. at 727. Courts have repeatedly described analogous cases as "simple" with regard to the habitual residence analysis—regardless of a lack of legal residency in the habitual residence (*Simcox v. Simcox*) or a foreign permanent address and an intent to return to the parties' country of origin (*Friedrich I*). *Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007); *Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1402 (6th Cir. 1993) ("This is a simple case. Thomas was born in Germany and resided exclusively in Germany [despite vacations abroad] until his mother removed him … therefore, we hold that Thomas was a habitual resident of Germany at the time of his removal.").

The Court's analysis in *Friedrich v. Friedrich* (*Friedrich I*), is instructive. 983 F.2d 1396. In *Friedrich I*, a German father filed a petition for the return of his child, alleging that the child's mother, a citizen of the United States, had wrongfully removed the child from Germany, where the family lived, to the United States. 983 F.2d 1396. Emphasizing her caretaking role and intentions to return eventually to the United States with the child, Mrs. Friedrich argued that the child's habitual residence had shifted from Germany to the United States. *Friedrich I*, 983 F.2d at 1401. The court, however, held that Germany was the child's habitual residence. *Id.* at 1402. Focusing on the child, "look[ing] back in time, not forward[,]" and finding any future intentions that Mrs. Friedrich had harbored for the child to reside in the United States irrelevant to its inquiry, the court concluded that the child's "habitual residence can be 'altered' only by a change in geography and the passage of time, not by changes in parental affection and responsibility." *Friedrich I*, 983

F.2d at 1402. The change in geography must occur before the questionable removal; here, the removal precipitated the change in geography." *Friedrich I*, 983 F.2d at 1401-2.

In cases such as *Friedrich I*, where children have lived with their family entirely in one country prior to their wrongful removal to another, federal courts have been nearly uniform in declaring the origin country to be the children's habitual residence.[4] *See, e.g., Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004) ("[I]f a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country."); *see also Nicolson v. Pappalardo*, 605 F.3d 100, 104–05 (1st Cir. 2010) (concluding that parties' three-month-old child, who had lived exclusively in Australia with her married parents, was a habitual resident of Australia by the time her American mother took her to the United States despite the mother's claims that she never shared an intent to raise the child in Australia); *Larbie v. Larbie*, 690 F.3d 295, 298, 311 (5th Cir. 2012) (concluding that a two-year-old child who had lived exclusively in the United States prior to his mother, a United Kingdom permanent resident, taking the child to the United Kingdom, the United States "was indisputably his habitual residence before his arrival in the U.K."); *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001)(A court order that granted the respondent-father custody of the children in the United States did not

---

[4]      In these cases, the Courts do leave open the possibility for such a case to exist, and no bright line rule exists. *See Taglieri v. Monasky*, 907 F.3d 404, 410 (6th Cir. 2018), cert. granted, 139 S. Ct. 2691, 204 L. Ed. 2d 1089 (2019), and aff'd, 140 S. Ct. 719 (2020); *see also Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020)(discussing a possible case where "an infant lived in a country only because a caregiving parent had been coerced into remaining there" would not being considered a habitual resident of such a country.)

     For example, a child born while on vacation would not be a habitual resident of the country to which the mother vacationed. *See, e.g., Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003)(The country of a child's birth was not the child's habitual residence when the child was born there to take advantage of free medical care in the country and the mother lived out of a suitcase.). Such examples are inapplicable here, as Henry was not an infant, Respondent was not coerced into staying in Mexico, and the parties were clearly not vacationing in Mexico, the country in which they lived and worked for five years.

alter the habitual residence analysis when "both children were born in Canada and resided there with their mother for a substantial portion of their lives—in Faith's case, for her entire life—until they were removed by their father to the United States."); *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 379 (8th Cir. 1995) (Holding that a father's coercion of a mother was not relevant to a habitual residence determination when a two-month old infant had no other potential habitual residence.); *Tsarbopoulos v. Tsarbopoulos*, 176 F.Supp.2d 1045, 1057 (E.D. Wash. 2001) (concluding that two-month-old child's habitual residence was the United States prior to the family's move to Greece).

The Court's efforts to look beyond the plain meaning of habitual residence are unnecessary. *Monasky* clearly instructed Courts to treat simple cases as simple cases, and federal courts have repeatedly described fact-patterns mirroring this case as such. While the parties had certainly discussed moving to the United States, Respondent stated the location of such a move "was always up in the air." Hr'g Tr. 273, September 15, 2020. There were undoubtedly no firm plans for such a return, at least not with Petitioner. A habitual residence requires only "some form of settled purpose," not an intent to remain there forever. *Koch v. Koch*, 450 F.3d 703, 717 (7th Cir. 2006). The parties' discussions of returning to the United States must be viewed in light of their efforts to actually do so. *See Koch*, 450 F.3d at 716 ("[The parties] shared an intent, perhaps better described as a hope, to return someday to the United States. But this hope must be viewed in light of what the family actually did.") Before Respondent left Mexico on June 17, Alice had never left the country, and both children had lived at Lomas Del Sol, #100 in Nuevo Vallarta from their births until they were taken from the marital home by Respondent in May 2020.

**C.    RESPONDENT'S ASSERTIONS THAT THE CHILDREN EITHER HAVE NO HABITUAL RESIDENCE OR HABITUAL RESIDENCY IN THE UNITED STATES MISSTATES THE LAW RELATED TO A CHILD'S ACCLIMATIZATION TO A COUNTRY AND SHARED PARENTAL INTENT**

In Respondent's brief of September 9, 2020, she claims  the parties intended to move to the United States, the children were not acclimatized to Mexico, and both that the children had no habitual residence and that is was the United States in general. These contradictory positions sidestep the threshold issue of whether the family moved from Mexico before the wrongful removal of the children on June 17, 2020.

"[T]he text of the Convention directs courts to only one point in time in determining habitual residence: the point in time 'immediately before the removal or retention.'" *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (*quoting* Art. 3); *see also Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("On its face, habitual residence pertains to customary residence prior to the removal."); *Koch*, 450 F.3d at 715 ("The establishment of a habitual residence requires an actual change in geography."). Whether the children acclimatized to a new home or whether the parents had shared intentions regarding a move must only be analyzed when the children have actually moved to a potentially new habitual residence. Because a habitual residence cannot be established wrongfully, the analysis must end if Respondent's removal of the children was in violation of his custodial rights in Mexico. *See, e.g., Martinez v. Cahue*, 826 F.3d 983 (7th Cir. 2016).

Respondent cites *Delvoye v. Lee* for the position that "it is possible, especially for children of young age as the children in this matter, to have no habitual residence" is in error. *See* Petitioner's Brief, September 9, 2020 (citing *Delvoye v. Lee*, 329 F.3d 330, 333-34 (3d Cir. 2003). As applied to the present case, *Delvoye* states the opposite:

"[w]here a matrimonial home exists, i.e., where both parents share a settled intent to reside, determining the habitual residence of an infant presents no particular problem." *Delvoye*, 329 F.3d at 333.

Only when a mother gives birth while temporarily abroad can an infant be without a habitual residence, and only until the mother returns to the country in which she has established her residence. See *Delvoye*, 329 F.3d at 334. In *Delvoye*, the "respondent, at petitioner's urging, had traveled to Belgium to avoid the cost of the birth of the child and intended to live there only temporarily. She retained her ties to New York, not having taken her non-maternity clothes, holding only a three-month visa and living out of the two suitcases she brought with her." Id. In essence it was a case of birth tourism, and an exceptional circumstance rather than normal possibility. *See Taglieri*, 907 F.3d at 418 ("In rare situations, an infant may not have a habitual residence.") (*citing Delvoye*, 329 F.3d at 333.) In *Monasky*, the Supreme Court explicitly warned against construing the Convention in a manner which "would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected." *Monasky*, 140 S. Ct. at 728.

Furthermore, Respondent affirmatively misrepresents the holding of *Kijowska v. Haines* in her brief, stating that it stands for the presumption that "a child may acquire habitual residency in a state or locale even if the child was wrongfully removed or retained there." *See* Petitioner's Brief, September 9, 2020 (citing *Kijowska*, 463 F.3d 583 (7th Cir. 2006)). In *Kijowska*, the Court explicitly rejected the claim that the children's habitual residence was the country to which they were wrongfully removed, holding that the removal of the child was not wrongful because the mother was not removing the child

from the child's habitual residence. *Kijowska*, 463 F.3d at 587. The Court stated that "a parent cannot create a new 'habitual residence' by the wrongful removal and sequestering of a child. That would invite abduction." *Id.* (internal quotation marks and citations omitted).

In arguing that the children have acclimated to the United States, or that the parties' had a shared intent to move to the United States, Respondent ignores that such acclimation or shared intention must have been manifest before her removal of the children on June 17, 2020. In the present case, both children plainly resided in Mexico before their wrongful removal. From the birth of Henry until June 17, 2020, Respondent testified that she had resided in Mexico. Analyzing whether visits to family in the United States prevented Henry from acclimatizing to Mexico is irrelevant, as neither party argues that the family was moving to the United States at the time of these visits. At no point did the family's residence become the United States during these visits, and accordingly, Henry's habitual residence remained in Mexico.

Respondent's position that the Court must determine whether the children acclimatized to Mexico, produces an absurd result. It is the only place they lived with their parents. The suggestion that the children have no habitual residence or that it is the United States in general, produces the very result that the Convention intended to prevent. *Taglieri*, 907 F.3d at 411 ("a presumption against finding a habitual residence for infants … is the worst of all possible worlds because it turns the Convention upside down"). Nothing would stop either parent from taking the children wherever or as frequently as the offending parent wished, "creating the risk of 'abduction ping pong' at

best or making possession 100% of the law at worst." *Taglieri*, 907 F.3d at 411 (citations omitted).

### III. PETITIONER HAS DEMONSTRATED BY THE PREPONDERENCE OF THE EVIDENCE THAT HE HAD AND WAS EXERCISING CUSTODIAL RIGHTS TO HIS CHILDREN AT THE TIME OF THEIR WRONGFUL REMOVAL

In addition to establishing the children's habitual residence was Mexico, Petitioner also proved by a preponderance of the evidence that Respondent's removal of the children was in breach of his custodial rights under Mexican law. To establish a prima facie case for wrongful removal, a petitioner must show that "the removal or retention was in breach of the petitioner's custody rights." *Custodio*, 842 F.3d at 1088. "Under the Convention, whether a parent was exercising lawful custody rights over a child at the time of removal must be determined under the law of the child's habitual residence." *Friedrich I*, 983 F.2d at 1402; Art. 3. The analysis of whether a removal or retention was in breach of a petitioner's custodial rights is a two-step process—1) the Court must determine whether the petitioner had *de jure* custody rights, and 2) the Court must determine whether these rights were exercised. *Friedrich II*, 78 F.3d at 1067.

*De jure* custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." Art. 3. Article 5(a) of the Convention provides that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Art. 5(a); *see also Abbott v. Abbott*, 560 U.S. 1, 10, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010).

Once *de jure* custodial rights are established, the test of whether a petitioner exercised those rights is extremely broad. *Friedrich II*, 78 F.3d at 1065 ("The only

acceptable solution … is to liberally find "exercise" whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.") "[A] person [who] has valid custody rights to a child under the law of the country of the child's habitual residence ... cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) (quoting *Friedrich II*) "Once [a Court] determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts." *Friedrich II*, 78 F.3d at 1066.

Petitioner plainly exercised his custodial rights up to and beyond the wrongful removal of the children. Testimony of Petitioner, Hr'g Tr. 110, September 10, 2020. Even when Petitioner was briefly separated from the family during May 2020, the Respondent frequently brought the children to where he was staying, or the Petitioner returned to their home to see them. Testimony of Respondent, Hr'g Tr. 309, September 15, 2020.

Respondent appears to only challenge Petitioner's *de jure* custody rights. Respondent alleges that Petitioner did not have custodial rights over his marital children under Mexican law. She acknowledges they were married and he is the father of both children. She claims that because Alice's certificate of live birth from the hospital did not include the Petitioner's name, he has no legal claim to custody of Alice without obtaining a court order in Mexico. The certificate she refers to, which Petitioner says Respondent filled out, and Respondent says she didn't, indicates that Respondent was not married at the time of Alice's birth. This is either a misrepresentation by Respondent or an error that

Respondent should have corrected when she later obtained the child's formal birth certificate.

This assertion that a form in a hospital with an incorrect marital status could defeat a married father's *de jure* parental rights has no basis in Mexican law. Mexican law, like Wisconsin law, is clear that all parents of marital children presumptively have such rights. Declaration of Jerry Luis Coats Cruz, ¶4 ("Because Daniel is the husband of the mother of Alice, he is presumed to be the parent with full custody rights, pursuant to the Civil Code for the State of Nayarit, articles number 317, 333 and 338.") The Seventh Circuit and other federal courts have recognized the concept of *patria potestad* (parental authority) in Mexican law as a broad grant of custodial rights. *Garcia v. Pinelo*, 808 F.3d 1158, 1165, 1167 (7th Cir. 2015) (Accepting the Mexican Central Authority's statement that, "[a]ccording to Mexican Law, individuals acquire parental rights (patria potestad) over a child since the moment of birth")*; see also A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624, 634 (E.D.N.Y.), *aff'd sub nom. Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) ("parental authority … is exercised jointly by both parents"); *Lieberman v. Tabachnik, 625 F.Supp.2d 1109*, 1118 (D.Colo.2008) (citing Mexican attorney's testimony that "patria potestas is the most sacred concept in Mexican family law").

Respondent's sole citation for Mexican law to the contrary, "Parental Authority and Child Custody in Mexico," contains no support for the contention that Petitioner's name not appearing on the birth certificate is determinative, and in fact does not reference birth certificates at all. *See* Patricia Begne, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527 (2005). In fact, it affirms that a parent has *de jure* parental rights including rights of custody. *Id*. at 530 ("Parental authority [patria potestad] … naturally confers on

parents the specific duty of caring for and raising their children."). "Custody and care of their minor children is the first duty of parents," and the parents' "parental authority is … mandatory [and] not transferable." *Id*. at 531.

Furthermore, the treatise affirms that the Mexican concept of parental authority grants *de jure* custodial rights. *Id*. at 530 ("the Mexican Supreme Court … stated that '[o]ne of the prerogatives of parental authority is the custody, care and attention of minors.'") "The Mexican Supreme Court, confirming that parental authority is indeed a legal relationship between parents and children, has also confirmed that the rights inherent in parental authority are not transferable because they are legally granted in recognition of the holder and reflect the legal relation between parents and their minor children." *Id*. at 530.

Importantly, these legal rights include the right to determine the residence of the child. *Id*. at 534. The United States Supreme Court has held that a right to determine a child's place of residence constitutes a custodial right giving rise to a remedy of return under the Convention. *See Abbott v. Abbott*, 560 U.S. 1, 11, 13, 130 S. Ct. 1983 (2010).

By virtue of Petitioner and Respondent's marriage, Petitioner has *de jure* custodial rights to the children. The existence of those rights is supported by the Declaration of Petitioner's Mexican attorney, by Respondent's treatise on Mexican law, and by the decisions of federal courts who have been asked to perform the same analysis on Mexican law. Respondent breached those rights by removing the children from Mexico despite Petitioner's active role in their lives. Accordingly, Petitioner has met each element of his prima facia burden, by a preponderance of the evidence, showing that Respondent's removal of the children was wrongful.

## VI. RESPONDENT DID NOT DEMONSTRATE BY THE PREPONDERENCE OF THE EVIDENCE THAT PETITIONER CONSENTED OR ACQUIESCED TO THE CHILDREN'S REMOVAL TO WISCONSIN

Because Petitioner has proven his *prima facie* case by a preponderance of the evidence, the burden shifts to Respondent to establish one of the "narrow exceptions set forth in the Convention" 22 U.S.C. § 9001(a)(4). Under the Convention, a respondent can prevent the return of wrongfully removed children by showing the petitioner "consented to or subsequently acquiesced in the removal or retention." Art. 13(a). "Consent and acquiescence are separate defenses." *Garcia v. Pinelo*, 122 F. Supp. 3d 765, 781 (N.D. Ill. 2015), *citing Walker v. Walker*, 701 F.3d 1110, 1122 (7th Cir. 2012). "The consent exception applies when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention <u>before it takes place</u>." Walker, 701 F.3d at 1122 (emphasis added). "A parent's consent need not be formal, but it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id*. (internal quotation marks omitted).

"Acquiescence, on the other hand, occurs when 'a petitioning parent agrees to or accepts a removal or retention after the fact.'" *Garcia*, 122 F. Supp. 3d at 781, quoting Walker, 701 F.3d at 1122. "Acquiescence is more formal [than consent] and might require evidence such as 'testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'" *Walker*, 701 F.3d at 1122–23, quoting Friedrich II, 78 F.3d at 1070. "Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Friedrich II*, 78 F.3d at 1070 (*citing Wanninger v. Wanninger*, 850 F. Supp. 78, 81–82 (D. Mass.1994) ("refusing to construe father's personal letters to wife and priest as sufficient evidence of acquiescence where father consistently attempted to keep in

contact with child")). The defenses of consent and acquiescence must "be drawn very narrowly lest their application undermine the express purposes of the Convention." *Id*. at 1123.

Petitioner denies that he ever "consented to or subsequently acquiesced in" Respondent's wrongful removal of the children, and the minimal evidence presented by Respondent does not meet the standard needed to establish a consent or acquiescence defense. *See* Art. 13(a). Petitioner's only evidence of "consent" are two incomplete transcripts of heated arguments between the parties. *See* Exhibits 1022 & 1069. *Friedrich II* explicitly cautions against reliance on such evidence, scrutinizing all contact between Petitioner and Respondent to attempt to find some statement Petitioner made that purportedly shows consent. *See Friedrich II*, 78 F.3d at 1070.

Respondent also argues that Petitioner agreed to allow the children to move to Wisconsin in early May, based on his communications with Mr. Haroon Ishrak and Respondent. *See* Exs. 1071, 1091, 1096. However, each of those communications speak to Petitioner's concerns that the COVID-19 pandemic could spark unrest in Mexico. Mr. Ishrak's testimony confirmed that the parties discussed taking children to Wisconsin for a short time because of the concerns with COVID-19.[5] There is no evidence of any specific plan to leave the country, let alone a plan to move the family permanently. Instead, the exhibits speak to reasonable efforts to plan for potential civil unrest that did not end up occurring.

---

[5]     Q. You didn't take that or assume that Mr. Schwartz is saying Sharon and the kids can go back to the United States and move permanently, are you? You're not suggesting that.
A. No, I'm not suggesting that. (Hr'g Tr. 211, September 10, 2020)

In contrast to the minimal written evidence in support of consent, both parties' actions clearly demonstrate there was no consent or acquiescence. Petitioner's actions strongly demonstrate that he did not consent. Faced with the threat of his marriage ending, Petitioner voluntarily started a rehabilitation program. He provided Respondent money so that she could live separately from him while he completed his rehabilitation program. He sent messages to Respondent begging her to return to the marital residence. Ex. 1075. He then retained counsel to file with this court the Petition for The Return of the Children, while also filing for divorce in Mexico, seeking a custody and placement order.

Respondent's actions also do not demonstrate she had Petitioner's consent. Respondent claims she "escaped" the marital residence and applied for an emergency passport without Petitioner's knowledge or consent. *See* Respondent's Declaration, ¶ 41, 44. On the day Petitioner was to return to the marital home, he was informed by his landlord that the Respondent had emptied the apartment, taken the children and dogs and left. Hr'g Tr. 359, September 15, 2020. He was shocked and devastated and frantic to locate his family. Hr'g Tr. 362, September 15, 2020. As the court in *Friedrich II* notes in a similar circumstance, "[t]he deliberately secretive nature of her actions is extremely strong evidence that Mr. Friedrich would not have consented to the removal of Thomas." 78 F. 3d at 1069. Equally telling, after Respondent "escaped," she posted on a social media site that she was going to Door County for the summer, with no mention of a permanent move. Ex. 9.E.

The law requires that acquiescence be formal, be clear and unambiguous, or that it occur over a significant period of time—none of which apply to Respondent's evidence, which amounts to ambiguous messages demonstrating marital unrest and a concern

about the COVID-19 pandemic. Respondent has failed to prove by a preponderance of the evidence that Petitioner consented or acquiesced to the removal of the children to Wisconsin as required by Article 12(a) of the Hague Convention.

## V.     CONCLUSION

Mexico was the children's only permanent address, and therefore, the children's habitual residence, until Respondent's wrongful removal. Mexico is the proper forum for any custody determination. Both parties have filed actions in Mexico and have residences there. Petitioner has shown that despite the misrepresentation of Respondent's marital status on the hospital birth record, he has full custody rights to both children, has exercised these rights since their birth in Mexico and has tried to exercise them since their removal.  Because Respondent failed to meet her burden of showing Petitioner consented or acquiesced to a permanent move to Wisconsin, Petitioner requests this court to find that the Respondent wrongfully removed the children from their habitual residence in Mexico.

Dated this 1st day of October 2020.

**BALISLE FAMILY LAW LEGAL COUNSEL, S.C.**

BY: _____
Linda S. Balisle, SBN 1010455
Nicholas O. Yurk, SBN 1095278
131 W. Wilson Street, Suite 802
Madison, WI 53703
(608) 259-8702 (o)
(608) 259-0807 (f)
office@balislefamilylaw.com

Attorneys for Petitioner