# A Critical Assessment of Child Custody Evaluations

## Limited Science and a Flawed System

Robert E. Emery,[1] Randy K. Otto,[2] William T. O'Donohue[3]

[1]University of Virginia, [2]University of South Florida, and [3]University of Nevada–Reno

SUMMARY—*Most parents who live apart negotiate custody arrangements on their own or with the help of lawyers, mediators, or other professionals. However, psychologists and other mental health professionals increasingly have become involved in evaluating children and families in custody disputes, because of the large number of separated, divorced, and never-married parents and the substantial conflict that often accompanies the breakup of a family. Theoretically, the law guides and controls child custody evaluations, but the prevailing custody standard (the "best interests of the child" test) is a vague rule that directs judges to make decisions unique to individual cases according to what will be in children's future (and undefined) best interests. Furthermore, state statutes typically offer only vague guidelines as to how judges (and evaluators) are to assess parents and the merits of their cases, and how they should ultimately decide what custody arrangements will be in a child's best interests. In this vacuum, custody evaluators typically administer to parents and children an array of tests and assess them through less formal means including interviews and observation. Sadly, we find that (a) tests specifically developed to assess questions relevant to custody are completely inadequate on scientific grounds; (b) the claims of some anointed experts about their favorite constructs (e.g., "parent alienation syndrome") are equally hollow when subjected to scientific scrutiny; (c) evaluators should question the use even of well-established psychological measures (e.g., measures of intelligence, personality, psychopathology, and academic achievement) because of their often limited relevance to the questions before the court; and (d) little empirical data exist regarding other important and controversial issues (e.g., whether evaluators should solicit children's wishes about custody; whether infants and toddlers are harmed*

*or helped by overnight visits), suggesting a need for further scientific investigation.*

*We see the system for resolving custody disputes as deeply flawed, for reasons that go beyond the problem of limited science. The coupling of the vague "best interests of the child" test with the American adversary system of justice puts judges in the position of trying to perform an impossible task, and it exacerbates parental conflict and problems in parenting and coparenting, which psychological science clearly shows to be key factors predicting children's psychological difficulties in response to their parents' separation and divorce.*

*Our analysis of the flawed system, together with our desire to sharply limit custody disputes and custody evaluations, leads us to propose three reforms. First, we urge continued efforts to encourage parents to reach custody agreements on their own—in divorce mediation, through collaborative law, in good-faith attorney negotiations, in therapy, and in other forums. Some such efforts have been demonstrated to improve parent–parent and parent–child relationships long after divorce, and they embrace the philosophical position that, in the absence of abuse or neglect, parents themselves should determine their children's best interests after separation, just as they do in marriage. Second, we urge state legislatures to move toward adopting more clear and determinative custody rules, a step that would greatly clarify the terms of the marriage contract, limit the need for custody evaluations, and sharply narrow the scope of the evaluation process. We find particular merit in the proposed "approximation rule" (recently embraced by the American Law Institute), in which postdivorce parenting arrangements would approximate parenting involvement in marriage. Third and finally, we recommend that custody evaluators follow the law and only offer opinions for which there is an adequate scientific basis. Related to this, we urge professional bodies to enact more specific standards of practice on this and related issues.*

Address correspondence to Robert E. Emery, Department of Psychology, Gilmer Hall, Box 400400, University of Virginia, Charlottesville, VA 22904-4400; e-mail: ree@virginia.edu.

Copyright © 2005 American Psychological Society

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 1 of 30   Document 97

EXHIBIT #1126

## INTRODUCTION

Child custody disputes can entail any number of emotionally wrenching circumstances. The prototypical case involves married parents who separate and, in the heat of divorce, cannot reach an agreement about where and how their children should live. In other cases, a marital or cohabiting relationship dissolves before a child is born and parents must negotiate custody without the benefit of a shared history of parenting. Custody disputes also can surface years after a break-up, for example when a parent relocates, an adolescent wants to change living arrangements, or parents have problems with a difficult child.

Child custody disputes also are not limited to conflicts between biological parents. Grandparents may dispute custody of their grandchildren with their own children, birth parents may contest custody in the context of adoption, or same-sex couples may dispute custody with each other or a biological parent. Finally, infidelity and genetic testing, as well as technological and social innovations in conception and childbearing, can create nightmarish scenarios in which biological and social parents can end up disputing custody (Schwartz, 2003). Our focus here is on child custody disputes between parting parents, whether married or not, but many of the same issues and concerns apply across these different circumstances.

Our initial mission for this monograph was simply to critique the psychological science underpinning child custody evaluations. We make such a critique in the section titled "The (Limited) Science of Custody Evaluations." However, the subject of child custody disputes is complicated by many emotional, practical, and legal issues that are of interest and relevance to psychologists. We therefore have broadened the scope of the report to consider these more general issues, particularly developments in child custody law, alternative dispute resolution, ethics, and societal values about family life. Of course, psychological science is our primary focus, and one of the strongest findings of basic research in this area is that children fare better in separation and divorce if parental conflict is minimal or at least contained and if children maintain a good relationship with at least one, and preferably both, of their parents (Emery, 1982, 1999b, 2004). In other words, the process of family dissolution and the nature of continuing family relationships are more important to children's mental health than is the structure of any particular custody arrangement.

This finding, together with our analysis of the context of custody disputes, leads us to call for three sets of reforms. First, we encourage continued efforts to promote the private settlement of child custody disputes through education, good-faith negotiation, and alternative dispute resolution. Private settlement of custody disputes can reduce conflict; it can encourage more cooperative, ongoing relationships between coparents; and it can facilitate positive relationships between children and both of their parents. Second, we support efforts to make child custody law more clear and determinative, in order to substantially reduce the number of custody disputes. Third, in disputes that remain contested, we would limit mental health expert testimony only to opinions clearly supported by psychological science, a circumstance that unfortunately does not characterize some of today's practice. This final point is not so much a call for a reform as a recommendation that expert witnesses in custody evaluations conform to existing standards for expert testimony.

### The Deer-Doe Case

We invite the reader to begin to consider the many emotional, legal, empirical, and value conflicts involved in child custody disputes with a hypothetical case. We revisit this case at points throughout the monograph to illustrate and anchor our discussion.

Jane and John Deer-Doe, both 39 years old, have two children: Isabella, a 10-year-old girl in the fourth grade, and Carlos, a 3-year-old boy who attends preschool but spends most of the day at home with his mother. Jane continued to work full time as a certified public accountant after Isabella was born, but, with John's reluctant agreement, she quit work after Carlos's birth. John, a moderately successful computer engineer and self-described highly involved father, says that he had expected Jane to return to work after a year or two at home with the children.

Jane and John agreed that they had longstanding conflicts about parenting, finances, and sexuality. John tried repeatedly to get Jane to address their unhappiness by seeing a marriage therapist. Jane was open to therapy but also accepting of an imperfect marriage. Jane's acceptance ended, however, when she learned of John's 2-year-long affair with a coworker. She immediately contacted an attorney, and shortly thereafter, John left the house at her request.

In their subsequent negotiations, Jane indicated her desire for a divorce, and John agreed. He hoped to remarry soon and wanted the children with him half of the time. Jane countered that John should have the children no more than every other weekend, consistent with his "minimal" involvement during their marriage, and she further insisted that their children have no contact with his "friend."

In the 3 months after her parents' separated, Isabella refused to see her father except on a couple of occasions. She continued to do well in school but was extremely angry with her father for "cheating on my mother." Carlos asked for his father repeatedly in the days and weeks after the separation but did so less after seeing his father only sporadically during this time. His preschool teachers complained that Carlos had become very aggressive in school and had begun to wet and soil himself again.

How can psychological scientists help families like the Deer-Does? As we will review in this monograph, there is good research to help us better understand children, divorce, and custody conflicts, and there is some reasonably strong evidence on some successful interventions. Unfortunately, very little research has been conducted directly on legal issues in the custody context, including child custody evaluations.

## DEMOGRAPHICS OF FAMILY STRUCTURE, CUSTODY DISPUTES, AND CUSTODY ARRANGEMENTS

The structure of American families changed dramatically in the latter part of the 20th century. As indicated in Figure 1, divorce rates trended upward in the United States throughout the 1900s and, following a rapid rise in the late 1960s, peaked in 1981 before turning downward (Bramlett & Mosher, 2002).

Other key elements of the demographic story include an average risk of divorce of somewhat less than 50%, higher divorce rates for African Americans, lower rates for Asian Americans, and the declining risk for divorce as a function of years in marriage (Bramlett & Mosher, 2001; see Fig. 2). About 60% of divorces involve children (Clarke, 1995), and about half take place in the first 7 years of marriage (see Fig. 2), so that children are likely to be young when marriages end and custody is disputed (Furstenberg, Peterson, Nord, & Zill, 1983). As we discuss later, special concerns arise about custody for infants, toddlers, and, to a lesser extent, preschoolers.

### Unmarried Parents

Over 40% of children born to married parents are expected to experience the divorce of their parents (Bumpass, 1984; U.S. Bureau of the Census, 1992), and the qualification "born to married parents" is an important one. In 2002, 34% of all children in the United States were born outside of marriage (Martin et al., 2003). In fact, the apparent decline in divorce since 1981 may be attributable to at-risk individuals and couples self-selecting out of legal marriage and childbearing. Rapid increases in nonmarital childbirth did not stabilize until about 1990, and cohabitation (which is more difficult to track) apparently is continuing to increase in frequency.

The best estimates suggest that about half of children born outside of marriage actually are born to unmarried but cohabiting parents (Sigle-Rushton & McLanahan, 2002), and cohab-



**Fig. 2.** Risk of divorce over the first 20 years of marriage, by ethnicity (based on Bramlett & Mosher, 2001).

iting unions are more likely to dissolve than legal marriages are. Forty-nine percent of cohabiting relationships end within 5 years, whereas 20% of first marriages dissolve within 5 years (Bramlett & Mosher, 2002). Although we know of no data regarding how many disrupted cohabitations involve parents and their biological children, the disruption of relationships between unmarried parents clearly is an important and growing area for research on child custody disputes.

### Child Custody Disputes

There is no good national data on how many custody disputes arise when divorcing, cohabiting, or unmarried parents part or on how many such disputes erupt years after the break-up (which may be a more common circumstance). What is clear is that courts are overwhelmed by the huge number of families separating, divorcing, and disputing custody. In 1995, domestic-relations disputes, which include but are not limited to child custody litigation, accounted for one quarter of all legal filings, making this the largest category of court action (Ostrom & Kauder, 1996). Other evidence indicates that custody disputes form the largest percentage of domestic-relations cases (Schepard, 2004).

### Child Custody Decisions

The best evidence on how child custody is decided in the context of divorce comes from Maccoby and Mnookin's (1992) study of 1,124 families with children in which the parents filed for divorce in two California counties in the middle 1980s. As illustrated in Figure 3, most of these cases were settled outside of court, as over three quarters of custody arrangements were negotiated either by the parents themselves or through their lawyers. Since 1981, California law has mandated that mediation be attempted before a custody hearing can be held before a judge; an additional 11% of the cases were settled in mediation, while 5% of the cases went the next step up in the hierarchy of legal conflict—a custody evaluation—before reaching a settlement. Only 4% of cases went to



**Fig. 1.** Annual U.S. divorce rates from 1867 to 2000 (based on Bramlett & Mosher, 2002, and Emery, 1999b).

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 3 of 30   Document 97



**Fig. 3.** Percent of 1,124 families in two California counties settling divorce custody using various methods, during the mid-1980s (based on Maccoby & Mnookin, 1992, p. 137).

trial, and most of these were settled during the trial process. A judge decided less than 2% of the cases (Maccoby & Mnookin, 1992).

The generality of these findings is limited by the two-county sampling, as well as by rapidly changing laws and societal expectations. Still, the data highlight several patterns observed across the United States and much of the industrialized world (Emery, 1999b; Pryor & Rodgers, 2001). First, many parents experience at least a mild degree of conflict surrounding child custody, and conflict is substantial in a significant subset of cases. Combining legal indicators and self-reported conflict measures, Maccoby and Mnookin (1992) estimated that 51% of divorces involved negligible conflict over issues related to custody, while 24% had mild conflict, 10% substantial conflict, and 15% intense conflict. Second, as is the case with other litigation, most custody disputes are decided outside of the courtroom. Third, alternative dispute resolution methods such as mediation increasingly are used, often successfully, in an attempt to settle disputed cases. Fourth, mental health professionals often are involved in child custody conflicts as mediators, custody evaluators, or therapists (although the last role is not reflected in these data).

The importance of each of these patterns is multiplied by high rates of separation and divorce, custody disputes between cohabiting and never-married parents, and the potential for conflict throughout the duration of the children's childhood. This means that (a) even if they represent a minority of cases, large numbers of children are exposed to substantial or intense parental and legal conflict in the midst of their parents' separation; (b) judges face the prospect of spending a great deal of their time hearing custody cases; (c) alternative dispute resolution and custody evaluations have become important parts of the process; and (d) mental health professionals are becoming increasingly involved in the child custody arena in a variety of ways.

### Child Custody Arrangements Following Separation and Divorce

Although laws, definitions, and terms vary from state to state, most of the key aspects of child custody arrangements are captured by the following concepts:

- *Legal custody* refers to parental authority or decision making. In cases of *sole legal custody*, one parent has the right to make major decisions about the children's lives, especially schooling, elective medical care, and religious training. When *joint legal custody* is in effect, both parents share these major decisions, while each parent makes day-to-day decisions autonomously when the children are with her or him. In some cases, the court will assign more specific decision making over day-to-day matters to one or both parents.
- *Physical custody* refers to the time children actually spend with their parents. In cases of *primary physical custody*, the children spend the majority of their time with one parent and generally "visit" (a term many find pejorative) with the "nonresidential parent" on some agreed-to schedule (e.g., one evening during the week and every other weekend). In cases of *joint physical custody*, children spend close to equal amounts of time with both parents. Although there is no uniform definition of joint physical custody, many consider it to be a minimum of an average of two overnights per week (Maccoby & Mnookin, 1992). This definition is consistent with child-support laws in 28 states that lower support obligations for joint physical custody arrangements and often define joint physical custody at about 100 overnights per year (Elrod & Spector, 2004).
- *Split custody* refers to circumstances in which each parent has sole physical custody of at least one child—that is, when siblings are split up between their parents.

### Single Mothers and Single Fathers
The United States Census Bureau generally does not track joint physical custody, but instead lists children as living with two married parents, a single mother, a single father, or in some other arrangement. In 2002, of all children living with a single parent, just over 82% lived with a single mother while approximately 18% lived with a single father (Fields, 2003). This percentage of children living with a single father represents an increase over the historical level of about 10% (Meyer & Garasky, 1993). Interpretation of these census data, however, is clouded by several factors including (a) remarriage, as children who live with remarried parents are counted as living in a two-parent household; (b) cohabitation, as many "single" parents live with a partner, including 11% of single mothers and 33% of single fathers in 2002 (Fields, 2003); and (c) reason for single-parent status, as the category includes separated, divorced, never-married, and widowed parents. Another limitation is that joint physical (or legal) custody is not routinely documented.

### Joint Custody
Joint custody (a term that confounds legal and physical custody) has been a much-discussed and much-debated coparenting arrangement since the 1980s (Folberg, 1991). Later, we discuss evidence about the well-being of children living in joint custody. Our present task is to estimate its prevalence.

We know of three national estimates of the frequency of joint custody (Child Trends, 2002; Clarke, 1995; Donnelly & Finkelhor, 1993), the best coming from special supplemental 1998 United States Census data (and also 1994 and 1996 data that provide essentially the same results). In this analysis, 65% of mothers had sole physical and legal custody, 10% had sole physical and joint legal custody, 11% of fathers had sole physical custody (with either joint or sole legal custody), 9% of parents had joint physical and legal custody, and 5% had split custody or some other arrangement (Child Trends, 2002). Thus, about 75% of children not living with both parents lived primarily with their mothers, approximately 10% lived primarily with their fathers, about 10% lived in joint physical custody, and another 5% lived either in split custody or in some other arrangement. Although some people argue that joint physical custody is becoming far more common, no trends for increased prevalence between 1994 and 1998 were found in the census data (Child Trends, 2002).

### Historical Trend Evidence and Joint Custody

Historical data from Wisconsin demonstrate the importance of distinguishing legal custody and physical custody, and also make us suspect that joint legal custody is becoming considerably more common than suggested by the census estimates. A review of 9,500 Wisconsin divorce settlements between 1980 and 1992 revealed that sole physical custody to fathers remained stable during these years while sole physical custody to mothers declined (see Fig. 4). Joint physical custody rose from 2% to 14% of the Wisconsin cases, while joint legal custody increased from 18% to 81% (Melli, Brown, & Cancian, 1997). Our experience leads us to believe that this dramatic increase in joint legal custody and more modest increase in joint physical custody have also occurred in many other states. Estimates from 1990 data gathered by the National Center for Health Statistics (Clarke, 1995) also support this suggestion, as different states reported widely varying rates of joint custody (legal and physical custody were not distinguished)—for example, 4% percent in Nebraska compared with 44% in geographically and politically similar Kansas.



**Fig. 4.** Percentage of custody arrangements in Wisconsin divorces from 1980 to 1992 (data were collected across calendar years; thus 1982 refers to 1981–82, etc.; based on Melli, Brown, & Cancian, 1997).

### Changes in Custody Arrangements

Custody arrangements change over time, and legal agreements often do not correspond to de facto residence. The best evidence on these points also comes from Maccoby and Mnookin's (1992) longitudinal study. For 783 cases where complete data were obtained during the 3-year study, initial legal agreements designated the following custody arrangements in the two California counties: 66% sole mother custody, 9% sole father custody, 21% joint physical custody, and 4% split custody. Shortly after the divorce decree was filed, however, only 52% of the cases with designated joint physical custody actually had a *de facto* joint physical custody. Among the 48% of the joint physical cases in which the living situation was not consistent with the legal agreement, most involved sole mother physical custody. Of cases with designated mother custody, 87% followed that arrangement in practice, as did 82% of father custody agreements, but only 35% of split-custody agreements actually conformed to that arrangement.

Three years later, only 45% of legally designated joint physical custody cases actually conformed to that arrangement, compared to 85% of cases with designated mother custody, 71% of cases of father custody, and 34% of split custody awards (Maccoby & Mnookin, 1992). The absolute percentages of the four types of custody arrangements 3 years after the divorce decree were similar to the initial arrangements, but the longitudinal analysis demonstrated that many families shifted out of their original custody arrangements and into new ones.

## CUSTODY LAW AND CHILD CUSTODY EVALUATIONS IN PRACTICE

Later, we consider broad conceptual issues related to child custody law and custody evaluations. We begin, however, with a brief overview of the current legal landscape and a minimal critique.

### The "Best Interests of the Child" Standard

Each state legislature in the United States controls its own child custody law, and laws can vary considerably from state to state. Still, every state law indicates that custody decisions are to be made according to "best interests of the child" standard, the principle that judicial determinations should be based on each child's unique future best interests (Elrod & Spector, 2004). Many mental health professionals applaud this "best interests of the child" standard as being responsive to individual children and families. We differ. Individualized decision making is appealing on the surface, but we are deeply concerned that a standard vague enough to be interpreted differently for each family that comes before the court (a) encourages parents to enter into custody disputes (thereby increasing parental conflict), because the outcome of a court hearing is difficult to

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 5 of 30   Document 97

predict; and (b) allows for bias to intrude in the exercise of judicial discretion.

For reasons we do not fully understand, the law apparently has interpreted children's best interests to be primarily their best psychological interests (as opposed to other possibilities such as their economic, educational, or medical interests). This is evident in the various factors deemed relevant to children's best interests listed in most state laws, which typically are rooted in the Uniform Marriage and Divorce Act (1979), which lists the following:

- The wishes of the children's parent or parents as to their custody
- The wishes of the children regarding their custodian
- The interaction and interrelationship of the children and their parent or parents, their siblings, and any other person who may significantly affect the children's best interests
- The children's adjustment to their home, school, and community
- The mental and physical health of all individuals involved

Because child custody laws differ from state to state, some factors designed to be considered by judges are idiosyncratic to one or only a handful of states. South Carolina, for example, takes into account the religious beliefs and commitment of the parents, while Alabama, Florida, Michigan, North Dakota, and Utah consider parents' "moral character" to be relevant to children's best interests. One of the goals of a child custody evaluation—the overriding goal, according to some—is to assess the child and parents relative to these state-specified best-interest factors.

## A Psychological Evaluation for the Deer-Doe Family

After several months of separation and still no custody agreement, Jane's attorney suggested a child custody evaluation as a next step in their negotiations, and, eager for some outside help, John agreed. Several weeks later, a psychologist, Dr. David Hagan, who was mutually agreed upon by both parties, was appointed by the court to assess Jane, John, his girlfriend, and their children.

Over the course of 6 weeks, Dr. Hagan conducted a comprehensive evaluation consisting of interviews and psychological testing with both parents; tests included the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the Rorschach Inkblot Technique, and the Wechsler Abbreviated Scale of Intelligence. Both children were interviewed, observed interacting with each other, and observed interacting with each parent at Dr. Hagan's office and at the respective parental homes. Dr. Hagan also administered a number of psychological tests to the children including the Achenbach Child Behavior Checklist (with parents and teachers as informants), the Roberts Apperception Test, the Bricklin Perceptual Scales, and the Wechsler Intelligence Scale for Children-IV. In addition, Dr. Hagan obtained collateral information by interviewing the children's teachers and grandparents, reviewing school and medical records, and reading all litigation-related documents. Finally, Dr. Hagan evaluated John's girlfriend by way of extensive interviewing and administration of the psychological tests mentioned earlier.

Dr. Hagan's bill for $7,400 reflected that he spent 37 hours conducting the evaluation, reviewing records, and writing a 35-page report summarizing his observations, findings, and opinions. (We discuss the report later.)

## Practices Reported by Custody Evaluators

Given their frequency, high cost, and social and personal importance, we might expect to find a large body of research on custody evaluations and their scientific underpinnings. However, only a few studies of custody evaluations have been completed. One thing these studies show is that, in real life, many evaluators use the instruments employed by our fictional Dr. Hagan. Another thing research shows is that most of these measures are deeply flawed when used in the custody context.

With the exception of one study (Bow & Quinnell, 2002) all research examining child custody evaluation practices has been based on the self-report of examiners. Although these data provide some helpful information, we must keep in mind that professionals' reports of their behavior may not accurately depict their actual practices (Greenberg, Otto, & Long, 2003).

Keilin and Bloom (1986) described the practices reported by 82 custody evaluators (78% psychologists) who responded to an anonymous survey. Respondents devoted an average of 19 hours to each evaluation and almost always reported interviewing each parent and the children. Most used psychological tests with adults (76%) and children (74%); most observed parent–child interactions (69%); half said they observed interactions between the two parents; and about one third reported visiting the children's homes or schools. Approximately one half interviewed third parties (e.g., friends and relatives) in an attempt to gain a better understanding of the children and their parents.

No one particular psychological test was used by a majority of the respondents when assessing children. Intelligence tests were used most frequently, with almost half of the evaluators using them in the majority of their cases. The next most frequently used instruments with children were the Thematic Apperception Test or the Children's Apperception Test (39%), followed by miscellaneous projective drawings, the Rorschach Inkblot Technique, and the Bender-Gestalt Visual Motor Test. In assessments of parents, the MMPI was the most commonly used assessment technique (70%), followed by the Rorschach Inkblot Technique (42%), and the Thematic Apperception Test (38%).

Keilin and Bloom (1986) also asked respondents to rank order 21 different factors with respect to their importance when considering custody. In descending order of significance, the ten most important were (1) the stated preferences of a 15-year-old (or older) child, (2) parental attempts at alienation (i.e., attempting to turn a child against the other parent), (3) the nature and quality of the child's emotional relationship with each parent, (4) the emotional or psychological stability of each

parent, (5) each parent's parenting skills, (6) each parent's openness towards the child's contact with the other parent, (7) the parents' preseparation caretaking and parenting roles, (8) the parents' expressed anger and bitterness regarding the divorce, (9) the parents' sexual orientation, and (10) the stated preferences of a 5-year-old child.

Ten years later, Ackerman and Ackerman (1997) surveyed 800 doctoral-level psychologists who conducted child custody evaluations and obtained responses from 201 (25%). Respondents spent 21 hours per evaluation—similar to the earlier survey—but these respondents reported devoting more time to reviewing collateral materials and report writing. Intelligence tests and projective measures continued to be the instruments most frequently employed with children, and the MMPI/MMPI-2 remained the most frequently used assessment instrument for parents, followed by the Rorschach Inkblot Technique.

Many custody evaluators also reported using assessment instruments with children that were developed specifically for use in custody contexts (Ackerman & Ackerman, 1997). Over one third used the Bricklin Perceptual Scales (Bricklin, 1990a) while 16% used the Perception of Relationships Test (Bricklin, 1989). Fewer respondents (11%) used the Ackerman-Schoendorf Scales for Parent Evaluation of Custody (Ackerman & Schoendorf, 1992), the one custody-assessment measure designed for entire families and adults. Fewer than 10% used other custody-assessment measures, specifically, the Parent Awareness of Skills Survey (Bricklin, 1990b) and the Custody Quotient (Gordon & Peek, 1989). Other investigators (e.g., Bow & Quinnell, 2001; Gourley & Stolberg, 2000) have reported findings regarding test usage by custody evaluators similar to those detailed by Keilin and Bloom (1986) and Ackerman and Ackerman.

Like Keilin and Bloom (1986) before them, Ackerman and Ackerman (1997) also asked custody evaluators to rate the importance of various factors to issues of child custody. According to the custody evaluators, the ten most important, in descending order of significance, were (1) the substance abuse status of each parent, (2) the parents' parenting skills, (3) parental attempts at alienation, (4) the nature and quality of the child's emotional relationship with each parent, (5) the emotional or psychological stability of each parent, (6) each parent's openness toward the child's contact with the other parent, (7) the parents' history of compliance with the court during the separation, (8) the parents' preseparation caretaking and parenting roles, (9) the stated preferences of a 15-year-old or older child, and (10) the parents' expressed anger and bitterness regarding the divorce.

## THE (LIMITED) SCIENCE OF CUSTODY EVALUATIONS

State statutes regarding children's best interests help us understand at least some of the practices of custody evaluators. We could (and later do) question, for example, whether (or when) a parent's mental health or the wishes of a child should be a central focus in child custody cases. Still, evaluators who assess such factors are following explicit legal guidelines. More difficult to explain and more problematic, however, are other aspects of evaluation practices including the widespread use of well-established measures with no clear relevance to the custody context (e.g., measures of intelligence), attempts to measure constructs created to apply to child custody decision making (e.g., "parent alienation syndrome"), efforts to identify "parent of choice" (e.g., the Bricklin Perceptual Scales), and the use of measures that a significant number of psychologists view with skepticism (e.g., the Rorschach Inkblot Technique).

We are dubious about many child custody evaluation practices, because of the absence of solid psychological science and of clear criteria to be predicted by psychological science. We also hold two much more fundamental questions about child custody evaluations: Why has society and the law placed such importance on a prediction about *psychological* factors in determining custody? And if the goal is to minimize children's psychological risk, might there be better roles for psychologists to play—both as practitioners and as scientists—in custody disputes? For now, however, we focus on the lack of scientific evidence to support many of the instruments and practices of mental health professionals who serve as custody evaluators.

Heilbrun, Rogers, and Otto (2002) described a three-category typology of assessment techniques used in forensic evaluations, including custody evaluations. *Clinical assessment instruments* are those developed to assess psychological constructs, typically for intervention purposes (e.g., measures of intelligence, psychopathology, academic achievement). *Forensically relevant instruments* assess constructs that are psychological in nature but may be of particular relevance in forensic contexts (e.g., measures of response style, risk for criminal offending). Finally, *forensic assessment instruments* are specifically designed to assess psycho-legal constructs. Here we review evidence in regard to the third and first categories of assessment techniques. We do not consider forensically relevant instruments because none have been used widely by custody evaluators, although that may change (Posthuma, 2003). We also raise concerns about "parent alienation syndrome" and other constructs that have been created for, and asserted to have scientific standing in, the context of custody evaluations.

### Forensic Assessment Instruments: No Scientific Support

In the past 15 years, psychologists have developed a number of forensic assessment instruments purporting to assess children's best interests in custody disputes (see Grisso, 2003). Our bottom-line evaluation of these measures is a harsh one: These measures assess ill-defined constructs, and they do so poorly, leaving no scientific justification for their use in child custody evaluations.

The most widely used forensic assessment instrument (Ackerman & Ackerman, 1997) is the Bricklin Perceptual Scales

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 7 of 30   Document 97

(BPS), described as a projective measure of parents' competence, supportiveness, follow-up consistency, and possession of admirable traits (Bricklin, 1990a). Using a stylus and rating card, children rate each parent on 32 different activities considered to be relevant to these four capacities. The parent who receives the greater number of positive ratings is identified as the "Parent of Choice." Bricklin asserts that the nonverbal nature of the task (using a stylus rather than a verbal response) allows for the assessment of the child's "unconscious preferences," which are less likely to be subject to distortion due to social desirability or parental persuasion. However, the BPS has been criticized on numerous grounds: There is no support for claims that it assesses children's unconscious preferences or that responses are not subject to external influence; the developer permits variation from standard test administration; the measure samples a relatively narrow range of parenting domains; the developer has not provided basic norms and psychometric properties of the measure; and data regarding concurrent and predictive validity are either absent or unconvincing (Heinze & Grisso, 1996; Melton, 1995; Melton, Petrila, Poythress, & Slobogin, 1997; Otto & Edens, 2003; Otto, Edens, & Barcus, 2000; Shaffer, 1992).

Another measure used fairly frequently is the Perception of Relationships Test (PORT; Bricklin, 1989), a projective drawing that is described as measuring the "whole organism or gut-level responses a child has toward a parent [that] are much more reflective of what the child's actual interactions or experiences with that parent have been" (Bricklin, 1993, p. 1). Seven drawing tasks completed by the child are scored to identify the "Primary Caretaking Parent." Like the BPS, the PORT has been widely criticized. Objections include the incomplete and confusing manual, unclear administration and scoring guidelines, minimal reliability data, missing norms, and lack of validity data (Carlson, 1995; Conger, 1995; Heinze & Grisso, 1996; Melton et al., 1997; Otto & Edens, 2003; Otto et al., 2000).

Bricklin (1990b) describes another measure, the Parent Awareness Skills Survey (PASS), as a "clinical tool designed to illuminate the strengths and weaknesses in awareness skills a parent accesses in reaction to typical child care situations" (p. 4). The PASS consists of 18 childcare scenarios selected to represent caretaking of children of various ages. The parent's responses are followed up with questioning by the examiner as needed, and scoring is based on guidelines in the test manual. The PASS also has been criticized for basic shortcomings: the absence of norms, reliability and validity data, and clear scoring guidelines (Otto & Edens, 2003; Otto et al., 2000). Of particular concern is the developer's suggestion that "the evaluator, by virtue of appropriate training in psychology and/or child development, can apply his or her own standards in assigning the suggested scores. The PASS allows for wide latitude in scoring since its main purpose is to discover the relative (rather than absolute) strengths and weaknesses any individual or compared set of respondents manifest" (Bricklin, 1990b, p. 11).

The Parent Perception of Child Profile (PPCP; Bricklin & Elliott, 1991) is described as a measure of parents' understanding of a child's development and needs across eight areas: interpersonal relations, daily routine, health history, developmental history, school history, fears, personal hygiene, and communication style. Because parents who more accurately assess their child are assumed to be better parents, the PPCP requires the examiner to assess the accuracy of each parent's report, using vaguely defined criteria that include the examiner's and third-party informants' opinions. According to the manual, data need not be gathered in all eight categories, and the examiner can decide which issues are most critical for a particular child and parent. The PPCP has been criticized for its incomplete manual, lack of scoring directions, and absence of reliability and validity data (Otto et al., 2000; Otto & Edens, 2003).

Another instrument used by evaluators with some frequency, the Ackerman-Schoendorf Scales for Parent Evaluation of Custody (ASPECT), is purported to be "a clinical tool designed to aid mental health professionals in making child custody recommendations" (Ackerman & Schoendorf, 1992, p. 1). The ASPECT is not a test, but an assessment approach that aggregates data from the parent (an open-ended "Parenting Questionnaire," the MMPI-2, the Rorschach Inkblot Technique, and an intelligence test) and from the child (the Rorschach Inkblot Technique, an intelligence test, an academic achievement test, and a projective story). Measures were selected based on the developers' review of the literature, and test scores are used to calculate a "Parental Custody Index" (PCI) for each parent. The PCI is considered to indicate parenting effectiveness, and judgments about the parents are based on their relative PCI values. With rare exceptions (e.g., Brodzinsky, 1993), reviews of the ASPECT have been uniformly negative. Criticisms include the absence of a clear relationship between many of the measures and behavior relevant to custody; the failure to assess factors clearly deemed relevant to custody decisions; and an absence of important data regarding basic psychometric properties, including predictive validity (Arditti, 1995; Heinze & Grisso, 1996; Melton, 1995; Melton et al., 1997; Otto & Edens, 2003; Otto et al., 2000; Wellman, 1994).

In summary, all measures that purport to assess constructs directly relevant to child custody determinations suffer from significant limitations. In fact, no study examining the properties of these measures has ever been published in a peer-reviewed journal—an essential criterion for science and, in theory, for the courts. In our view, the absence of scientific support should preclude the use of any of these forensic assessment instruments for any purpose other than research. We even have doubts about the value of research using these measures, because it is hard to conceive of any psychological test that could measure all the factors that might be relevant to child custody (Shuman, 2002) or that might assess the best custody arrangements for children when the criteria for fulfilling children's best interests are so poorly defined (Emery, 1999b).

## Clinical Assessment Instruments: Some Cautions in the Custody Context

Heilbrun et al. (2002) describe measures of intelligence, personality, psychopathology, and academic achievement as clinical assessment instruments. In contrast to forensic assessment instruments, we believe use of many of these measures is warranted in forensic assessment contexts to the degree that they offer reliable and valid assessments of relevant constructs identified in the law. We do, however, wonder about the routine use of measures such as IQ tests, which can add to the time and expense of a custody evaluation without holding a clear relevance to the issue before the court.

A greater concern is the validity of clinical assessment instruments in the custody context, as a number of considerations suggest the need for caution. For one thing, as in other forensic contexts, examinees may be less than candid in their responses, including on psychological tests. Tests that do not include measures of response style are particularly vulnerable to dissimulation, while tests with embedded measures of response style are not necessarily impervious to false reporting.

Whether the constructs assessed by the instrument are, broadly conceived, "states" or "traits" is another important issue. Assessments of characteristics that commonly change over time (e.g., parental depression) provide a weak basis for an evaluator to make claims about how a parent functioned in the past or will function in the future. Because families are evaluated during a period of high stress, moreover, evaluators also must be cautious about drawing inferences about functioning at some later, hopefully less stressful, point in time. Given the very nature of custody disputes and the context in which most custody evaluations occur, it is particularly important that the evaluator not assume that instruments assessing more enduring styles will not change in response to situational factors. The Standards for Educational and Psychological Testing (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, 1999) direct that "a test taker's score should not be accepted as a reflection of lack of ability with respect to the characteristic being tested for without consideration of alternate explanations for the test taker's inability to perform on that test at that time" (p. 43). The upheaval of divorce constitutes a reasonable "alternative explanation" that should certainly be considered when interpreting a test score.

We do not want to throw out the baby with the bathwater. There may be a role for clinical assessment instruments in some custody evaluation contexts. More specifically, to the degree that there is a psychological construct that is relevant to the issues at the heart of a custody matter and there are valid psychological measures of that construct available, use of such measures can be of some value. Examples of relevant things that may need to be determined in a custody case might include whether a child has a learning disorder that needs special attention, whether a mother suffers from depression that affects her ability to meet her children's emotional needs, or whether a father has a substance-abuse disorder that results in him placing the children in at-risk situations when in his care.

### Projective Measures

Our concerns about clinical assessment instruments apply to highly structured, well-validated, and well accepted measures of intelligence, academic achievement, and psychopathology. These issues present the greatest concerns, however, for unstructured, projective measures, given questions that have been raised about even basic psychometric properties of such tests, including their reliability and validity. There is a considerable difference of opinion and ongoing, active debate regarding the general utility of projective measures such as the Rorschach Inkblot Technique (compare Wood, Nezworski, & Stejskal, 1997; Wood, Nezworski, Lilienfeld, & Garb, 2003 and Weiner, 1996; Meyer, 1997, 2001), Draw a Person, and Human Figure Drawings. The very existence of this debate, in combination with some of the specific criticisms and potential dangers in the custody context, lead us to suggest that such measures not be used in child custody evaluation contexts, or any other evaluation contexts for that matter.

We do not have the space, expertise, or the inclination to review the broad and polarized literature on projective tests in this monograph. Thus we only point to the extensive and serious controversy, and note this: Questions about the value of projectives or any other assessment technique need to be debated and answered by psychological scientists outside of the courtroom. It is naive to expect judges to make informed judgments about the psychometric adequacy of projective measures in the context of a custody hearing. We also are concerned about the potential for evaluators to assert that projective measures have scientific authority while the underlying empirical, legal, and values questions remain unanswered, precisely because the "test" is mysterious to lay observers and therefore potentially misleading or difficult to challenge. A nonexpert might feel competent challenging the relevance or the validity of a relatively straightforward measure like an IQ test or an MMPI-2. Yet, despite more significant concerns about its psychometric properties, results of a Rorschach may be more difficult to challenge precisely because of its more obscure source of material and scoring (Shuman, 2002).

### Clinical Interviews

The clinical interview is another assessment technique that requires considerable caution when used as a measurement technique in custody evaluations. Interviewers may yield inferences that are reliable or unreliable, valid or invalid, but there are no structured interviews with well-established psychometric properties specifically developed for use in the child custody context, and survey data regarding psychologists' custody evaluation practices indicate that use of any structured interview approach is virtually unheard of (Ackerman & Ackerman, 1997; Keilin & Bloom, 1986). Thus, differences between

 Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 9 of 30   Document 97

interviewers may result from variance in the family's responses or from the contrasting structure, content, or interpretation of the interview. We urge psychological scientists to work to develop structured interviews for the custody context. In the meantime, we expect custody evaluators to continue to interview families. Although we are dubious about the psychometrics of unstructured interviews, we find some comfort in the fact that, unlike projective measures, interviews are more straightforward and understandable and hopefully are not presented as providing data as scientific-sounding as that of a test.

### Direct Observation

Direct observation of parent–child interactions is another complex and generally unstandardized assessment strategy. Threats to validity include reactivity, unreliable coding systems, unrepresentative samples of behavior, and problematic data compilation and analysis. As with interviews, we urge the development of standardized observation measures for use in the custody context, and urge evaluators to describe their observations clearly and to identify the inferences they draw from observational assessments.

### Combining Assessment Results and Drawing Inferences

This last point raises a broader and very important issue. All clinical assessment instruments assess constructs that, at most, are only indirectly relevant to custody; thus their use in custody evaluations typically requires inferences to be made. Once a parent's depression or a child's academic abilities are assessed, for example, the examiner may draw some inference regarding how that factor is relevant to the best interests of a child. The question is: How is the examiner to draw conclusions from a single measure or, even more importantly, combine data from several sources to form a conclusion about the best interests of the child? For example, how does an evaluator weigh the results of a hypothetically accurate (impossible in practice) evaluation where all data indicate that the mother is an effective disciplinarian but not terribly warm and that the father is warmly supportive but not good at setting limits? Thus, our concerns with clinical assessment instruments are not only how to measure relevant constructs reliably and validly in a difficult context, but also how to synthesize multiple measurements in a manner relevant to the ultimate issue of a custody determination. Perhaps ideally, the law should provide a formula for making such decisions, but the factors to be considered in the law are rarely even ranked relative to one another.

### Controversial Topics Requiring Further Investigation

Surveys of practicing custody evaluators indicate that, in addition to using clinical assessment instruments and dubious forensic assessment instruments, they also frequently assess certain quite controversial constructs. We illustrate our concerns by focusing on three in particular: (a) parental alienation

syndrome (PAS), (b) children's wishes regarding custody, and (c) overnight visitation for very young children.

### PAS: Asserting Science Where There Is None

"Parental alienation" is a construct ranked high on the list of factors evaluators consider to be directly relevant to custody decision making. There is no test instrument designed to measure parent alienation. Rather, it is a "diagnosis" reached through clinical interviews. Some experts have testified to making the diagnosis of parental alienation syndrome, and their testimony is claimed to be an important influence on judicial decision making (Gardner, 2004).

"Parental Alienation Syndrome" is a term created by psychiatrist Richard Gardner (2001) based on his clinical experience with custody disputes. Gardner asserts that PAS, which he says develops almost exclusively in the context of custody disputes, is characterized by one parent "programming" a child against the other parent (Gardner, 2001). The assumption is that a child's disdain for one parent is generally unjustified and solely attributable to denigration on the part of the other, alienating parent. Gardner (2004) also claims that PAS can be "diagnosed" reliably and validly by expert evaluators, although he offers no explicit criteria for doing so or objective evidence to support his claim (Emery, 2005).

We recognize that parents often undermine each other's relationships with their children following separation (Emery, 2005; Kelly & Johnston, 2001). We also note that many state statutes include a "friendly parent" rule, a preference for awarding custody to the parent who will be more likely to promote the children's relationship with the other parent (Elrod & Spector, 2004). However, the scientific status of PAS is, to be blunt, nil. As Gardner (2004) himself noted in a recent posthumous publication, only one study of parent alienation ever attempted a statistical analysis: his own. Very recently, Johnston conducted two studies of case records designed to identify the sources of alienation; she found many contributing factors leading to a child aligning with one parent against the other, including high-conflict custody litigation and poor parenting on the part of the "alienated" parent (cited in Johnston & Kelly, 2004).

We believe that it is blatantly misleading to call parental alienation a scientifically based "syndrome" (Emery, 2005). Careful assessments of each parent's willingness to support the other coparent clearly may be relevant to custody, but there is no established way of measuring "alienation." Evaluators therefore must carefully identify the sources of their information concerning a more or less "friendly" parent, as well as the inferences they draw from these assessments. Certainly, these assessments are best conducted by an evaluator who interviews both parents, something Gardner (2001) did not do in many cases.

### Children's Wishes

Surveys indicate that custody evaluators place considerable importance on children's stated preferences regarding custo-

dy—particularly the preferences of adolescents, but also of children as young as 5 years old (Ackerman & Ackerman, 1997; Keilin & Bloom, 1986). This surely reflects the fact that children's wishes regarding custody typically are included in state laws as a factor to be considered when determining children's best interests. In fact, some statutes explicitly direct that the wishes expressed by a child of a given age—for example, 12 years old—should determine custody if there is no reason why those wishes should not be followed (Elrod & Spector, 2004). Although all agree that the wishes of teenagers can be influenced by unfortunate circumstances (e.g., a parent's greater material resources or permissiveness), laws regarding the expressed wishes of children of a certain age both respect the increasing autonomy of adolescents and recognize the realistic difficulty of trying to keep children in an arrangement to which both they and one parent object.

A policy of acting on the freely expressed wishes of an adolescent is not without problems, but far bigger problems (and controversies) arise in regard to wishes of children who (a) are school aged or even younger and/or (b) do not come forward with a freely expressed preference. Some psychologists have offered that, even in these circumstances, children should be encouraged to express a preference regarding custody as a means of empowering them (see Weithorn, 1987). Others express concern that, instead of giving children the right to have input, such policies give children the responsibility for making adult decisions—decisions that the adults have failed to make themselves (Emery, 2003). Still others say that children's preferences should be assessed only sensitively and indirectly and that this information should be used as feedback to facilitate independent parental decision making (McIntosh, Long, & Moloney, 2004).

One of us has taken a strong position against attempting to assess children's unexpressed wishes (Emery, 2003), but our present concern is more basic. The freely offered preferences of children—particularly older children—are important considerations in custody evaluations for both practical and legal reasons, but there is no direct evidence on how or indeed whether evaluators should assess the wishes of children who, for whatever reason, do not express them.

### Overnights With Infants and Toddlers

A final controversy we will discuss is whether or to what extent infants and toddlers should have overnight visits with their nonresidential parents. Children's age in relation to overnights is not a consideration mentioned often in surveys of custody evaluators, but it stands as an example of the sorts of controversial issues that evaluators often are asked to address. Other such issues include the question of whether a residential parent with primary physical custody should be allowed (if there are good reasons) to move with the child away from a nonresidential parent, or under what circumstances parental conflict is so intense that joint physical custody is unworkable.

Using differing interpretations of attachment theory, leading psychological scientists have taken strong and very different positions on the issue of overnights involving young children. A document prepared for the Spokane (Washington) Bar Association, and endorsed by many leading attachment researchers, called attention to the psychological importance of young children's secure attachment with a primary attachment figure. Based on research and theory on the primary attachment, the report recommended against overnight visits with the nonresidential parent until children are 4 years old (Spokane County Bar Association, 1996). In contrast, in a paper published in a major family-court journal, other leading psychological scientists highlighted the importance of children's attachments to multiple caregivers. Focusing on the value of developing multiple attachments, the authors recommended that infants should have regular overnight visits with nonresidential parents in the first year of life (Kelly & Lamb, 2000). Both interpretations offered various caveats about the quality of children's relationship with the nonresidential parent, parental cooperation, and similar issues, but they clearly came to very different substantive conclusions about what psychological science indicates regarding whether, when, or how often infants and toddlers should have overnight visits with nonresidential parents.

There is only meager direct evidence on the harm (Solomon & George, 1999) or absence of harm (Pruett, Williams, Insabella, & Little, 2003) associated with overnight visits for very young children. As with the issue of children's wishes, the psychological scientists debating the question of overnight visits apparently come to logical conclusions based on their own, theoretical premises, yet the limited state of knowledge allows reasonable scientists to come to opposing conclusions. Such differences of opinion are of great value in science, but when translated into policy recommendations, they can confuse and confound judges, lawyers, evaluators, and parents. For example, we have had distraught mothers approach us in shock after being court-ordered to stop breast-feeding their infants to allow for smoother overnight visits, yet we also know of judges who claim to overturn consensual parenting plans if they include overnight visits for children 3 years of age or younger because of worries about disrupting attachments.

One of us has developed a set of guidelines for parents about overnights and other arrangements for young children that represents what we believe to be a balanced position (Emery, 2004). However, our point here is that, whatever conclusion one reaches, it is based on limited evidence. Psychological scientists need to recognize and acknowledge their limited data base.

Our bigger point, to which we turn shortly, is this: Custody decision making and custody evaluations have an impossible task in attempting to determine children's future "best interests" in cases where parents cannot agree. Neither the wisest judge nor the most insightful evaluator has good answers to impossible questions.

The custody report completed by Dr. Hagan in our fictional case illustrates our various concerns with the limited science of

 Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 11 of 30   Document 97

custody evaluations and, more importantly, shows the problems that can arise under the regime of vague custody laws and vague professional and ethical standards for custody evaluators.

### The Deer-Doe Case: Dr. Hagan's Custody Report

Dr. Hagan wrote a 35-page report summarizing his evaluation of the Deer-Doe family. The report contained precise details of the results of the various standardized tests, but the lawyers were only really interested in the final paragraphs under the heading, *Summary and Recommendations*.

"In summary, substantial evidence points to Ms. Deer-Doe's longstanding depression, her intense, repressed hostility toward Mr. Deer-Doe, and her alienation of the children against their father. In contrast, Mr. Deer-Doe appears to be well adjusted, is eager to promote the children's relationship with their mother, and is able and interested in being a full-time father. It therefore is recommended that, in order to promote his best interests, Carlos Deer-Doe be shifted immediately to his father's custody with regular visits with his mother, provided that she enters into individual psychotherapy.

"Although Isabella's intense anger at her father is largely a product of alienation, no change in custody is recommended for her at this point in time, because she is closely allied with her mother and is likely to continue to reject and rebel against her father's care. Instead, individual psychotherapy and family therapy with her father is recommended for Isabella, with further evaluation in 3 to 6 months depending upon the recommendations of Isabella's therapists and her mother's therapist, if relevant. A key consideration at that time will be whether Isabella's stated wish to live with her mother, if she continues to voice this preference, is a result of alienation."

When he read the evaluation, John Deer-Doe was jubilant. He felt vindicated, eager to be a full-time father again, and excited about the prospect of starting his new family. He vowed he was now going to get remarried "the day after my divorce is final." His lawyer, who also was encouraged by Dr. Hagan's report and recommendations, told John that the evaluation was not only a victory for him but for all fathers. "Sometimes the system really does work," she offered.

Jane Deer-Doe's reactions were understandably quite different. Shocked and panicked, she became emotionally distraught in her lawyer's office. He eventually helped Jane calm down by telling her that he had learned only recently that Dr. Hagan, who used to be fair and evenhanded, had become notoriously biased in favor of fathers as a result of losing custody in his own, bitter divorce. If he had known this a few months ago, Jane's lawyer told her, he never would have agreed to Dr. Hagan as the court-appointed evaluator.

Ms. Deer-Doe's attorney went on to offer that he would postpone the pending hearing in order to get a second evaluation by another mental health professional and have Dr. Hagan's evaluation reviewed by a third professional so as to identify any important limitations or weaknesses. If the court refused to appoint a more objective, neutral evaluator, then he would hire an expert who would do the job right. In any case, the postponement meant that, at a minimum, no changes in custody would take place for 6 to 9 months given the congested court calendar. In the meantime, he

urged Ms. Deer-Doe to cheer up, continue to be a wonderful mother, and to be on her very best behavior so as not to give her soon-to-be-ex-husband any ammunition in his campaign against her and motherhood.

### A Bigger Problem: The Legal and Emotional Context of Custody Disputes

We could conclude our monograph here with this summary: There is essentially no psychological science to support the measures and constructs designed specifically for the assessment of child custody arrangements for individual children. Moreover, established measures of clinical constructs must be used with caution due to threats to their validity and questions about the relevance in the custody context of the constructs they assess. We also could conclude that the state of psychological science is too limited to reach clear conclusions about controversial issues such as children's wishes, overnight visits, or even PAS, and remind the reader that the burden of proof falls on proponents of a particular hypothesis or recommendation. To these three points, we could add questions about ethics and professional practice—for example, potential concerns about systematic bias on the part of evaluators, questions about whether evaluators should address the "ultimate issue" (i.e., recommend specific custody arrangements), and worries about a battle of experts when each side hires its own evaluator.

However, we believe there are bigger problems in custody evaluations than shoddy science, and we also believe that consideration of these broader issues points the way to some promising solutions for custody evaluations, children, and families. Thus, we turn now to examine the more general literature on children's adjustment to their parents' separation and divorce. After this, we outline three general recommendations that we consider in light of psychological research, legal analysis, and professional responsibilities including various issues we raised about Dr. Hagan's custody evaluation.

### AVERAGE EFFECTS AND VARIATION IN THE WELL-BEING OF CHILDREN FROM DIVORCED FAMILIES

There is a large, sophisticated, multidisciplinary research literature on how children are affected by parental separation and divorce. We cannot review many original sources from this literature in this limited space, although we have done so elsewhere (Emery, 1999b). In the following section, we offer an overview of the major conclusions researchers have drawn. After this, we consider what factors predict children's more or less adequate adjustment. For present purposes, research on the average well-being of children from divorced families is of interest primarily as a starting point for examining predictions of individual differences in outcome, one of the main goals of a custody evaluation. Thus, we review this extensive literature only briefly.

On average, parental divorce is associated with an increased risk for a variety of psychological problems among children

(Emery, 1999b; Hetherington & Kelly, 2002; McLanahan & Sandefur, 1994). In a meta-analysis of 92 studies, Amato and Keith (1991) found an average effect size of .14 standard deviation units when comparing children from divorced versus married families across all child outcomes. Another meta-analysis of studies in the 1990s found that the average effect size was somewhat larger than this earlier estimate, ranging from a low of .12 standard deviation units for measures of self-concept to a high of .22 standard deviation units for conduct problems (Amato, 2001).

While the effect sizes suggest a modest, average increase in psychological problems, it is important to underscore the variability in the psychological adjustment of children whose parents separate and divorce. Most children are resilient despite their parents' divorce, as indexed by measures of psychological maladjustment that do not differentiate them from children whose parents remain continuously married (Emery, 1999a; Emery & Forehand, 1994). Still, depending on the outcome, parental separation or divorce is linked with a 25% to 100% (a doubling) increase in the risk for psychological difficulties at the extremes of the distribution (Hetherington & Kelly, 2002; Zill, Morrison, & Coiro, 1993). Given the high prevalence of separation and divorce, even a modest increase in risk translates into an important societal concern.

### Nonrandom Selection Into Divorce

Still, at least some of the putative "effects" of parental divorce on children, perhaps as much as 50% of the variance, are due to nonrandom selection into divorce. Many of the problems found among children from divorced families actually are present before the parents separate (Cherlin et al., 1991) and therefore cannot be consequences of parental divorce, although this selection effect seems to be stronger in accounting for the psychological difficulties of children than for those of young adults (Cherlin, Chase-Lansdale, & McRae, 1998). Behavior geneticists have raised the strongest selection argument, suggesting that children's risk in divorce may be fully or partially attributable to the passive gene–environment correlation, because genetic factors influence divorce and may also affect children's behavior (McGue & Lykken, 1992). Despite this important concern, in one adoption study (O'Connor, Caspi, DeFries, & Plomin, 2000) and one twin study (D'Onofrio et al., in press), divorce still was associated with a diminished but increased risk for psychological problems, particularly externalizing problems, among children.

### Different Risks for Different Outcomes

Externalizing difficulties are the child emotional problems most strongly linked to parental separation and divorce (Amato, 2001; Amato & Keith, 1991; Emery, 1982, 1999b). Other emotional difficulties less strongly tied to parental marital status include depression; anxiety; poor school behavior and per-

formance; and difficulties in romantic relationships, including an increased risk for divorce among offspring (e.g., McLanahan & Bumpass, 1988). A significantly increased risk for troubled family relationships, especially between children and their fathers, also accompanies divorce. One national study found that fully 65% of young adults between the ages of 18 and 22 whose parents were divorced had poor relationships with their fathers; only 29% of those whose parents were married had poor relationships with their fathers (Zill et al., 1993).

Scientific research notwithstanding, some clinical investigators point to case studies indicating that the adverse consequences of divorce for children are unexpectedly large (e.g., Wallerstein, Lewis, & Blakeslee, 2000). We believe that this conclusion, and much of the debate about it, is due to confusion of psychopathology with what one of us has termed psychological distress or "pain" (Laumann-Billings & Emery, 2000). Even resilient, well-functioning young people whose parents divorce report considerable distress in regard to their memories of their childhood ("I had a harder childhood than most people"), feelings about their current family relationships ("Sometimes I wonder if my father even loves me"), and concern over events where both of their parents will be present ("I worry about big events like graduations or weddings where both of my parents will have to come"; Laumann-Billings & Emery, 2000). Thus, even if resilience—as defined by the absence of mental health problems—is the normative outcome of divorce for children, children's resilience often is colored by painful memories of the past, difficult ongoing feelings about family members, and concerns about future family interactions. There is increasing agreement that making this distress-versus-disorder distinction may help clear up much of the controversy about the consequences of divorce for children (Kelly & Emery, 2003; Wallerstein, 2003).

## PREDICTORS OF CHILDREN'S PSYCHOLOGICAL ADJUSTMENT TO DIVORCE

Average outcomes are an important backdrop to our discussion, but the prediction of individual differences in children's psychological well-being is more directly relevant to custody evaluations. In the following sections, we review research on different risk factors, relying primarily on secondary versus original sources because of space limitations and the large number of studies.

### Parental Conflict

A large body of research demonstrates that conflict between parents is associated with an increased risk for psychological problems among children in all families, whether the parents are married, separated, or divorced (Ahrons & Miller, 1993; Ahrons & Tanner, 2003; Amato & Keith, 1991; Emery, 1982; Johnston & Roseby, 1997; Otto, Buffington-Vollum, & Edens, 2003). Although non-

 Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 13 of 30   Document 97

random selection cannot be completely ruled out, many analogue experiments demonstrate that conflict simulated in the laboratory or recorded systematically at home directly causes some adverse reactions among children (Cummings & Davies, 1994; Davies, Harold, Goeke-Morey, & Cummings, 2002).

Parental conflict often precedes a separation or divorce, and various studies demonstrate that children fare better psychologically if they live in a harmonious divorced family than in a conflict-ridden two-parent family (Emery, 1982). Because separation can bring relief from the struggles of living with parents in a conflict-ridden marriage, we therefore must add improved psychological adjustment to the range of variability found in children's psychological outcomes following their parents' divorce. This "relief hypothesis" is supported by research findings that show children's improved adjustment after separation in high-conflict marriages. However, a new and important twist is what happens to children from low-conflict marriages: Several recent studies have found that children fare better following separation from a high-conflict marriage but worse when their low-conflict parents separate (Amato, Loomis, & Booth, 1995; Peris & Emery, in press). In fact, Amato (2001) argues that, in close to half of divorces, the marriage had been "good enough" from the children's perspective. That is, parental conflict had been sufficiently well contained that the children do more poorly following their parents' separation than they would have done had their parents stayed together.

Whether or not more parents could stay together for their children's sake, these data point to the psychological importance of conflict and to the fact that parental separation does not necessarily decrease it. Conflict can, in fact, increase following separation, continue for years, and come to focus more squarely on children who are a point of connection between former partners (Emery, Laumann-Billings, Waldron, Sbarra, & Dillon, 2001; Johnston, 1994).

Parental conflict can affect children directly by creating stress and anxiety (Kelly, 1998) and indirectly by undermining parenting quality and the children's relationship with one or both parents (Otto et al., 2003). As with divorce itself, conflict after divorce is linked with a variety of short- and long-term psychological problems among children, ranging from conduct problems to depression (Emery, 1999b; Schmidtgall, King, Zarski, & Cooper, 2000). However, not all conflict is equally disruptive to children's emotional well-being. The results of systematic analogue studies (Cummings & Davies, 1994), together with field research (Grych & Fincham, 1990) and clinical experience (Emery, 2004), suggest that conflict is least destructive when it (a) is contained between parents; (b) is relatively infrequent; (c) is less intense emotionally or physically; (d) resolves; (e) is not about the children or childrearing; and (f) does not involve the children—which includes not arguing in front of or around the children, not asking children to carry messages between parents, not deriding the other parent to the children, not expecting the children to take sides, not making a child a scapegoat or a me-

diator, and not asking children to make decisions that the parents themselves cannot make (Emery, 2004). Another brief excerpt from the Deer-Doe case illustrates the sort of conflicts that can be all too familiar in separation and divorce.

## Conflict and the Deer-Doe Case

As continued legal maneuvering delayed what he thought would be the speedy implementation of the recommendations made in Dr. Hagan's custody evaluation, John Deer-Doe grew extremely frustrated with his children's mother, with the legal system, and especially with not being able to see his children regularly. As a result of several letters from his lawyer and angry e-mails with Jane, for the first time since the separation, he had the children with him for a long, 3-day holiday weekend. John had a great time with Carlos on his Friday off and on Saturday, but he was deeply disappointed by Isabella's persistent distance and moodiness. His frustration erupted on Saturday evening when he asked Isabella why she didn't spend more time with him and answered his own question by blaming her mother's interference. Before Isabella could even react, he asked, "Wouldn't you like to live with me half of the time?" At this point, Isabella exploded. "I told Mom a hundred times. I want to live with her! I don't want to *see* you! I want to go *home*!"

Hurt and angry, John screamed back, "Fine!" He threw Isabella's things into her backpack, and returned her to her mother's house. They drove in silence, but as Isabella opened the car door, John told her, "You can tell your mother that I'll bring Carlos back tomorrow . . . maybe." Isabella burst into tears, slammed the car door shut, and ran to her mother's front door. John drove away before the door opened, not knowing whether Jane was even home or not.

As this vignette illustrates, hurt, anger, and conflict between separated parents can take many forms, and can erupt even in the absence of the other parent. The vignette also shows how the conflicts that may undermine relationships between separated parents can lead to conflicts between parents and children that undermine crucial parent–child relationships as well.

## Parent–Child Relationships

In most studies of children from divorced families, the quality of the relationship between a child and his or her primary residential parent is the strongest predictor of that child's psychological well being (e.g., Buchanan, Maccoby, & Dornbusch, 1996; Hetherington & Kelly, 2002; Martinez & Forgatch, 2002). The most widely accepted classification of parenting groups caretakers into four categories based on the degree of warmth and control they offer to their children (Lamborn, Mounts, Steinberg, & Dornbusch, 1991; Maccoby & Martin, 1983; Novak, 1996; Steinberg, 2001). *Authoritative* parents are warm and involved, and they consistently and democratically enforce developmentally appropriate rules and discipline. *Authoritarian* parents offer their children low warmth and high control, using

more frequent and autocratic punishment (Novak, 1996). *Permissive* parents are loving but indulgent, and they offer children little guidance and discipline about controlling their behavior. Finally, *neglectful* parents provide children with little affection or discipline.

Research on two-parent families consistently indicates that children of preschool age through adolescence who are raised by authoritative parents fare best on indicators of psychological and behavioral health, while the children of neglectful parents fare worst (Lamborn et al., 1991; Maccoby & Martin, 1983; Novak, 1996; Steinberg, 2001). Research on children in divorced families also shows that authoritative parenting by the primary residential parent is linked with better postdivorce adjustment (Buchanan et al., 1996; Fauber, Forehand, Thomas, & Wierson, 1990; Hetherington, Cox, & Cox, 1982; Hetherington & Kelly, 2002; Thomson, Hanson, & McLanahan, 1994). We should note, however, that more authoritarian parenting styles are found to be equally or more effective in certain contexts, for example among minority families living in potentially dangerous environments (where increased parental vigilance and authority may be needed; Deater-Deckard, Dodge, & Bates, 1996). Authoritarian parenting also predicts lower levels of substance use among adolescents living with divorced parents (Buchanan et al., 1996).

### Mothers Versus Fathers

As noted above, most children live primarily with one parent following separation and divorce—approximately 75% live with their mothers and 10% live with their fathers. Although some early, small-scale studies indicated that children who lived with their same-gender parents were better adjusted than their counterparts living with opposite-sex parents (e.g., Santrock & Warshak, 1979), these findings have not been replicated in more recent research employing large samples (Buchanan et al., 1996; Downey & Powell, 1993). In general, researchers find that children of both genders function equally well living primarily either with their mothers or fathers (Downey, Ainsworth-Darnell, & Dufur, 1998); however, a few investigators have found that children do somewhat better in sole-mother residence than they do in sole-father residence (Buchanan et al., 1996). Still, differences between primary-mother versus primary-father residential arrangements, if they are found at all, are not large in magnitude. Thus, neither parental gender, nor the interaction between parent and child gender, has been found to moderate children's well-being in an important way.

The extent to which children's relationships with their "other" parents predicts their psychological well-being, particularly when there is parental conflict, is one of the most controversial issues in custody law (e.g., favoring or opposing joint physical custody) and in custody evaluations. Data are not conclusive, but there is research relevant to these issues. Given that the issue is so pressing, we believe it is important to draw some clear, if qualified, conclusions from the available research.

### Contact Between Children and Nonresident Parents

An important demographic issue that we have not addressed, but that bears in a very important way on parent–child relationships following a separation, is the extent of contact between children and their nonresidential parents. Seltzer's (1991) analysis of the 1987–88 round of the National Survey of Families and Households data provides detailed and high-quality, if somewhat dated, evidence on this issue, especially on the frequency of contact between children and nonresidential fathers. Three broad trends characterized the findings from this national survey. First, contact between nonresident, separated, or divorced fathers and their children was not terribly frequent, even immediately after the separation. For example, only 43% of fathers separated for 2 years or less saw their children on a weekly basis or more frequently, while 30% of fathers separated for less than 2 years saw their children several times a year or less. Second, contact dropped off substantially over time, such that 6 to 10 years following separation, only 19% of nonresident fathers saw their children weekly or more, while 62% had face-to-face contact with their children several times a year or less. Third, higher contact levels were predicted by a variety of factors including less geographic distance between the parents' households, a shorter length of time since separation, absence of remarriages, the child having been born into a legal marriage instead of out of wedlock, and the child being older rather than younger (Seltzer, 1991). Other evidence from national samples shows that nonresidential mothers maintain somewhat more frequent contact with their children than nonresidential fathers do (Zill, 1988).

Some commentators believe that father contact has increased dramatically in the last 15 years, but the relatively modest increases in sole father custody and joint physical custody (reviewed earlier) make us skeptical that there have really been any dramatic changes. In the most recent national data we could locate, an analysis of 1998 U.S. Census data, 40% of nonresident fathers and 22% of nonresident mothers had had no contact with their children in the previous year. Among the 60% of nonresident fathers who had seen their children, contact occurred on an average of 69 days per year. The 78% of nonresident mothers who saw their children did so more often, an average of 86 days per year (Child Trends, 2002). These data were not disaggregated by levels of contact, overnight visits, or time since separation, and they included parents who did not live with their children for a variety of reasons (e.g., divorced, never married). Still, the evidence indicates that, even in a recent cohort, a substantial number of nonresident parents maintain little contact with their children, and contact in the range considered to be joint physical custody (about 100 overnights per year) is not the norm.

### Nonresident Fathering and Children's Psychological Well-Being

The normative backdrop is important in considering the question of whether more frequent contact with nonresident parents predicts better psychological adjustment among children. A

Case 1:20-cv-01028-WCG    Filed 10/08/20    Page 15 of 30    Document 97

meta-analysis of 63 studies examining the relationship between children's psychological well-being or academic success and different dimensions of the relationship between a child and his or her nonresident father (i.e., payment of child support, amount of contact, feeling close to the father, and authoritative parenting) indicated that the amount of contact is a poor predictor of children's psychological well-being (Amato & Gilbreth, 1999). As shown in Table 1, the weighted effect sizes (product–moment correlations) between contact levels and three indices of children's psychological well-being were uniformly very small. For externalizing problems and academic success, a fathers' payment of child support was a better predictor of his children's adjustment than was a father's contact with his children. In contrast, authoritative parenting and, to a lesser extent, closeness to the father consistently accounted for a significant if statistically small proportion of variance in all three measured outcomes.

The authors tested for a number of variables that might moderate these relationships, including child gender, age, race, divorce versus nonmarital birth, and remarriage of the parents, but none of these variables moderated the effect sizes in any meaningful way. Although the meta-analysis did not test for the moderating effects of parental conflict, Amato and Gilbreth (1999) discussed the critical role of parental conflict, including research indicating a positive effect of contact when parents cooperate and a negative effect when parents are in conflict (Amato & Rezac, 1994; Hetherington, Cox, & Cox, 1982).

### Joint Custody and Children's Psychological Well-Being

Whether joint physical custody is linked with better psychological adjustment among children is an important question in its own right, and if children fare notably better under joint physical custody than in other arrangements, a nonlinear relationship also might explain the weak association between nonresident-father contact and child outcome. Children may benefit from spending more time with their fathers only when contact reaches some high threshold (see, e.g., Cabrera, Tamis-LeMonda, Bradley, Hofferth, & Lamb, 2000; Lamb, 1999; Lewis & Lamb, 2003). Surprisingly, relatively few investigators have examined how joint physical custody is associated with children's well-being. A recent meta-analysis (Bauserman, 2002) located only 11 published studies and 22 unpublished studies (21 of which were unpublished dissertations) with a combined sample size of 814 joint-custody children and 1,846 sole-custody children. Combining the results across measures, Bauserman reported a study-level overall effect size of .23 standard deviation units, slightly above what is traditionally considered to be a small effect. This analysis included both joint physical and joint legal custody, but surprisingly these arrangements did not differ significantly in their effects when compared to sole custody (joint physical, $d = .29$ for 20 studies; joint legal, $d = .22$ for 15 studies).

Importantly, neither presence of past parental conflict (5 studies) nor that of current parental conflict (14 studies) accounted for significant variance in the joint-custody effect sizes; perhaps of more importance, however, joint-custody groups had lower levels of both past and present conflict than sole-custody groups did (Bauserman, 2002). As Bauserman noted, this suggests the very important possibility that self-selection into joint custody may account for part or all of the results. We cannot extrapolate from voluntary joint physical custody to circumstances when joint physical custody is imposed upon parents by laws favoring joint physical custody, by evaluators who recom-

**TABLE 1**

*Meta-Analysis of 63 Studies Showing How Strongly Different Relationships Between Children and Nonresident Fathers Predicted Children's Academic Success and Psychological Well-Being (Adapted From Amato and Gilbreth, 1999)*

| | Dimension of nonresident father–child relationship | | | |
|---|---|---|---|---|
| Child well-being index | Payment of child support by father | Amount of contact between child and father | Child feeling close to father | Authoritative parenting by father |
| Academic success | | | | |
|   Effect size (weighted $r$) | .09*** | .03* | .06* | .15*** |
|   Number of effect sizes | 17 | 17 | 7 | 11 |
|   Sum of sample sizes | 7,156 | 4,918 | 1,212 | 1,185 |
| Externalizing problems | | | | |
|   Effect size (weighted $r$) | −.08*** | −.02 | −.05* | −.11*** |
|   Number of effect sizes | 8 | 37 | 12 | 26 |
|   Sum of sample sizes | 2,917 | 6,808 | 1,586 | 2,657 |
| Internalizing problems | | | | |
|   Effect size (weighted $r$) | −.01 | −.03* | −.07* | −.12*** |
|   Number of effect sizes | 8 | 43 | 14 | 13 |
|   Sum of sample sizes | 1,916 | 4,841 | 1,617 | 545 |

*$p < .05$. **$p < .01$. ***$p < .001$.

mend that arrangement, or by judges who order it. Finally, it is important to note that, although conflict differences did not account for the advantage of joint over sole custody in the meta-analysis, this analysis does not address the possibility that joint physical custody may be the right solution for the wrong people in contested-custody or other high-conflict situations (Emery, 1999b). At least some research shows that high conflict predicts worse child adjustment within joint-physical-custody groups (Johnston, Kline, & Tschann, 1989).

Thus, our conclusion about the potential benefits of joint physical custody is a cautious one because of (a) the important and unanswered question of whether low-conflict couples self-select into that arrangement; (b) concerns about the potential damage to children caused by likely greater exposure to parental conflict in such an arrangement; (c) the null results for father contact found in a more extensive body of research where self-selection is less of a concern; and (d) the continued low prevalence rates of joint physical custody despite two decades of experimentation. We believe that joint physical custody benefits children when parental conflict is contained. Therefore, more parents who want to attempt joint physical custody (and therefore are likely to be fairly cooperative) should be encouraged to try it. However, joint physical custody seems to be a workable arrangement only for a minority of parents and should not be encouraged as the fair solution for parents who dispute custody or otherwise are in high conflict. Finally, we note that there is no clear line defining when joint physical custody is potentially beneficial or potentially harmful for children. The field would benefit greatly from research on what kinds and levels of parental conflict and cooperation distinguish "good" from "bad" joint physical custody.

### Parents' Mental Health

The Uniform Marriage and Divorce Act explicitly indicates that the mental health of all parties should be a consideration in determining children's best interests. Statutes offer little more than this general guidance, however, thereby leaving much room for interpretation. Thus, although mental health professionals can assess mental health with adequate reliability and validity, questions arise about the specific relevance of parents' mental health problems for children, parenting, and custody arrangements.

Emery (1999b) suggested that four mental health problems among parents are of special concern to understanding the potential consequences of divorce for children: (a) depression, (b) antisocial behavior, (c) major mental illness (e.g., schizophrenia and bipolar disorder), and (d) personality disorders. Substance abuse should also be added to this list. Parental depression is associated with negative child outcomes in a number of studies (Otto et al., 2003), but the effects are likely to be mediated through parental conflict and inadequate parenting (Emery, Weintraub, & Neale, 1982). In their review of the literature, Otto and colleagues (Otto et al., 2003) reported that one of the most consistent findings is that parents who engage in antisocial behaviors tend to have children who exhibit a number of behavior problems, particularly aggression, delinquency, and other externalizing problems. Children whose parents suffer from schizophrenia also are at a significantly elevated risk both for schizophrenia and for a range of serious emotional problems, although the increased risk appears to result primarily from genetic effects as opposed to childrearing (Gottesman, 1991). Perhaps the greatest concern in regard to schizophrenia and other major mental illness is whether the parent with the disorder is, with treatment, functioning sufficiently well to care for his or her children. A similar concern arises regarding the well-being of children who have a substance-abusing parent. Evidence shows that both genetic and environmental liabilities contribute to the increased risk for psychological problems among such children (Walden, McGue, Iacono, Burt, & Elkins, 2004), but the most pressing issue is the parent's immediate functioning and whether or not this impairs the parent's ability to care for or protect the safety of his or her children. Finally, little research is available on how children are affected by parental personality disorders, although experts in custody disputes increasingly recognize that personality disorders often are an important concern, particularly in cases characterized by chronic high conflict (Ehrenberg, Hunter, & Elterman, 1996; Johnston & Roseby, 1997).

The literatures on parents' mental health, parent–child relationships, genetic transmission, and children's psychological well-being are too vast and complicated for us to consider in any detail here. Still, several broad conclusions seem clear. First, some evidence shows that children are adversely affected when their parents have emotional, behavioral, or substance-abuse problems, but the children's problems might be caused not by their invariably troubled relationships with their parents but by genetic risk or life hardships associated with their parents' psychological problems (Jenuwine & Cohler, 1999). Second, whether or not a parent is engaged in treatment is a major consideration for serious emotional problems like severe depression, substance abuse, or schizophrenia, since appropriate treatment can do much to mitigate symptoms and improve parents' functioning. Third, although the assessment of parents' mental health is of critical and obvious importance when a parent's emotional difficulties are serious enough to necessitate the involvement of child protective services, in other circumstances (i.e., when a parent's emotional difficulties would not lead to unwanted legal intervention in a two-parent family) such assessment seems to us to be merely a search for a "tie breaker" under a vague custody rule fraught with problems. Once again, our view is that it is better to change an impossible rule than to do one's best to follow it.

In summary we conclude that, as others have suggested (Herman et al., 1997; Otto et al., 2003), a parental diagnosis is not, in and of itself, the primary concern when deciding custody; rather, what is of utmost importance is the impact of parental psychological functioning on the child's development and behavior. When a parent's emotional problems are sufficiently

severe that they would warrant legal intervention independent of a custody dispute, we have no doubt that parental mental health should be a central consideration in custody cases. In more ordinary circumstances, however, we see no obvious reason why a history of parental depression, for example, should be a determinative factor in a custody dispute unless it clearly and substantially interferes with parenting.

### Economic Well-Being

A family's standard of living falls after separation and divorce, if for no other reason than it is more expensive to live in two households than to live in one. We should note, however, that the average decline is greater for divorced women than for divorced men, as women typically have lower incomes and the extra expense of childrearing (Duncan & Hoffman, 1985). Economic strains can set into motion a number of changes for children, including possibly moving from the family home, changing schools, losing contact with old friends, and spending more time in childcare and having less contact with parents as the parents work to make ends meet. Not surprisingly, research shows that economic stability is an important predictor of postdivorce child functioning (Dunn, 2004; Lamb, Sternberg, & Thompson, 1997). The differences found between the adjustment of children in married and single-parent families are reduced by about half for academic measures like school attainment and by a lesser amount for internalizing and externalizing problems when income is statistically controlled for (Brooks-Gunn & Duncan, 1997; King, 1994; McLanahan, 1997; McLanahan & Sandefur, 1994).

But while family income no doubt is important, much of the variance in children's psychological adjustment in divorced and married families is not explained by economics. Moreover, income may exert its effects indirectly, for example by influencing parenting and other aspects of family functioning, rather than directly, for example by affecting living conditions and opportunities available to children. Results of one study indicated, for example, that divorced working mothers, but not married working mothers, provided less cognitive and social stimulation to their children than married nonworking mothers did (MacKinnon, Brody, & Stoneman, 1982), and other research indicates that parents under economic stress are less likely to be supportive (Thomson et al., 1994).

These findings suggest that caution should be exercised when using parents' incomes as a predictor of children's well-being following divorce; but we particularly call attention to a more basic issue. The suggestion that custody should go to the parent with the higher income sounds outlandish and biased; but we could, if we chose, muster arguments that living with the higher-income parent might be in a child's best interests in terms both of the correlates of greater wealth (e.g., health, well-being) and the direct benefits of greater wealth (e.g., living conditions, opportunities). We would not want to make such arguments too seriously, but we do believe they illustrate an important point: Why should parents' relative mental health, parenting skills, or any

other factor determined on a case-by-case basis determine custody? We believe that the essential problem of determining children's "best interests" based on criteria that are only vaguely specified is the same evaluators consider children's economic or psychological best interests. In the latter case, the difference is that the core problem is more effectively disguised.

### Ranking Predictors

Based on an extensive review of the literature, one of us (Emery, 1999b) concluded that the following four factors were the most consistent predictors of children's positive psychological adjustment following separation and divorce:

- A good relationship with an authoritative residential parent
- Minimal or controlled parental conflict that does not involve the children
- Economic security
- A good relationship with an authoritative nonresidential parent

Our present review is consistent with this earlier conclusion, and also with the suggestion (Emery, 1999b) that the four factors are ranked in their order of importance (defined as proportion of variance explained) for various measures of children's psychological well-being. Given this conclusion, we urge any professional intervening with separating and divorcing families to attempt to promote all four goals. Since this cannot always be accomplished, however, our rank ordering indicates that factors ranked higher should take precedence over factors ranked lower—if, that is, the objective is to minimize children's risk for developing psychological problems. This means, for example, that if parental conflict is high, and if the nature of that conflict is such that it harms children (e.g., revolves around issues of childrearing, involves the children in the parents' disputes) then frequent contact with both parents is likely to be more harmful than beneficial to children. In the face of high conflict, therefore, children would do better living primarily in one household with an authoritative mother or father and having more limited contact with the other parent. Even as we reach this conclusion, we recognize that philosophical or legal considerations might place a higher value on goals other than maximizing children's mental health—for example, the value that children should have frequent contact with both of their parents despite the presence of damaging conflict. We recognize that a degree of conflict between former partners, sometimes intense conflict, can be expected in divorce, but that conflict also can be contained, diminished, and hopefully resolved over time.

### A Referral for the Deer-Does

Jane Deer-Doe was frightened and infuriated when she unexpectedly found Isabella knocking on her door a day early, after her father had returned her in a fury. Jane was more angry than worried about Isabella's flood of bitter tears. In the face of Dr. Hagan's adverse custody recommendation, she thought this was her opportunity to

turn the tables on John. Secretly, she also hoped for vindication not only for all of her actions since her separation but also for the choices, mistakes, and sacrifices she had made in marriage. Enraged and not wanting to waste a moment—and with Isabella listening in—Jane telephoned her lawyer at his home and tried to tell him about what happened and about her outrage. But he was abrupt with Jane and suggested that she instead come by his office on Monday morning. There was nothing to be done on a Saturday night.

To Jane's surprise, her lawyer did not launch into a case against John, even when she finally related all of the details in his office. He listened patiently, but told Jane he needed to give her a "reality check" about what the courts could and could not do. He talked about the cost of extending the litigation process, delays in hearing dates, legal counter-tactics like bringing up any and all of her vulnerabilities as a parent and as a person (and her husband certainly knew her weak spots), and how children can get caught in the middle of such contests. He pointed out that no court was going to deny John all of his rights as a father, so she was going to have to deal with him one way or another. He also noted that local court rules mandated that parents attempt mediation before a custody hearing could be held.

Jane's lawyer told her that he wanted her to try mediation to see if she and John might work out at least some issues about their children without going to court. He described how mediation works and offered that, even if it failed, her effort would look good if the case did go to court. Jane's lawyer eventually told her that he had, in fact, talked with John's lawyer and that she agreed that they should try mediation. John's lawyer had promised she would convince John to try it. After raising a number of objections to the idea, Jane eventually accepted her lawyer's advice—but only with great reluctance and trepidation.

Research shows what the Deer-Does' lawyers intuitively recognized: The process of change, the quality of family relationships, and the management of conflict are more important to children's psychological adjustment to divorce than are the structure of custody arrangements or, indeed, the structure of the family (Ahrons, 1998; Amato & Booth, 1997; Buchanan et al., 1996; Emery, 1999b; Hetherington & Kelly, 2002). This conclusion creates a problem for lawyers in traditional practice, however, because the adversary system on which our legal procedures are based can exacerbate rather than help to contain parental conflict and can further undermine rather than promote coordinated coparenting. The dilemma for lawyers and other professionals who work with custody disputes is particularly vexing under the regime of the vague children's-best-interests standard. We briefly evaluate this custody standard in historical context before turning to our specific recommendations for reform.

## CHILDREN'S BEST INTERESTS: A STANDARD WITH NO STANDARDS

In theory, the "best interests of the child" standard gives judges the flexibility to craft custody decisions that are uniquely appropriate for each individual family. In practice, however, the standard has been widely criticized because it (a) encourages litigation by making judges' decisions unpredictable; (b) increases acrimony, because virtually any evidence that makes one parent look bad may be deemed relevant (recall the morality statutes found in some state laws); (c) increases the potential for bias in the exercise of judicial discretion; and (d) limits appellate review, because the guidelines governing judicial decision making are unclear (Garrison, 1996; Mnookin, 1975). In fact, the problems with the best-interests standard have led at least one distinguished legal commentator to propose a fair and simple alternative: Flip a coin (Chambers, 1984). This flip suggestion highlights the extent of the problems that lay hidden underneath the best-interests standard's superficial appeal.

### Historical Perspective
Until the middle of the 19th century, custody laws were perfectly clear: Fathers were automatically granted custody of their children, who were viewed, like a wife, as a man's property (Wyer, Gaylord, & Grove, 1987). Laws began to change in the late 1800s with the emergence of the "tender years" doctrine, which held that mothers are uniquely suited to rear children (*Ex Parte Devine*, 1981; Lyman & Roberts, 1985; Mason, 1994; Wyer et al., 1987). The tender-years doctrine came to control custody decision making during much of the 20th century, but in the 1970s the presumption was challenged as sexist (Hall, Pulver, & Cooley, 1996; Mason, 1994). The subsequent decline of the tender-years presumption left courts without clear guidance in following the best-interests standard, a principle that had been in place since the beginning of the 20th century (Mnookin, 1975). For decades, children were automatically placed with their mothers in their best interests (unless the mother was "unfit"), but the desire to avoid sexism left courts without a dominant guiding principle.

As we noted earlier, some states today list factors that they deem relevant to children's best interests, at least in general terms, but the ultimate goal is never defined (Mnookin, 1975). This presents judges with an impossible practical, legal, and ethical dilemma. As noted family law professor Robert Mnookin (1975) put it:

> Deciding what is best for a child poses a question no less ultimate than the purposes and values of life itself. Should the judge be primarily concerned with the child's happiness? Or with the child's spiritual and religious training? Should the judge be concerned with the economic "productivity" of the child when he grows up? Are the primary values of life in warm interpersonal relationships, or in discipline and self-sacrifice? Is stability and security for a child more desirable than intellectual stimulation? These questions could be elaborated endlessly. And yet, where is the judge to look for the set of values that should inform the choice of what is best for the child? (pp. 260–261)

### Custody Evaluations: A Solution to Judges' Dilemma?
Without clear guidance from the law, judges have turned to mental health professionals and custody evaluations for help in

 Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 19 of 30   Document 97

discerning children's best interests (Feller, Davidson, Hardin, & Horowitz, 1992; Mnookin, 1975; Shuman, 2002; Wald, 1976). By doing so, the courts have implicitly embraced the value that children's psychological well-being—their happiness—comes first and foremost on the list of their best interests. Alternative experts the courts instead might employ include accountants who have evaluated each parent's ability to provide for their children economically, educators who can comment on the parents' relative commitment to promoting success in school, religious leaders or philosophers who have assessed the quality of each parent's moral values and training, or perhaps dieticians who have evaluated each parent's preference for healthy versus convenience food. These suggestions may seem outrageous, but so is the idea that custody should be awarded to a parent who has an edge over another parent in promoting children's psychological well-being, particularly when the construct is ill defined or undefined.

We appreciate the terrible dilemma that the vague best-interests standard creates for judges, custody evaluators, and, of course, parents and children. We also believe that a mental health professional or other neutral third party or parties may be in a better position than a judge bound by rules of legal procedure to make recommendations about custody. However, we believe it is legally, morally, and scientifically wrong to make custody evaluators de facto decision makers in custody cases, which is often what happens because judges often accept evaluators' recommendations. As law professor Daniel Shuman (2002) recently summarized, "the role of mental health professionals in custody litigation is being transformed from expert as expert to expert as judge" (p. 160). Shuman went on to point out:

> If society wishes to use mental health practitioners as experts in child custody cases, the law and science demand rigorous threshold scrutiny of their methods and procedures so that courts are informed consumers of this evidence. If society wishes to use mental health practitioners as judges in child custody cases, then social policy demands a public debate and legislative approval of this change . . . (p. 162)

We agree. Establishing panels of mental health professionals who would decide custody disputes would be a major procedural change in the law, perhaps an important one. However, we believe that there are simpler and likely more effective changes in policy that would improve custody decision making for children and divorcing families and simultaneously solve many of the problems faced by custody evaluators, lawyers, judges, and other professionals who now work with custody disputes. Our recommendations include (a) promoting parental self-determination through alternative dispute resolution and other means, (b) working to develop and implement clear custody standards, and (c) altering the practice of current custody evaluations under the best-interests standard.

## RECOMMENDATION 1: ENCOURAGE ALTERNATIVE DISPUTE RESOLUTION AND PRIVATE SETTLEMENT

We believe that the best solutions to the problems posed by child custody disputes and unscientific custody evaluations involve changing the system of dispute resolution in ways that encourage parents to reach their own decisions about rearing their children following a separation (Emery, 1999b, 2004). Obviously, there will be fewer custody evaluations, and fewer cases that judges must decide, if more parents resolve their differences by deciding custody arrangements on their own. We also believe that encouraging private settlement is the best way to promote children's mental health in separation and divorce. If the research-based goals are to contain parental conflict, encourage cooperative coparenting, support both parents' authoritative relationships with the children, and preserve economic resources, then it seems reasonable to steer clear of something called "the adversary system," the method of dispute resolution embraced by the American system of justice (Emery & Wyer, 1987b). "Going to war" is not the way to promote peace, certainly not in a divorced family.

Over the last two decades, many legal and mental health professionals, and many divorced parents, have come to this same conclusion. As an alternative, they urge separated parents to determine their own children's best interests by grappling with and working out the difficult issues of residence and childrearing themselves. One important reason to do this from the outset of a separation is that parents ultimately must deal with custody decisions, parenting, and each other on their own. If a degree of cooperation in coparenting is the ultimate goal for promoting children's best interests, then it seems reasonable to hypothesize that a more cooperative approach like mediation, for example, will help parents achieve this outcome better than adversarial negotiations or litigation in the courtroom will.

More cooperative approaches to dispute settlement—those in which parents exercise a greater degree of control over both the process and the outcome than they do in the adversary system—include a range of options such as (a) *pro se* divorce, in which parents manage all legal matters on their own without the use of lawyers; (b) divorce education, usually involving court-mandated classes on parenting in divorce that encourage cooperative coparenting, even during settlement negotiations; (c) more informal, cooperative negotiations between parents and their attorneys, an approach that includes but is not limited to *collaborative law*, a new option invented by family lawyers in which both attorneys agree to represent their clients only so long as they negotiate in good faith and settle their disputes outside of court (Tesler, 2001); (d) family therapy and parent training, which, while not focused on resolving custody disputes, do focus on the importance of authoritative parenting and cooperation in coparenting for separated and divorced parents (Martinez & Forgatch, 2001; Wolchik et al., 2000); (e) divorce mediation, the most firmly established of the new approaches, in which parents

negotiate a settlement with the help of a neutral expert, usually a mental health professional or a lawyer (Emery, 1994); and (f) use of family coordinators, for that subset of high-conflict families that cannot participate in or benefit from any of the previous options (e.g., Coates et al., 2003).

## The Example of Divorce Mediation

Importantly, research shows that some of these new approaches do help encourage private settlement, cooperative coparenting, and a long-term perspective on childrearing following separation and divorce. The evidence is strongest for divorce mediation, which has been studied more thoroughly than other legal interventions in divorce, although there undoubtedly is a need for more research on all types of custody-dispute-resolution procedures—perhaps especially on the adversary settlement process itself (Beck & Sales, 2001). A few randomized trials and a number of evaluations of large-scale programs have shown the following: Relative to traditional adversary settlement (attorney negotiations and formal courtroom litigation), mediation (a) settles a large percentage of cases otherwise headed for court; (b) possibly speeds the time involved in reaching a settlement, saves money, and increases compliance with agreements; (c) clearly increases party satisfaction with the process of dispute resolution; and, most importantly, (d) leads to improved relationships between nonresidential parents and children, as well as between the separated or divorced parents themselves (Emery, Sbarra, & Grover, 2005).

One of us has conducted a randomized trial of custody mediation and litigation, including a 12-year follow-up of the 71 families in the study (Emery et al., 2001). The study included primarily young, low-income parents, all of whom could be considered high conflict because they failed to reach a settlement on their own and were recruited into the study at the time that they filed a petition for a contested-custody hearing. Participants were randomly assigned at this time to participate either in mediation or in an evaluation by the court (adversary control group), and various tests were conducted to examine self-selection and attrition over time (neither of which proved to bias the study's results in any detectable manner). Among the major findings of an initial study and replication (Emery et al., 2001; Emery, Matthews, & Kitzmann, 1994; Emery, Matthews, & Wyer, 1991; Emery & Wyer, 1987a) were the following:

- Only 11% of cases randomly assigned to mediation appeared in front of a judge, compared with 72% of cases randomly assigned to the adversary-settlement group.
- On average, parents reported greater satisfaction with mediation than with adversary settlement on items assessing both the presumed strengths of mediation (e.g., "your feelings were understood") and the presumed strengths of adversary settlement (e.g., "your rights were protected").
- Reports of greater satisfaction were notably stronger for fathers than for mothers, apparently as a result of a ceiling

effect: Mothers almost always won in court and therefore generally were quite satisfied following adversary settlement.
- The pattern of results held not only immediately after the dispute resolutions but also in a 1.5-year follow-up and even 12 years later.
- Nonresidential parents who mediated were far more likely to maintain contact with their children. Thirty percent of nonresidential parents who mediated saw their children once a week or more 12 years after the initial dispute, in comparison to only 9% of parents in the adversary group. In the mediation group, fully 54% of nonresidential parents also spoke to their children on the telephone once a week or more 12 years later, in contrast to 13% in the adversary group.
- The increased contact between parents necessitated by greater nonresidential parent–child contact did not increase parent conflict; rather, conflict was somewhat lower in the mediation group.
- Among parents who mediated rather than continuing with the legal action over the custody dispute, 12 years later the residential parents reported that the nonresidential parents were significantly more likely to discuss problems with them; had a greater influence on childrearing decisions; and were more involved in the children's discipline, grooming, moral training, errands, holidays, significant events, school or church functions, recreational activities, and vacations.

These studies provide strong evidence about the potential for mediation to bring about improved family relationships after separation and divorce, even many years later. Still, while the study's internal validity is strong, its external validity can be questioned. The results of various other evaluations of mediation and adversary settlement help to support the generality of the findings, but an appropriate degree of caution is suggested by variation in the quality of mediation in different settings, the push in some court-based mediation programs to "get agreements" rather than focus on fostering positive postdivorce family relationships, and the general need for more research (Emery, Sbarra, & Grover, 2005).

The limited evidence on other legal and mental health procedures (e.g., divorce education, parent training) also suggests that encouraging parents to take the long view and work together as parents even in the middle of separation and divorce can benefit children, parent–child relationships, and coparents (Emery, Waldron, & Kitzmann, 1999). This is not to suggest that people should not feel hurt, angry, and bitter in the midst of separation and divorce, but instead that, if they have children, former partners who remain parents need to find a way not to act on their understandably painful emotions as they renegotiate their family relationships (Emery, 1994, 2004). Also, despite the proven benefits, it is important to acknowledge that mediation is not a panacea, and there may be a subset of parents for whom mediation is not indicated (e.g., families with a history of significant domestic violence).

### The Deer-Does in Mediation

Neither John nor Jane Deer-Doe entered mediation with a sense of optimism, let alone a desire to be in the same room with one another. Their mediator, Dr. Cynthia Barnes, who also was a clinical psychologist and family therapist, was pleasant, calm, and clearly in control of the meeting, but she could not prevent the Deer-Does from erupting into an angry argument after only about 20 minutes. A tense discussion concerning their disagreements about the children exploded when John accused Jane of using the children to meet her own, limitless need for attention. Jane shot back, "It wasn't me who had an affair." In an angry, loud voice, John was retorting, "I never would have had to go outside the marriage if you . . ." when Dr. Barnes interrupted to ask to speak with each parent alone.

At first, Jane fumed during her caucus alone with Dr. Barnes, but she found herself in tears within a few minutes. "I just can't believe I'm losing my marriage," she said, "and now he wants me to lose my kids too." She talked about her feelings of loss, grief, fear, hurt, and anger, not about problems with the custody arrangement. At one point, Jane even confessed that at times she longed to get her marriage back; John had, after all, been a good father and husband. But this revelation quickly led Jane back to John's affair and the pain it caused her; she was becoming angry again when Dr. Barnes interrupted her.

Dr. Barnes offered that she recognized that Jane was in great pain in response to losing so many things, and that she needed to grieve. In fact, Dr. Barnes recommended a therapist for Jane to consult in order to discuss these issues. Yet, Dr. Barnes also pointed out that the goal of mediation was to preserve and protect the best part of Jane's relationship with John—their children. She wanted Jane to think about ways they might be able to try to do that.

John was far less emotional when he met with Dr. Barnes alone. He clearly was very frustrated, but kept saying that all he wanted was to have time with his children and get on with his life. Dr. Barnes acknowledged John's feelings, but suggested that maybe Jane—and maybe Isabella and Carlos too—were not as ready to move on as he was, especially in regard to his new relationship. She also obliquely suggested that John might want to slow down his current romantic relationship a bit for his own sake, as well. Her strong advice to John was to work on taking small but positive steps forward with the kids, and to focus on first rebuilding his relationship with them alone before including his new girlfriend in his time with them.

When the Deer-Does and the mediator got back together toward the end of their two hours, Dr. Barnes again acknowledged everyone's difficult emotions, but pointed out how mediation was focused on trying to solve problems. She repeated her theme about taking small but positive steps, and to the parents' surprise, they took one by arranging a plan for Carlos and Isabella to spend time with John for an overnight during the coming weekend. They agreed on very explicit details, not only for timing and transportation but also on what to tell the children about the plan and what to do if one of them grew distraught.

Jane and John did not work everything out in one mediation session, but they did discover a forum where they could bring their conflicts and try to sort them out. Mediation offered them an environment that accepted their painful emotions but simultaneously encouraged them to put their own feelings on hold and focus on a plan for their children. Jane and John did not realize it, but this is exactly what they needed to do in a much bigger way, in order to move forward as parents and also as people in the coming months and years.

### RECOMMENDATION 2: ADOPT A CLEAR CUSTODY STANDARD LIKE THE APPROXIMATION RULE

Our primary recommendation is to continue to develop practices and policies that encourage parents to reach their own, hopefully reasonably amicable decisions about residence and parenting, even when they are in the midst of separation and divorce. We view mediation as only one of a range of options designed to facilitate that goal. Our second recommendation is that state legislatures move to enact clear guidelines for determining custody in cases where the parents cannot reach an agreement. A fair standard that results in more predictable outcomes should reduce the number of contested custody cases, alter the need for and nature of custody evaluations, and as a result, we believe, help to reduce or at least not exacerbate conflict between separating parents. In short, a clear, determinative custody rule is likely to serve the children's best interests in separation and divorce.

There is one proposal for a clear custody guideline whose potential we find particularly hopeful. The "approximation rule" suggests that parenting arrangements after divorce should approximate, as much as is possible, the respective involvement of the parents in childrearing during marriage (Scott, 1992). Parents who had equal or near-equal involvement during the marriage would maintain some form of joint physical custody after separation. Parents who divided their childrearing roles disproportionately during the marriage also would continue that arrangement. Parents who had agreed to change their roles over time, or who wanted a different postdivorce custody arrangement for whatever reason, would be encouraged to negotiate their own arrangements according to the primary, private settlement recommendation of those who have advocated for the approximation rule.

In our view, the most important advantage of the approximation rule is that it is a clear, determinative standard. Parents and their lawyers would know what to expect of the courts, and this knowledge would promote settlement. In custody disputes that are nevertheless litigated, the approximation rule would sharply limit the scope of the legal inquiry, as well as any custody evaluations that might occur. Rather than assessing children's future best interests, under the approximation rule judges and custody evaluators would focus on the far clearer and far narrower question of each parent's past involvement in childrearing.

No state has implemented the proposed approximation rule, so there is no evidence on its effectiveness. We note, however, that the American Law Institute (2002), whose model statutes

often become the basis for state law, has endorsed the approximation rule in its proposed reforms of divorce and custody law (along with the principle of parent self-determination, consistent with our first recommendation).

We also should be clear that our support of the approximation rule is motivated more by the problems created by the ill-defined nature of the current best-interests standard than by the approximation rule itself. We would be open to any clear and determinative rule for deciding children's best interests, but favor the approximation rule over its two major rivals: (a) a primary-caretaker parent standard, which would award sole legal and physical custody to the parent who did most of the childrearing; and (b) a presumption in favor of joint physical custody. We view the approximation rule as a pluralistic hybrid of these two alternatives.

We find the approximation rule appealing because it is a clear and determinative alternative but not a "one size fits all" solution. At the same time, we are aware that the approximation rule is not without problems. Parents' involvement changes over time and as children grow older (for example, fathers' involvement in childrearing tends to increase). In addition, parents and their lawyers certainly would debate circumstances like the Deer-Does, in which parents agree that one parent will temporarily become more involved in childrearing. We also would not expect the approximation rule to end strategic maneuvering. For example, an unhappily married parent might quit work or even get fired in order to be home with the children—and have an advantage in a future custody dispute.

We do not propose solutions to these possible difficulties, but again note that the best-interests standard is itself fraught with problems—some similar, and some much bigger, in our view. We believe that the benefits of a clear rule potentially far outweigh the costs and that implementing the rule is a social experiment well worth undertaking. In fact, divorce policy already has witnessed the success of moving from vague to specific guidelines. In the early 1980s, the rules governing child support were unclear, and this uncertainty encouraged conflict and poor enforcement. Federal legislation used financial incentives to encourage states to adopt clear child support guidelines by 1986 (National Institute for Child Support Enforcement, 1986). Despite struggles with initial implementation—and many continuing problems with child support—two decades later, all agree that the clear guidelines are a vast improvement for families, legal professionals, and the child-welfare system. We expect the same outcome when legislatures finally move to adopt a clear child custody rule.

## RECOMMENDATION 3: LIMIT EXPERT TESTIMONY AND CLARIFY STANDARDS OF PRACTICE

As long as the best-interests principle remains in place as an ill-defined standard, our third and final recommendation is to utilize existing evidence law, professional ethics codes, and practice standards to limit the expert testimony of mental health professionals in child custody cases to the presentation of scientifically supported evidence. Until far stronger scientific support is forthcoming, this recommendation specifically includes the suggestions (reviewed earlier) to (a) abandon use of all custody-specific "tests" that purport to measure children's best interests directly or indirectly, (b) prohibit testimony about PAS or any other "syndrome" that lacks scientific support, (c) identify the specific nature and sources of inference based on unstructured interview and observational assessments, and (d) apply appropriate caution in interpreting established measures and integrating information across different areas of assessment.

## Rules of Evidence

Our recommendation to limit expert testimony may seem radical, but our proposal simply urges the application of established rules for expert testimony to such testimony in custody cases (Shuman, 2002). Expert testimony in all legal proceedings is guided by rules of evidence that identify the circumstances under which such testimony is appropriate (Ewing, 2003; Shuman, 2000; Shuman & Sales, 1998). A key problem for courts and legislatures is determining exactly what makes testimony scientific and expert. Historically, the testimony of experts was admitted if it passed a legal test developed by a United States district court. In *Frye v. United States* (1923) the court wrote that

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to determine. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle for discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs (p. 1014).

The *Frye* test, however, has been criticized on a number of grounds (Shuman, 2000). Some have argued that it is too conservative and may result in exclusion of testimony based on novel-yet-valid techniques and approaches; others say it is too liberal and allows for testimony based on techniques that have gained general acceptance despite being invalid. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), the United States Supreme Court ruled that the general-acceptance test developed in *Frye* "is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence" (p. 2799). The Court ruled that the trial judge should ensure that the opinion is based on an "inference or assertion . . . derived by the scientific method" and determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology can be applied to the facts in issue" (p. 2796).

The Court went on to identify four factors that judges could employ when considering specific testimony, including (a) the

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 23 of 30   Document 97

"testability" of the theoretical basis for the opinion; (b) the error rates associated with the approach, if known; (c) whether the technique or approach on which the opinion is based has been subjected to peer review; and (d) whether the technique or approach is generally accepted in the relevant scientific community.

The guidance provided by *Daubert* could be used to examine whether the expert opinions offered by mental health professionals in custody disputes are science based, but there is no evidence indicating that trial judges have actively done this. Those offering anecdotal accounts or personal impressions, however, are essentially unanimous in their impression that evidence offered by experts in custody cases is rarely objected to and even less frequently excluded (Shuman, 2002). Similarly, a review of appellate cases also suggests that the opinions of mental health experts are rarely excluded on the grounds that the basis for the expert opinions offered does not meet required scientific standards. Our view is that the low scientific standards for expert testimony again can be traced to the vague best-interests principle and the impossible dilemma it creates for judges. For this reason, and because individual trial judges rarely have the time or the expertise to evaluate the scientific status of psychological measures, we believe that it is incumbent upon the mental health professions to develop clear professional standards regarding expert testimony in child custody cases.

### Professional Standards and Guidelines

The American Psychological Association (APA; 1994), Association of Family and Conciliation Courts (AFCC; 1995), and American Academy of Child and Adolescent Psychiatry (AACAP; 1997) all have developed guidelines for professionals conducting custody evaluations. All of these guidelines recommend an assessment of childrens' needs, parents' abilities to meet these needs, and parents' abilities to provide for future needs. The APA and AACAP guidelines also identify a number of factors considered to be integral to child custody evaluations, including assessment of parenting abilities, assessment of capacity to provide a stable loving home, identification of inappropriate behavior that negatively influences the child (e.g., substance use/abuse), consideration of parental psychopathology as it affects parenting ability or the child directly, and consideration of the child's wishes.

Despite broad agreement about factors that should be assessed, there is little agreement about how to assess them. For example, the AFCC guidelines (which are currently undergoing revision) do not provide assessment guidelines, while APA and AACAP both generally advocate a multimethod approach combining clinical interviews, direct observation, and psychological tests. Guidelines promulgated by AACAP question the value of psychological testing, while suggesting that collateral information be obtained from school personnel, healthcare providers, childcare providers, family, friends, and other individuals who may provide information germane to child custody placement. The lack of consensus begs the question: What accounts for the variability in recommendations? We conclude that much of the variability is the result of a lack of requisite knowledge. There is not enough scientific evidence (and legal guidance) about how evaluations should be conducted and about what type of evaluation is most helpful. Accordingly, we urge professional organizations to develop very clear guidelines concerning acceptable, scientifically based practices and what inferences can appropriately be drawn from them. We have offered our review of the literature on these measures as a starting point to these discussions and negotiations.

We also urge professional organizations to adopt clear ethical standards for mental health professionals to follow in custody evaluations. For example, professional organizations have failed to take a clear stand on principles of practice that are widely embraced by those with extensive professional experience in the custody context. We suggest three such principles are worthy of becoming standards of practice: Evaluators should

- Show preference for evaluations conducted by mutually agreed-upon or court-appointed experts
- Promote settlement and other steps that will facilitate a degree of parental cooperation in childrearing and authoritative parent–child relationships—for example, by providing concrete, private feedback to the parties about the evaluator's opinion before submitting a final report
- Acknowledge that custody is ultimately a legal decision and thus avoid offering "expert opinion" on legal matters—such as who should enjoy primary legal or physical custody and under what conditions—despite considerable pressure to do so within the legal system

### CONCLUDING COMMENT: A QUESTION OF VALUES

A clear custody rule—whether the approximation rule, the primary-caretaker-parent standard, a presumption in favor of joint physical custody, or some other law—would necessarily take a stand on values concerning family life, values that often are contested in our changing, pluralistic society. Custody laws once did take a clear and strong stand favoring fathers as property holders, and later, mothers as nurturers. Today, there is no social consensus about the appropriate family roles for men and women, and we believe this is one reason why legislatures have failed to adopt a clearer and more determinant custody standard. The "children's best interests" standard seems to embrace a laudable value, the well-being of children; yet as we have seen, the standard actually encourages uncertainty and parental conflict that is contrary to children's interests.

No matter what the goals or actual effects of the best-interests standard, it is impossible to sidestep the values issue. Beaber (1982) provides some illustrative examples of key value questions raised by child custody disputes:

1. Should brothers and sisters be in the custody of the same parent?
2. Should an older child, over age 12, have veto power in a custody dispute between two parents?
3. Should boys be placed with fathers and daughters with mothers?
4. Should young children, under age five, be placed with mothers?
5. Should continuity of residence and school district control placement?
6. Should children be placed with the parent who does not work outside the home or who works the fewest hours and/or the most convenient hours?
7. Should children be placed in the home that does not have/will not have a stepparent? (p. 319)

Science cannot answer such value questions. Philosopher of science Carl Hempel (1965) has argued for the demarcation between factual issues that science in principle can settle and value issues that it cannot, and it is perhaps nowhere more important to make this distinction than in matters of child custody. Hempel makes this point using a thought experiment involving Laplace's demon—a hypothetical entity who knows all scientific laws and all initial conditions and who can perfectly and instantaneously make all relevant calculations needed to make an empirical decision:

> Let us assume, then that faced with a moral decision we are able to call upon the Laplacean demon as a consultant. What help might we get from him? Suppose that we have to choose one of several alternative courses of action to use, and that we want to know which of these we *ought* to follow. The demon would then be able to tell us, for any contemplated choice, what its consequences would be for the future course of the universe, down to the most minute detail, however remote in space and time. But having done this for each of the alternative courses of action under consideration, the demon would have completed his task: he would have given us all the information that an ideal science might provide under the circumstances. And yet he would not have resolved out moral problem, for this requires a decision as to which of the several alternative sets of consequences mapped out by the demon as attainable to us is the best; which of them we ought to bring about. And the burden of this decision would still fall upon our shoulders; it is we who would have to commit ourselves to an unconditional judgment of value by singling out one of the sets of consequences as superior to its alternatives. Even Laplace's demon, or the ideal science he stands for, cannot relieve us of this responsibility. (pp. 88–89)

In short, even if all of the relevant empirical relations regarding various child custody options were known, we would still be left with the value questions of what outcomes are the best. This conclusion gives us a final perspective on our three sets of recommendations. Our recommendation favoring alternative dispute resolution and parent self-determination not only recognizes the psychological importance of renegotiating family relationships for children but embraces the value that, except in cases of abuse or neglect, parents themselves should have the option of determining their children's best interests. Our call for the enactment of a custody standard such as the approximation rule that has the potential to produce more predictable outcomes urges a clear articulation of "family values" as embodied in the law. Finally, our recommendation that mental health professionals limit their role in providing expert testimony in custody cases places the value of science above all others in professional practice.

## REFERENCES

Ackerman, M.J., & Ackerman, M.C. (1997). Custody evaluation practice: A survey of experienced professionals (revisited). *Professional Psychology: Research and Practice, 28*, 137–145.

Ackerman, M., & Schoendorf, K. (1992). *ASPECT: Ackerman-Schoendorf Scales for Parent Evaluation of Custody.* Los Angeles, CA: Western Psychological Services.

Ahrons, C. (1998). *The good divorce.* New York: Quill.

Ahrons, C.R., & Miller, R.B. (1993). The effect of postdivorce relationships on parent involvement: A longitudinal analysis. *American Journal of Orthopsychiatry, 63*, 441–450.

Ahrons, C.R., & Tanner, J.L. (2003). Adult children and their fathers: Relationship changes 20 years after parental divorce. *Family Relations: Interdisciplinary Journal of Applied Family Studies, 52*, 340–351.

Amato, P.R. (2001). Children of divorce in the 1990s: An update of the Amato and Keith (1991) meta-analysis. *Journal of Family Psychology, 15*, 355–370.

Amato, P.R., & Booth, A. (1997). *A generation at risk.* Cambridge, MA: Harvard.

Amato, P.R., & Gilbreth, J. (1999). Nonresident fathers and children's well-being: A meta-analysis. *Journal of Marriage and the Family, 61*, 557–573.

Amato, P.R., & Keith, B. (1991). Parental divorce and well-being of children: A meta-analysis. *Psychological Bulletin, 110*, 26–46.

Amato, P.R., Loomis, L.S., & Booth, A. (1995). Parental divorce, marital conflict, and offspring well-being during early adulthood. *Social Forces, 73*, 895–915.

Amato, P.R., & Rezac, S.J. (1994). Contact with nonresident parents, interparental conflict, and children's behavior. *Journal of Family Issues, 15*, 191–207.

American Academy of Child and Adolescent Psychiatry (1997). Practice parameters for child custody evaluation. *Journal of the American Academy of Child and Adolescent Psychiatry, 36*, 57S–68S.

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education (1999). *Standards for educational and psychological testing* (3rd ed.). Washington, DC: American Psychological Association.

American Law Institute (2002). *Principles of the law of family dissolution: Analysis and recommendations.* Bender: Newark, NJ.

American Psychological Association (1994). Guidelines for child custody evaluations in divorce proceedings. *American Psychologist, 49*, 677–680.

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 25 of 30   Document 97

Arditti, J.A. (1995). Ackerman-Schoendorf Scales for Parent Evaluation of Custody. In J.C. Conoley & J.C. Impara (Eds.), *The twelfth mental measurements yearbook* (pp. 20–22). Lincoln, NE: Buros Institute of Mental Measurements.

Association of Family and Conciliation Courts (1995). *Model standards for child custody evaluation*. Madison, WI: Author.

Bauserman, R. (2002). Child adjustment in joint-custody versus sole-custody arrangements: A meta-analytic review. *Journal of Family Psychology*, 16, 91–102.

Beaber, R.J. (1982). Custody quagmire: Some psychological dilemmas. *Journal of Psychiatry & Law*, 10, 309–326.

Beck, C.J.A., & Sales, B.D. (2001). *Family mediation: Facts, myths, and future prospects*. Washington, DC: American Psychological Association.

Bow, J.N., & Quinnell, F.A. (2001). Psychologists' current practices and procedures in child custody evaluations: Five years after American Psychological Association guidelines. *Professional Psychology: Research and Practice*, 32, 261–268.

Bow, J.N., & Quinnell, F.A. (2002). A critical review of child custody evaluation reports. *Family Court Review*, 40, 164–176.

Bramlett, M.D., & Mosher, W.D. (2001). *First marriage dissolution, divorce, and remarriage: United States* (Advance Data From Vital and Health Statistics No. 323). Hyattsville, MD: National Center for Health Statistics.

Bramlett, M.D., & Mosher, W.D. (2002). *Cohabitation, marriage, divorce, and remarriage in the United States* (Vital and Health Statistics, Series 23, No. 22). Hyattsville, MD: National Center for Health Statistics.

Bricklin, B. (1989). *Perception of Relationships Test*. Furlong, PA: Village Publishing.

Bricklin, B. (1990a). *Bricklin Perceptual Scales*. Furlong, PA: Village Publishing.

Bricklin, B. (1990b). *Parent Awareness of Skills Survey*. Furlong, PA: Village Publishing.

Bricklin, B. (1993). *Test Manuals Supplement #9*. Furlong, PA: Village Publishing.

Bricklin, B., & Elliott, G. (1991). *Parent Perception of Child Profile*. Furlong, PA: Village Publishing.

Brodzinsky, D. (1993). On the use and misuse of psychological testing in child custody evaluations. *Professional Psychology: Research and Practice*, 24, 213–219.

Brooks-Gunn, J., & Duncan, G.J. (1997). The effects of poverty on children. *The Future of Children*, 7, 55–71.

Buchanan, C.M., Maccoby, E.E., & Dornbusch, S.M. (1996). *Adolescents after divorce*. Cambridge, MA: Harvard.

Bumpass, L., (1984). Children and marital disruption: A replication and update. *Demography*, 21, 71–82.

Cabrera, N., Tamis-LeMonda, C.S., Bradley, R.H., Hofferth, S., Lamb, M.E. (2000). Fatherhood in the twenty-first century. *Child Development*, 71, 127–136.

Carlson, J.N. (1995). Perception of Relationships Test. In J.C. Conoley & J.C. Impara (Eds.), *The twelfth mental measurements yearbook* (pp. 746–747). Lincoln, NE: Buros Institute of Mental Measurements.

Chambers, D.L. (1984). Rethinking the substantive rules for custody disputes in divorce. *University of Michigan Law Review*, 83, 480–569.

Cherlin, A.J., Chase-Lansdale, P.L., & McRae, C. (1998). Effects of parental divorce on mental health throughout the life course. *American Sociological Review*, 63, 239–249.

Cherlin, A.J., Furstenberg, F.F., Jr., Chase-Lansdale, P.L., Kiernan, K.E., Robines, P.K., Ruane Morrison, D., Teitler, J.O. (1991).

Longitudinal studies of effects of divorce on children in Great Britain and the United States. *Science*, 252, 1386–1389.

Child Trends (2002). *Charting parenthood: A statistical portrait of fathers and mothers in America*. Washington, DC: Child Trends.

Clarke, S.C. (1995). *Advance report of final divorce statistics, 1989 and 1990*. (Monthly Vital Statistics Report, Vol. 43, No. 9, Supplement). Hyattsville, MD: National Center for Health Statistics.

Coates, C.A., Jones, W., Bushard, P., Deutsch, R., Hicks, B., Stahl, P., Sullivan, M., Sydlik, B., & Wistner, R. (2003). Parenting coordination: Implementation issues. *Family Court Review*, 41, 533–564.

Conger, J. (1995). Perception-of-Relationships Test. In J.C. Conoley & J.C. Impara (Eds.), *The twelfth mental measurements yearbook* (pp. 747–748). Lincoln, NE: Buros Institute of Mental Measurements.

Cummings, E.M., & Davies, P. (1994). *Children and marital conflict*. New York: Guilford.

Davies, P.T., Harold, G.T., Goeke-Morey, M.C., & Cummings, E.M. (2002). Child emotional security and interparental conflict. *Monographs of the Society for Research on Child Development*, 67, vii–viii.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

Deater-Deckard, K., Dodge, K.A., & Bates, J.E. (1996). Physical discipline among African American and European American mothers: Links to children's externalizing behaviors. *Developmental Psychology*, 32, 1065–1072.

Donnelly, D., & Finkelhor, D. (1993). Who has joint custody? Class differences in the determination of custody arrangements. *Family Relations*, 42, 57–60.

D'Onofrio, B., Turkheimer, E., Emery, R., Slutske, W., Heath, A., Madden, P., & Martin, N. (in press). A genetically informed study of marital instability and its association with offspring psychopathology. *Journal of Abnormal Psychology*.

Downey, D.B, Ainsworth-Darnell, J.W., & Dufur, M.J. (1998). Sex of parent and children's well-being in single-parent households. *Journal of Marriage and the Family*, 60, 878–893.

Downey, D.B., & Powell, B. (1993). Do children in single-parent households fare better living with same-sex parents? *Journal of Marriage and the Family*, 55, 55–71.

Duncan, G.J., & Hoffman, S.D. (1985). Economic consequences of marital instability. In M. David & T. Smeeding (Eds.), *Horizontal equity, uncertainty and well-being* (pp. 427–469). Chicago: University of Chicago Press.

Dunn, J. (2004). Annotation: Children's relationships with their nonresident fathers. *Journal of Child Psychology and Psychiatry*, 45, 659–671.

Ehrenberg, M.F., Hunter, M.A., & Elterman, M.F. (1996). Shared parenting agreements after marital separation: The roles of empathy and narcissism. *Journal of Consulting and Clinical Psychology*, 64, 808–818.

Elrod, L.D., & Spector, R.G. (2004). A review of the year in family law: Children's issues remain the focus. *Family Law Quarterly*, 37, 527–575.

Emery, R.E. (1982). Interparental conflict and the children of discord and divorce. *Psychological Bulletin*, 92, 310–330.

Emery, R.E. (1994). *Renegotiating family relationships: Divorce, child custody, and mediation*. New York: Guilford.

Emery, R.E. (1999a). Changing the rules for determining child custody in divorce cases. *Clinical Psychology: Science and Practice*, 6, 323–327.

Emery, R.E. (1999b). *Marriage, divorce, and children's adjustment* (2nd ed.). Thousand Oaks, CA: Sage.

Emery, R.E. (2003). Childen's voices: Listening—and deciding—is an adult responsibility. *Arizona Law Review, 45*, 621–627.

Emery, R.E. (2004). *The truth about children and divorce: Dealing with the emotions so you and your children can thrive*. New York: Viking.

Emery, R.E. (2005). Parental alienation syndrome: Proponents bear the burden of proof. *Family Court Review, 43*, 8–13.

Emery, R.E., & Forehand, R. (1994). Parental divorce and children's well-being: A focus on resilience. In R.J. Haggerty, L. Sherrod, N. Garmezy, & M. Rutter (Eds.), *Risk and Resilience in Children* (pp. 64–99). London: Cambridge University Press.

Emery, R.E., Laumann-Billings, L., Waldron, M., Sbarra, D.A., and Dillon, P. (2001). Child custody mediation and litigation: Custody, contact, and co-parenting 12 years after initial dispute resolution. *Journal of Consulting and Clinical Psychology, 69*, 323–332.

Emery, R.E., Matthews, S.G., & Kitzmann, K.M. (1994). Child custody mediation and litigation: Parents' satisfaction and functioning a year after settlement. *Journal of Consulting and Clinical Psychology, 62*, 124–129.

Emery, R.E., Matthews, S., & Wyer, M.M. (1991). Child custody mediation and litigation: Further evidence of the differing views of mothers and fathers. *Journal of Consulting and Clinical Psychology, 59*, 410–418.

Emery, R.E., Sbarra, D., & Grover, T. (2005). Divorce mediation: Research and reflections. *Family Court Review, 43*, 22–37.

Emery, R.E., Waldron, M., & Kitzmann, K. (1999). Delinquent behavior, future divorce or nonmarital childbearing, and externalizing behavior among offspring: A 14-year prospective study. *Journal of Family Psychology, 13*, 568–579.

Emery, R.E., Weintraub, S., & Neale, J.M. (1982). Effects of marital discord on the school behavior of children with schizophrenic, affectively disordered, and normal parents. *Journal of Abnormal Child Psychology, 10*, 215–228.

Emery, R.E., & Wyer, M.M. (1987a). Child custody mediation and litigation: An experimental evaluation of the experience of parents. *Journal of Consulting and Clinical Psychology, 55*, 179–186.

Emery, R.E., & Wyer, M.M. (1987b). Divorce mediation. *American Psychologist, 42*, 472–480.

Ewing, C.P. (2003). Expert testimony: Law and practice. In A. Goldstein (Ed.), *Forensic Psychology* (pp. 55–66). New York: Wiley.

*Ex Parte* Devine, 398 So.2d 686 (Ala.1981).

Fauber, R.L., Forehand, R., Thomas, A.M., & Wierson, M. (1990). A mediational model of the impact of marital conflict on adolescent adjustment in intact and divorced families: The role of disrupted parenting. *Child Development, 61*, 1112–1123.

Feller, J.N., Davidson, H.A., Hardin, M., & Horowitz, R.M. (1992). *Working with the courts in child protection*. Washington, DC: U.S. Department of Health and Human Services.

Fields, J. (2003). *Children's living arrangements and characteristics: March 2002*. (Current Population Reports, P20–547). Washington, DC: U.S. Census Bureau.

Folberg, J. (1991). *Joint custody and shared parenting*. New York: Guilford.

Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

Furstenberg, F.F., Peterson, J.L., Nord, C.W., & Zill, N., (1983). The life course of children of divorce: Marital disruption and parental contact. *American Sociological Review, 48*, 656–668.

Gardner, R.A. (2001). Should courts order PAS children to visit/reside with the alienated parent? A follow-up study. *American Journal of Forensic Psychology, 19*, 61–106.

Gardner, R.A. (2004). Commentary on Kelly and Johnston's "The Alienated Child: A Reformulation of Parental Alienation Syndrome." *Family Court Review, 42*, 611–621.

Garrison, M. (1996). How do judges decide divorce cases? An empirical analysis of discretionary decision making. *North Carolina Law Review, 74*, 401–552.

Gordon, R., & Peek, L.A. (1989). *The Custody Quotient: Research manual*. Dallas, TX: Wilmington Institute.

Gottesman, I.I. (1991). *Schizophrenia genesis: The origins of madness*. New York: Freeman.

Gourley, E.V., & Stolberg, A.L. (2000). An empirical investigation of psychologists' custody evaluation practices. *Journal of Divorce and Remarriage, 33*, 1–29.

Greenberg, S., Otto, R.K., & Long, A. (2003). The utility of psychological testing in personal injury evaluation. *Assessment, 10*, 410–419.

Grisso, T. (2003). *Evaluating competencies: Forensic assessments and instruments* (2nd ed). New York: Kluwer/Plenum.

Grych, J.H., & Fincham, F.D. (1990). Marital conflict and children's adjustment: A cognitive-contextual framework. *Psychological Bulletin, 108*, 267–290.

Hall, A.S., Pulver, C.A., & Cooley, M.J. (1996). Psychology of the best interests standard: Fifty state statutes and their theoretical antecedents. *American Journal of Family Therapy, 24*, 171–180.

Heilbrun, K., Rogers, R., & Otto, R.K. (2002). Forensic assessment: Current status and future directions. In J.R.P. Ogloff (Ed.), *Taking psychology and law into the twenty-first century* (pp. 119–146). New York: Kluwer/Plenum.

Heinze, M., & Grisso, T. (1996). Review of instruments assessing parenting competencies used in child custody evaluations. *Behavioral Sciences and the Law, 14*, 293–313.

Hempel, C. (1965). *Aspects of scientific explanation and other essays in the philosophy of science*. New York: Collier-MacMillan Limited.

Herman, S.P., Duanne, J.E., Ayres, W., Arnold, V., Benedek, E., Benson, R.S., Bernet, W., Bernstein, G.A., Bryant, E., Licamele, W., McClellan, J., & Shaw, K. (1997). Practice parameters for child custody evaluation. *Journal of the American Academy of Child & Adolescent Psychiatry, 36*, 57S–68S.

Hetherington, E.M., & Clingempeel, W.G. (1992). Coping with marital transitions: A family systems perspective. *Monographs of the Society for Research in Child Development, 57*(2–3), 1–242.

Hetherington, E.M., Cox, M., & Cox, R. (1982). Effects of divorce on parents and children. In M. Lamb (Ed.), *Nontraditional families* (pp. 233–288). Hillsdale, N.J.: Erlbaum.

Hetherington, E.M., & Kelly, J. (2002). *For better or for worse: Divorce reconsidered*. New York: W.W. Norton.

Jenuwine, M.J., & Cohler, B.J. (1999). Major parental psychopathology and child custody. In R.M. Galatzer-Levy & L. Kraus (Eds.), *The scientific basis of child custody decisions* (pp. 285–318). New York: Wiley.

Johnston, J.R. (1994). High conflict divorces. *The Future of Children, 4*, 165–182.

Johnston, J.R., & Kelly, J.B. (2004). Rejoinder to Gardner's "Commentary on Kelly and Johnston's 'The Alienated Child: A Reformulation of Parental Alienation Syndrome.'" *Family Court Review, 42*, 622–628.

Johnston, J.R., Kline, M., & Tschann, J. (1989). Ongoing postdivorce conflict in families contesting custody: Effects on children of joint custody and frequent access. *American Journal of Orthopsychiatry, 59*, 576–592.

Johnston, J.R., & Roseby, V. (1997). *In the name of the child*. New York: Free Press.

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 27 of 30   Document 97

Keilin, W.G., & Bloom, L.J. (1986). Custody evaluation practice: A survey of experienced professionals. *Professional Psychology: Research and Practice*, *17*, 338–346.

Kelly, J. (1998). Marital conflict, divorce, and children's adjustment. *Child and Adolescent Psychiatric Clinics of North America*, *7*, 259–271.

Kelly, J.B., & Emery, R.E. (2003). Children's adjustment following divorce: Risk and resilience perspectives. *Family Relations: Interdisciplinary Journal of Applied Family Studies*, *52*, 352–362.

Kelly, J.B. & Johnston, J.R. (2001). The alienated child: A reformulation of Parental Alienation Syndrome. *Family Court Review*, *39*, 249–266.

Kelly, J., & Lamb, M.E. (2000). Using child development research to make appropriate custody and access decisions for young children. *Family and Conciliation Courts Review*, *38*, 297–311.

King, V. (1994). Nonresident father involvement and child well-being: Can dads make a difference? *Journal of Family Issues*, *15*, 78–96.

Lamb, M.E. (1999). Noncustodial fathers and their impact on the children of divorce. In R.A. Thompson & P.R. Amato (Eds.), *The postdivorce family: Children, parenting, and society* (pp. 105–125). Thousand Oaks, CA: Sage.

Lamb, M.E., Sternberg, K.J., & Thompson, R.A. (1997). The effects of divorce and custody arrangements on children's behavior, development, and adjustment. *Family and Conciliation Courts Review*, *35*, 393–404.

Lamborn, S., Mounts, N., Steinberg, L., & Dornbusch, S.M. (1991). Patterns of competence and adjustment among adolescents from authoritative, authoritarian, indulgent, and neglectful homes. *Child Development*, *62*, 1049–1065.

Laumann-Billings, L., & Emery, R.E. (2000). Distress among young adults from divorced families. *Journal of Family Psychology*, *14*, 671–687.

Lewis, C., & Lamb, M.E. (2003). Fathers' influences on children's development: The evidence from two-parent families. *European Journal of Psychology of Education*, *18*, 211–228.

Lyman, R.D., & Roberts, M.C., (1985). Mental health testimony in child custody litigation. *Law & Psychology Review*, *9*, 15–34.

Maccoby, E.E., & Martin, J.A. (1983). Socialization in the context of the family: Parent–child interaction. In E.M. Hetherington (Vol. Ed.), *Handbook of child psychology: Vol. 4. Socialization, Personality, and Social Development* (4th. ed, pp. 1–102). New York: Wiley.

Maccoby, E.E., & Mnookin, R.H. (1992). *Dividing the child: Social and legal dilemmas of custody*. Cambridge, MA: Harvard University Press.

MacKinnon, C.E., Brody, G.H., & Stoneman, Z. (1982). The effects of divorce and maternal employment on the home environments of preschool children. *Child Development*, *53*, 1392–1399.

Mason, M.A. (1994). *From father's property rights to children's rights: The history of child custody in the United States*. New York: Columbia University Press.

Martin, J.A., Hamilton, B.E., Sutton, P.D., Ventura, S.J., Menacker, F., & Munson, M.L. (2003). *Births: Final data for 2002*. (National Vital Statistics Reports, Vol. 52., No. 10). Hyattsville, MD: National Center for Health Statistics.

Martinez, C.R., & Forgatch, M.S. (2001). Preventing problems with boys' noncompliance: Effects of a parent training intervention for divorcing mothers. *Journal of Consulting & Clinical Psychology*, *69*, 416–428.

Martinez, C.R., & Forgatch, M.S. (2002). Adjusting to change: Linking family structure transitions with parenting and boys' adjustment. *Journal of Family Psychology*, *16*, 107–117.

McGue, M., & Lykken, D.T. (1992). Genetic influence on risk of divorce. *Psychological Science*, *6*, 368–373.

McIntosh, J., Long, C., & Moloney, L. (2004). Child-focused and child-inclusive mediation: A comparative study of outcomes. *Journal of Family Studies*, *10*, 87–95.

McLanahan, S.S. (1997). Parent absence or poverty: Which matters more? In G.J. Duncan & J. Brooks-Gunn (Eds.), *Consequences of growing up poor* (pp. 35–48). New York: Russell Sage.

McLanahan, S.S., & Bumpass, L.L. (1988). Intergenerational consequences of family disruption. *American Journal of Sociology*, *94*, 130–152.

McLanahan, S., & Sandefur, G. (1994). *Growing up with a single parent: What hurts, what helps*. Cambridge, MA: Harvard University Press.

Melli, M.S., Brown, P.R., & Cancian, M. (1997). Child custody in a changing world: A study of postdivorce arrangements in Wisconsin. *University of Illinois Law Review*, *3*, 773–800.

Melton, G.B. (1995). Ackerman-Schoendorf Scales for Parent Evaluation of Custody. In J.C. Conoley & J.C. Impara (Eds.), *The twelfth mental measurements yearbook* (pp. 22–23). Lincoln, NE: Buros Institute of Mental Measurements.

Melton, G.B., Petrila, J., Poythress, N., & Slobogin, C. (1997). *Psychological evaluations of the courts: A handbook for mental health professionals and lawyers* (2nd ed.). New York: Guilford.

Meyer, G. (1997). Thinking clearly about reliability: More critical corrections regarding the Rorschach Comprehensive System. *Psychological Assessment*, *9*, 495–498.

Meyer, G. (2001). Introduction to the final special section in the special series on the utility of the Rorschach for clinical assessment. *Psychological Assessment*, *13*, 419–422.

Meyer, D.R., & Garasky, S. (1993). Custodial fathers: Myths, realities, and child support policy. *Journal of Marriage and the Family*, *55*, 73–89.

Mnookin, R. (1975). Child custody adjudication: Judicial functions in the face of indeterminacy. *Law and Contemporary Problems*, *39*, 226–293.

National Institute for Child Support Enforcement (1986). *History and fundamentals of child support enforcement* (2nd ed.). Washington, DC: U.S. Government Printing Office.

Novak, G. (1996). *Developmental psychology: Dynamic systems and behavior analysis*. Reno, NV: Context Press.

O'Connor, T.G., Caspi, A., DeFries, J.C., Plomin, R. (2000). Are associations between parental divorce and children's adjustment genetically mediated? An adoption study. *Developmental Psychology*, *36*, 429–437.

Ostrom, B.J., & Kauder, N.B. (1996). *Examining the work of state courts, 1995: A national perspective from the court statistics project*. Williamsburg, VA: National Center for State Courts.

Otto, R.K., Buffington-Vollum, J., & Edens, J.F. (2003). Child custody evaluation: Research and practice. In A. Goldstein (Ed.), *Forensic psychology* (pp. 179–208). New York: Wiley.

Otto, R.K., & Edens, J.F. (2003). Parenting capacity. In T. Grisso (Ed.), *Evaluating competencies: Forensic assessments and instruments* (pp. 229–308). New York: Kluwer/Plenum.

Otto, R.K., Edens, J.F., & Barcus, E. (2000). The use of psychological testing in child custody evaluations. *Family and Conciliation Courts Review*, *38*, 312–340.

Peris, T., & Emery, R. (in press). A prospective study of the consequences of marital disruption for adolescents: Pre-disruption family dynamics and post-disruption adolescent adjustment. *Journal of Clinical Child and Adolescent Psychology*.

Posthuma, A. (2003). A new MMPI-2 scale for custody disputes. *American Journal of Forensic Psychology, 21*, 51–64.

Pruett, M.K., Williams, T.Y., Insabella, G., & Little, T.D. (2003). Family and legal indicators of child adjustment to divorce among families with young children. *Journal of Family Psychology, 17*, 169–180.

Pryor, J. & Rodgers, B. (2001). *Children in changing families: Life after parental separation*. Boston, MA: Blackwell Publishers.

Santrock, J.W., & Warshak, R.A. (1979). Father custody and social development in boys and girls. *Journal of Social Issues, 35*, 112–135.

Schepard, A.I. (2004). *Children, courts, and custody: Interdisciplinary models for divorcing families*. New York: Cambridge University Press.

Schmidtgall, K., King, A., Zarski, J.J., & Cooper, J.E. (2000). The effects of parent conflict on later child development. *Journal of Divorce and Remarriage, 33*, 149–157.

Schwartz, L.L. (2003). A nightmare for King Solomon: The new reproductive technologies. *Journal of Family Psychology, 17*, 229–237.

Scott, E. (1992). Pluralism, paternal preferences, and child custody. *California Law Review, 80*, 615–672.

Seltzer, J.A. (1991). Relationship between fathers and children who live apart: The father's role after separation. *Journal of Marriage and the Family, 53*, 79–101.

Shaffer, M.B. (1992). Bricklin Perceptual Scales. In J.C. Conoley & J.C. Impara (Eds.), *The twelfth mental measurements yearbook* (pp. 118–119). Lincoln, NE: Buros Institute of Mental Measurements.

Shuman, D.W. (2000). *Psychiatric and psychological evidence*. Minneapolis: West Group.

Shuman, D.W. (2002). The role of mental health experts in custody decisions: Science, psychological tests, and clinical judgment. *Family Law Quarterly, 36*, 135–162.

Shuman, D.W., & Sales, B. (1998). The impact of Daubert and its progeny on the admissibility of behavioral and social science evidence. *Psychology, Public Policy, and Law, 5*, 3–15.

Sigle-Rushton, W., & McLanahan, S. (2002). The living arrangements of new unmarried mothers. *Demography, 39*, 415–433.

Solomon, J., & George, C. (1999). The effects on attachment of overnight visitation in divorced and separated families. In J. Solomon & C. George (Eds.), *Attachment disorganization* (pp. 243–264). New York: Guilford.

Spokane County Bar Association (1996). *Child-centered residential schedules*. Spokane, WA: Author.

Steinberg, L. (2001). We know some things: Parent-adolescent relationships in retrospect and prospect. *Journal of Research on Adolescence, 11*, 1–19.

Tesler, P.H. (2001). *Collaborative law: Achieving effective resolution in divorce without litigation*. Chicago, IL: American Bar Association.

Thomson, E., Hanson, H.L., & McLanahan, S.S. (1994). Family structure and child well-being: Economic resources vs. parental behaviors. *Social Forces, 73*, 221–242.

Uniform Marriage and Divorce Act, 9A Uniform Laws Annotated, Sec. 316 (1979).

U.S. Bureau of the Census (1992). *Marriage, divorce, and remarriage in the 1990's*. (Current Population Reports, P23–180). Washington, DC: U.S. Government Printing Office.

Wald, M. (1976). State intervention on behalf of "neglected" children: A search for realistic standards. In M. Rosenheim (Ed.), *Pursuing justice for the child* (pp. 246–278). Chicago: University of Chicago Press.

Walden, B., McGue, M., Iacono, W.G., Burt, S.A., & Elkins, I. (2004). Identifying shared environmental contributions to early substance use: The respective roles of peers and parents. *Journal of Abnormal Psychology, 113*, 440–450.

Wallerstein, J.S. (2003). Children of divorce: A society in search of policy. In M.A. Mason, A. Skolnick, & S.D. Sugarman (Eds.), *All our families: New policies for a new century* (2nd ed., pp. 66–95). New York: Oxford University Press.

Wallerstein, J.S., Lewis, J., & Blakeslee, S. (2000). *Unexpected legacy of divorce: The 25 year landmark study*. New York: Hyperion Press.

Weiner, I. (1996). Some observations on the validity of the Rorschach Inkblot Method. *Psychological Assessment, 8*, 206–213.

Wellman, M. (1994). Ackerman-Schoendorf Scales for Parent Evaluation of Custody. In D. Keyser & R. Sweetland (Eds.), *Test critiques* (Vol. 10, pp. 13–19). Austin, TX: Pro-Ed.

Weithorn, L. (1987). *Psychology and child custody evaluations*. Lincoln, NE: University of Nebraska Press.

Wolchik, S.A., West, S.G., Sandler, I.N., Tein, J., Coatsworth, D., Lengua, L., Weiss, L., Anderson, E.R., Greene, S.M., & Griffin, W.A. (2000). An experimental evaluation of theory-based mother and mother-child programs for children of divorce. *Journal of Consulting and Clinical Psychology, 68*, 843–856.

Wood, J.M., Nezworski, M.T., Lilienfeld, S.O., & Garb, H.N. (2003). *What's wrong with the Rorschach?* San Francisco, CA: Jossey-Bass.

Wood, J.M., Nezworski, M.T., & Stejskal, W.J. (1997). The reliability of the Comprehensive System for the Rorschach: A comment on Meyer (1997). *Psychological Assessment, 9*, 490–494.

Wyer, M., Gaylord, S., & Grove, E. (1987). The legal context of child custody evaluations. In L. Weithorn (Ed.), *Psychology and child custody determinations* (pp. 4–22). Lincoln, NE: University of Nebraska Press.

Zill, N.D. (1988). Behavior, achievement, and health problems among children in stepfamilies: Findings from a national survey of child health. In E.M. Hetherington & J.D. Arasteh (Eds.), *Impact of divorce, single parenting, and stepparenting on children* (pp. 325–368). Hillsdale, NJ: Erlbaum.

Zill, N., Morrison, D.R., & Coiro, M.J. (1993). Long-term effects of parental divorce on parent-child relationships, adjustment, and achievement in young adulthood. *Journal of Family Psychology, 7*, 91–103.

Case 1:20-cv-01028-WCG   Filed 10/08/20   Page 29 of 30   Document 97

Copyright of Psychological Science in the Public Interest is the property of Blackwell Publishing Limited. The copyright in an individual article may be maintained by the author in certain cases. Content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.