UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL LUKE SCHWARTZ,

        Petitioner,

    v.                                    Case No. 20-C-1028

SHARON ROSE HINNENDAEL,

        Respondent.

## DECISION AND ORDER

This case arises under the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 et seq., which implements the Hague Convention on Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980). The Act entitles a person whose child has been removed from his custody in another country and taken to the United States to petition in federal or state court for the return of the child. 42 U.S.C. § 11603(a), (b). The petitioner in this case, Daniel L. Schwartz, is the father, and the respondent, Sharon Hinnendael, his wife, is the mother of the children that are the subject of the petition. The children are H.H.S., who was born in June 2018, and A.J.S., who was born in March 2020. Ms. Hinnendael removed the children from where the family was living in Mexico and took them to Wisconsin on or about June 16, 2020. Mr. Schwartz commenced this action for the return of the children under the Hague Convention on July 8, 2020. For the reasons that follow, the petition will be denied.

## ICARA AND THE HAGUE CONVENTION

Under the ICARA, a petitioner seeking return of a child must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e)(1). Article 3 of the Convention states:

> The removal or retention of a child is to be considered wrongful where -
>
> (a) it is a breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, Art. 3, T.I.A.S. No. 11,670, at 9. In other words, the Act "entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of 'habitual residence,' unless certain exceptions apply." *Norinder v. Fuentes*, 657 F.3d 526, 529 (7th Cir. 2011) (citing *Abbott v. Abbott*, 560 U.S. 1 (2010)). "Prime among [those exceptions], a child's return is not in order if the return would place her at a 'grave risk' of harm or otherwise in 'an intolerable situation.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting Art. 13(b)).

The removal or retention of a child is wrongful under the Convention if the child was habitually resident in the other country immediately prior to the removal or retention. As the Seventh Circuit has recognized, "[t]he Convention does not define the term "habitual residence." *Koch v. Koch*, 450 F.3d 703, 712 (7th Cir. 2006). The Supreme Court's recent decision in *Monasky v. Taglieri*, 140 S. Ct. 719 (2020), provides helpful guidance on the issue. There the court held "that a child's habitual residence depends on the totality of the circumstances specific to the case." *Id.* at 723. "Because locating a child's home is a fact-driven inquiry," the Court instructed that "courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Id.* at 727 (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)).

In this case, there is no dispute that both children were born in Mexico and were living there with their parents at the time Ms. Hinnendael removed them to Wisconsin. But neither child

2

was of an age where they were capable of creating the kinds of ties that are necessary to establish a habitual residence. H.H.S. was not yet two years old, and A.J.S. was just three months old at the time of their removal.

"For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Id.* The kinds of factors courts have considered in determining the habitual residence of older children include:

> "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings."

*Id.* 727 n.3 (citing FEDERAL JUDICIAL CENTER, J. GARBOLINO, THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES 67–68 (2d ed. 2015)). But "[b]ecause children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers," the *Monasky* Court noted that "the intentions and circumstances of caregiving parents are relevant considerations." *Id.* at 727. Importantly, with respect to children, the Court explained that "an infant's 'mere physical presence' . . . is not a dispositive indicator of an infant's habitual residence." *Id.* at 729. "No single fact, however, is dispositive across all cases." *Id.* at 727. With these principles in mind, I now turn to the facts of the case.

## BACKGROUND

Both Mr. Schwartz and Ms. Hinnendael are United States citizens, and except for the five-year period prior to Ms. Hinnendael's return with the children, both had lived their entire lives in the United States. Mr. Schwartz was born in 1987 in Pasadena, California, grew up in Pasadena, and attended and graduated from Denison University in Ohio. Ms. Hinnendael was born in 1986

3

in Appleton, Wisconsin, and grew up in Green Bay. Mr. Schwartz's parents currently live in Pasadena, and Ms. Hinnendael's parents live in Sister Bay, Wisconsin.

The parties met in California where Ms. Hinnendael was pursuing a modeling and acting career. They were married in Glendale, California on April 19, 2014. Ms. Hinnendael filed for divorce only eight months later on November 25, 2014, and returned to Wisconsin. Ms. Hinnendael moved to Mexico in 2015 on a work visa and took a job selling time shares for a U.S. company called Vida Vacations. Although Ms. Hinnendael testified that she moved to Mexico to get away from L.A. and Mr. Schwartz, he followed shortly thereafter and the two reconciled. The divorce action was dismissed due to inactivity. Ms. Hinnendael worked for Vida Vacations only a few months, but Mr. Schwartz obtained a job at the same company and has continued his employment there to this day.

After she left her employment at Vida Vacations, Ms. Hinnendael's work visa was revoked, and she remained in the country on a tourist visa. It was her understanding that, in order to retain her tourist visa, she was required to return to the United States every six months. Mr. Schwartz also entered Mexico on a work visa but became a permanent resident after his children were born. At that time, the couple lived in Puerto Vallarta.

As noted above, H.H.S. was born in June 2018. Because he was born in Mexico to American parents, he has dual citizenship. On June 8, 2018, Mr. Schwartz and Ms. Hinnendael submitted an application for H.H.S.'s United States passport, and a United States passport was issued to H.H.S. on August 24, 2018, confirming H.H.S. as a citizen of the United States of America. On August 15, 2018, Mr. Schwartz, Ms. Hinnendael, and H.H.S. moved to a rental property located at 100 Lomas Del Sol Bahia De Banderas, Nayarit, Mexico. On August 27, 2018, a Consular Report of Birth Abroad of a Citizen of the United States of America was issued for

4

H.H.S. listing both Mr. Schwartz and Ms. Hinnendael as his parents. From September 6, 2018, through January 3, 2020, H.H.S. traveled to the United States nine times to visit Mr. Schwartz and Ms. Hinnendael's families, all of whom resided in the United States.

A.J.S. was born in Mexico on March 10, 2020. On June 16, 2020, a United States passport was issued to A.J.S., confirming A.J.S. as a citizen of the United States of America. Ms. Hinnendael, H.H.S., and A.J.S. flew to the United States on June 17, 2020, and reside in Sister Bay, Wisconsin.

## ANALYSIS

### A. Habitual Residence

This case, unlike the vast majority of Hague Convention cases, involves parents who are both citizens of the United States. Even though Mr. Schwartz and Ms. Hinnendael shared an address in Mexico for five years and the children spent most of their young lives in Mexico, Mr. Schwartz has not established by a preponderance of the evidence that the children are habitual residents of Mexico. The record suggests that Mr. Schwartz and Ms. Hinnendael did not have a shared intent to abandon the United States for Mexico. Indeed, they frequently spoke of returning "home" to the States.

Throughout their time in Mexico, Mr. Schwartz was the only family member to secure residency status in Mexico, and the timing of his residency status is unknown. Ms. Hinnendael remained in Mexico on a tourist visa and did not take steps to secure residency status. Neither obtained Mexican passports for themselves, choosing instead to retain their United States passports. Their children likewise were issued United States passports. They retained their California driver's licenses, with Mr. Schwartz having his last reissued in September 2017, and Ms. Hinnendael's in July 2019. Mr. Schwartz and Ms. Hinnendael maintained a joint Bank of

5

America bank account in the United States, and Ms. Hinnendael continued to file United States Federal and State tax returns for tax years 2015 through 2018 while living in Mexico. She did not file for tax year 2019 because she did not earn enough income to do so.

With respect to the parties' development of a social life, although Mr. Schwartz had American work friends, Ms. Hinnendael did not have a similar social outlet. She was not fluent in Spanish and mainly focused on staying home and taking care of the children. The parties and the children also made frequent return trips to the United States to visit family during their time in Mexico. H.H.S. traveled with Ms. Hinnendael and Mr. Schwartz extensively to the United States in the first 18 months of his life. In particular, from September 6, 2018, through January 3, 2020, H.H.S. was taken to the United States nine times to visit family. Both sets of grandparents lived in the United States, as well as various aunts and uncles. Given their ages, neither H.H.S. nor A.J.S. had any similar relationships with Mexican nationals. Mr. Schwartz and Ms. Hinnendael never purchased a home or owned real estate in Mexico, and the lease for the place they rented ended on August 15, 2020. In addition, the parties did not have assets or property in Mexico.

In sum, Mr. Schwartz and Ms. Hinnendael appear to have lived as visitors, rather than individuals seeking to become citizens of Mexico. They did not immerse themselves in the culture and establish roots in a new country. Their only tie to Mexico, other than their appreciation of the vacation atmosphere in which they lived, was Mr. Schwartz's job. He sold Mexican resort time shares primarily to wealthy American tourists. Except for their bond to their parents, the children's closest ties are to their grandparents, aunts, and uncles, all of whom live in this country. For these reasons, the court concludes that Mr. Schwartz has failed to meet his burden of establishing by a preponderance of the evidence that his children were habitual residents of Mexico.

### B. Grave Risk Exception

Although the finding that the children were not habitual residents of Mexico is dispositive of the petition, to complete the record the court will also address Ms. Hinnendael's assertion that the "grave risk" exception to the duty to return them applies. Respondent's argument is not without merit. "Article 13(b) of the Convention and 42 U.S.C. § 11603(e)(2)(A) provide that when a respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation, the automatic return required by the Convention should not go forward." *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011). "The respondent must present clear and convincing evidence of this grave harm because any more lenient standard would create a situation where the exception would swallow the rule." *Id.* at 535 (citing *Simcox v. Simcox*, 511 F.3d 594, 605 (6th Cir. 2007)).

The record reflects that the parties had a stormy relationship with significant peaks and valleys. But it also contains significant evidence of Mr. Schwartz's abusive conduct toward Ms. Hinnendael. Ms. Hinnendael presented extensive evidence, including video recordings, of Mr. Schwartz's habitual abuse of drugs, cocaine in particular, even in the presence of and while caring for H.H.S. She also testified that she had been repeatedly abused sexually and psychologically by Mr. Schwartz throughout the marriage, and that on several occasions he had threatened to physically harm her.

To be sure, the record also reflects Ms. Hinnendael was a user of marijuana and may have abused alcohol. But by his own admission, Mr. Schwartz's drug abuse was severe, and he finally enrolled in treatment shortly before his wife left with the children. Although he has presented

7

evidence of drug testing with negative results more recently, the relatively brief period since he last tested positive is not sufficient to provide confidence that his problem is behind him.

Also troubling is the evidence of Mr. Schwartz's behavior during the daily Facetime visits with his children throughout the pendency of the case. Despite his realization that his behavior was being recorded, Mr. Schwartz continued to discuss the case in front of his children, accused their mother of punishing him and asserting a "Charles Manson narrative," threatened to sue and bankrupt their grandfather, and made other inappropriate comments. Dr. Jaffe testified that such behavior would likely cause serious psychological damage to children and also indicated in Mr. Schwartz a lack of self-control or willingness to control his emotions.

The Seventh Circuit has noted that "while the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence." *Khan v. Fatima*, 680 F.3d 781, 784 (7th Cir. 2012) (quoting Merle H. Weiner, *Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 COLUM. HUMAN RTS. L. REV. 275, 278–79 (2002)). In *Khan*, the court held that evidence that the husband in that case had a violent and ungovernable temper, had physically abused his wife in front of the three-year-old child, and had been rough on occasion with the child was sufficient to invoke the exception. *Id.* at 785. It is not enough, the court noted, to say that the laws of the country from which the mother fled are able to protect the child: "The Convention says nothing about the adequacy of the laws of the country to which the return of the child is sought—and for good reason, for even perfectly adequate laws do not ensure a child's safety. Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected." *Id.* at 788.

Yet, other than the testimony of Ms. Hinnendael regarding his threats to her, there is no evidence of any history of physical violence on the part of Mr. Schwartz. Throughout the marriage he has maintained steady employment and supported his family. There is no evidence to suggest that Mr. Schwartz would ever deliberately harm either of his children. From all appearances, he sincerely loves them and wants them to be happy. The kinds of behavior exhibited during the Facetime visits, if continued over time, could cause significant psychological harm to children, but given their ages at this time, the risk of such damage would not seem either grave or immediate.

Even though Mr. Schwartz might not present a grave risk of direct harm to his young children, however, it is likely they would suffer at least psychological harm should they be separated from their mother. While Mr. Schwartz has performed the role of breadwinner, Ms. Hinnendael has been by all accounts the primary caretaker of both children for their entire young lives. Sending them back to Mexico and separating them from their mother would likely be emotionally traumatic, given their young ages. Mr. Schwartz seems to recognize this fact, as well. In the petition for divorce he filed in Mexico after Ms. Hinnendael arrived in Wisconsin, he requested shared custody in which the children would live with their mother during the week and with him on weekends. Dkt. No. 18-1 at 8. Of course, this assumes that Ms. Hinnendael would return with the children to Mexico which, under the circumstances, seems to be Mr. Schwartz's hope. Given her expressed fear of Mr. Schwartz, however, it is not clear she would do so or should be expected to do so.

Based on the foregoing, the court finds that the grave risk exception applies. Returning the children to Mexico and separating them from their mother would expose them to a grave risk of psychological harm or otherwise place them in an intolerable situation. For this reason, as well, the petition is denied.

## CONCLUSION

In sum, the court finds that Mr. Schwartz has failed to meet his burden of establishing by a preponderance of the evidence that his children were habitual residents of Mexico. In addition, the court finds by clear and convincing evidence that returning the children would subject them to a grave risk of psychological harm or otherwise place them in an intolerable situation. Accordingly, the retention of the children in the United States was not wrongful within the meaning of the Convention. The petition is therefore denied, and this action is dismissed.

**SO ORDERED** at Green Bay, Wisconsin this 16th day of October, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge